1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| WARSAW ORTHOPEDIC, INC., | CASE NO. 3:08-CV-01512-MMA (MDD) |
| Plaintiff, | |
| vs. | **PRETRIAL ORDER** |
| NUVASIVE, INC., | |
| Defendant. | |
| | Trial:        August 30, 2011 |
| NUVASIVE, INC., | |
| Counterclaimant, | Honorable Michael M. Anello |
| vs. | |
| MEDTRONIC SOFAMOR DANEK USA, INC.; WARSAW ORTHOPEDIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO., and MEDTRONIC SOFAMOR DANEK DEGGENDORF, GmbH, | |
| Counterclaim Defendant. | |
| AND RELATED COUNTERCLAIMS | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Following pretrial proceedings pursuant to Fed. R. Civ. P. 16 and Civil Local Rule 16.1.f.6.

**IT IS ORDERED**:[1]

## I.     NATURE OF ACTION

1.     This is an action for patent infringement.  In this phase of the litigation ("Phase I"), Plaintiff Warsaw Orthopedic, Inc. ("Warsaw") alleges that Defendant and Counterclaim Plaintiff NuVasive, Inc. ("NuVasive") infringes U.S. Patent Nos. 5,860,973 (the "'973 patent"), 6,592,586 (the "'586 patent"), and 6,945,933 (the "'933 patent").  NuVasive alleges that Counterclaim Defendant Medtronic Sofamor Danek USA, Inc. ("Medtronic USA") infringes U.S. Patent No. 7,470,236 (the "'236 patent").[2]

2.     NuVasive raises certain affirmative defenses to Warsaw's claims and seeks declaratory judgments that Warsaw's asserted patents are not infringed and/or are invalid. Medtronic USA raises certain affirmative defenses to NuVasive's claims and seeks a declaratory judgment that NuVasive's '236 patent is not infringed and/or is invalid.

The issues to be tried in Phase I are raised in the following pleadings:

- Plaintiffs' First Amended Complaint For Patent Infringement (Dkt. 11)

- Defendant NuVasive, Inc.'s First Amended Answer to Plaintiffs First Amended Complaint for Patent Infringement and Third Amended Counterclaims (Dkt. 81)

- Plaintiffs' Answer to Defendant and Counterclaimant NuVasive, Inc.'s Third Amended Counterclaims, and Counterclaims (Dkt. 82)

- NuVasive's Answer to Counterclaims as Pled in Docket 82, Filed September 21, 2009 (Dkt. 84)

## II.     JURISDICTION AND VENUE

3.     This action arises under the Patent Laws of the United States, Title 35, United States Code.  This Court's jurisdiction over both Warsaw's patent infringement claims and NuVasive's patent infringement claims is invoked under 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper in this District under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

---

[1] Nothing herein shall modify or supersede the terms set forth in the Court's July 29, 2011 Order [Doc. No. 332], which remains in full force and effect.
[2] Warsaw and Medtronic USA are collectively and individually referred to herein as "Medtronic".

1

## III.   ADMITTED FACTS

2

The following facts are admitted and require no proof:

3

4.      Warsaw Orthopedics, Inc. is an Indiana corporation, with its principal place of

4

business in Winona Lake, Indiana.

5

5.      Medtronic Sofamor Danek USA, Inc. is a Tennessee corporation, with its principal

6

place of business in Memphis, Tennessee.

7

6.      Medtronic Puerto Rico Operations Co. is a Cayman Islands corporation, with its

8

principal place of business in Villalba, Puerto Rico.

9

7.      Medtronic Sofamor Danek Deggendorf, GmBH is a German corporation, with its

10

principal place of business in Deggendorf, Germany.

11

8.      NuVasive, Inc. is a Delaware corporation, with its principal place of business in San

12

Diego, California.

13

9.      Warsaw owns the '973, '586, and '933 patents.

14

10.     NuVasive owns the '236 patent.

15

11.     The '973 patent, entitled "Translateral Spinal Implant," issued on January 19, 1999.

16

12.     Gary Karlin Michelson is the sole named inventor on the '973 patent.

17

13.     The '586 patent, entitled "Single-Lock Anterior Cervical Plating System," issued on

18

July 15, 2003.

19

14.     Gary Karlin Michelson is the sole named inventor on the '586 patent.

20

15.     The '933 patent, entitled "Instruments and Methods for Minimally Invasive Tissue

21

Retraction and Surgery," issued on September 20, 2005.

22

16.     Charles L. Branch, Kevin T. Foley, Thomas E. Roehm III, and Anthony J. Melkent

23

are the named inventors on the '933 patent.

24

17.     The '236 patent, entitled "Electromyography System," issued on December 30,

25

2008.

26

18.     Brian S. Kelleher, James F. Marino, Corbett W. Stone, Robin H. Vaughn, and

27

Jeffrey H. Owens are the named inventors on the '236 patent.

28

19.     NuVasive denies that any surgeon has used the "blade rotation spreader" in any surgery with the MaXcess I retractor.  NuVasive denies that any surgeon has used the "blade rotation spreader" in any surgery with the Solid MaXcess III retractor.  NuVasive admits that at least one surgeon has used the "blade rotation spreader" in a surgical procedure with the MaXcess II or MaXcess III retractors since October 2005.  (NuVasive's Response to Request for Admission No. 19)

20.     NuVasive informs surgeons that its CoRoent XL products can be used with fusion promoting substances.  (NuVasive's Response to Request for Admission No. 3)

21.     NuVasive has informed surgeons of a use of the CoRoent XL Products in which a CoRoent XL Product is selected such that the implant rests on the ring apophysis of the vertebrae as NuVasive understands that term.  However, NuVasive contends that the ultimate use of the CoRent XL Products is dictated by the patient's needs and the surgeon's judgment.  (NuVasive's Response to Request for Admission No. 8)

22.     NuVasive's Helix ACP Plates compete with Medtronic's anterior cervical plates, among others, in the anterior cervical fusion market.  (NuVasive's Response to Request for Admission No. 9)

23.     Warsaw has never offered NuVasive a license to either the '973 or the '933 patents.  (NuVasive's Response to Request for Admission No. 10)

24.     NuVasive's CoRoent XL Products compete with Medtronic's Clydesdale in the Interbody Fusion market.  (NuVasive's Response to Request for Admission No. 16)

25.     NuVasive's MaXcess I, MaXcess II, MaXcess III and Solid MaXcess III retractors can be used with and are intended to be used with NuVasive's CoRoent XL family of implants in NuVasive's XLIF procedure.  (NuVasive's Response to Request for Admission No. 23)

26.     Warsaw denies that the Brantigan '327 patent is principally directed at a spinal fusion device.  However, Warsaw admits that, in the context of teaching a "prosthetic" device to replace vertebral bodies and interbody spaces, the Brantigan '327 patent does disclose a spinal implant that can be used for a fusion procedure.  (Warsaw's Response to Request for Admission No. 1)

27.     The Brantigan '327 Patent teaches a spinal implant having a Height for contacting each of the two adjacent vertebrae.  (Warsaw's Response to Request for Admission No. 4)

28.     Warsaw denies that the Brantigan '327 patent is directed at an implant that must have a width that is at least as great as the height.  However, Warsaw does admit that the Brantigan '327 patent discloses a single spinal implant with a width as its largest dimension.  (Warsaw's Response to Request for Admission No. 5)

29.     Warsaw denies that the Brantigan '327 patent teaches indiscriminate surface roughenings designed solely or even principally for maintaining the implant in place, or that the roughenings alone are designed to maintain the implant in place.  In the context of teaching an exterior surface with a specific geometric configuration designed to permit vascularization within its interior and to hold fusion promoting substance within its interior, Warsaw admits that the reference does disclose a spinal implant having surface roughenings with specific geometric configurations that are present on the exterior surface of the implant for engaging the two adjacent vertebrae and for assisting to maintain the implant in place.  (Warsaw's Response to Request for Admission No. 6)

30.     The Brantigan '327 patent teaches a spinal implant having a plurality of openings capable of retaining fusion promoting material.  (Warsaw's Response to Request for Admission No. 7)

31.     The Brantigan '327 patent teaches a spinal implant made of an artificial material. (Warsaw's Response to Request for Admission No. 8)

32.     The Brantigan '327 patent teaches a spinal implant comprising a bone ingrowth material.  (Warsaw's Response to Request for Admission No. 9)

33.     PEEK is a bone ingrowth material.  (Warsaw's Response to Request for Admission No. 10)

34.     The Brantigan '327 patent teaches a spinal implant having an internal chamber and an access opening for accessing the internal chamber.  (Warsaw's Response to Request for Admission No. 11)

35.     The Brantigan '327 patent teaches a spinal implant having an internal chamber capable of containing fusion promoting material.  (Warsaw's Response to Request for Admission No. 12)

36.     The Brantigan '327 patent teaches a spinal implant comprising a wall surrounding at least in part an internal chamber.  (Warsaw's Response to Request for Admission No. 13)

37.     The Brantigan '327 patent teaches a spinal implant comprising a wall having a plurality of openings passing therethrough in communication with an internal chamber.  (Warsaw's Response to Request for Admission No. 14)

38.     The Brantigan '327 patent teaches a spinal implant having an outer surface with a plurality of openings passing through the implant.  (Warsaw's Response to Request for Admission No. 15)

39.     Warsaw denies that the Brantigan '327 patent is principally directed to a spinal implant designed for use with two immediately adjacent vertebrae in a spinal fusion procedure. Warsaw does admit, however, that the reference does disclose a spinal implant having a plurality of openings capable of permitting bone growth in continuity from one of the adjacent vertebrae to the other of the two adjacent vertebrae to permit fusion of the two adjacent vertebrae to occur at least in part through the implant.  (Warsaw's Response to Request for Admission No. 16)

40.     The Brantigan '327 Patent teaches, *inter alia*, a spinal implant that can be used in the lumbar spine.  (Warsaw's Response to Request for Admission No. 17)

41.     The Brantigan '327 Patent teaches, *inter alia*, a spinal implant that can be used in the thoracic spine.  (Warsaw's Response to Request for Admission No. 18)

## IV.    RESERVATIONS AS TO ADMITTED FACTS

None.

## V.    UNCONTESTED FACTS

42.     Pending claim 15 of patent application serial number 09/722,070 issued as claim 1 of the '236 patent.  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 7)

43.     During the prosecution of the '236 patent, one of the amendments made by the applicants to step (c) of then pending claim 15 was the addition of the limitation "and stopping the

emission of said stimulus signal immediately after said predetermined neuro-muscular response is detected."  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 1)

44.     In response to a pending Office Action, the '236 patent applicants in explaining why the pending rejection was inappropriate stated in part: "Claim 15 has also been amended to reflect that the emission of the stimulus signal is immediately stopped after the predetermined neuro-muscular response is detected. This is a safety mechanism designed to remove the stimulation of the spinal nerve during the processing time required to communicate the intensity level to a user (e.g. surgeon or other operating room personnel) and during the time required for the user to make a determination of the proximity of the spinal nerve to the probe or surgical tool based on the communicated intensity level (e.g. not close - free to continue towards lateral aspect; relatively close - use caution when proceeding towards lateral aspect; too close - do not proceed towards lateral aspect)."  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 2)

45.     In response to a pending Office Action, the '236 patent applicants in explaining why the pending rejection was inappropriate stated in part: "This avoids the unnecessary stimulation found, for example, in the Raymond '153 reference. More specifically, as evident in Col 3, lines 28-32, Raymond '153 teaches that "The amount of current generated by the electrical source is automatically controlled so as to maintain the signal generated as a function of the response of the nerve to the stimuli."  This is further evidenced at Col. 3, lines 47-52 which states, 'As the response to the detecting device begins to detect a response to the stimuli, and as the needle is inserted deeper within the tissue in the direction of the nerve to be located, the current intensity is automatically decreased as the needle approaches the nerve.'  This does not stop the stimulation altogether, as found in claim 15, and thus subjects the nerve to unnecessary stimulation that may result in irritation and/or damage over time.  The present invention eliminates any such drawback by stopping the stimulation immediately after the predetermined neuromuscular response is detected."  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 4)

46.     The Helix and Helix Mini ACP Systems meet the following nine limitations of claim 8 of the '586 patent: (1) A plate system adapted for use in the anterior human cervical spine for contacting the anterior aspect of at least two cervical vertebral bodies, [said plate system comprising:]; (2) a plate having a longitudinal axis and a length sufficient to span a disc space and overlap portions of at least two adjacent cervical vertebral bodies; (3) said plate having a lower surface for placement against the vertebral bodies and an upper surface opposite said lower surface; (4) said lower surface being concave along a substantial portion of the longitudinal axis of said plate; (5) at least two bone screws each having a central longitudinal axis and being adapted to engage each of the at least two vertebral bodies, respectively; (6) each of said bone screws having a leading end for insertion into the vertebral bodies and a trailing end opposite said leading end; (7) at least two bone screw receiving holes extending through said plate from said upper surface to said lower surface; (8) each of said bone screw receiving holes having a central longitudinal axis and being adapted to receive one of said bone screws to attach said plate to the vertebral bodies; (9) at least a first of said bone screw receiving holes adapted to overlie a first of the vertebral bodies and at least a second of said bone screw receiving holes adapted to overlie a second of the vertebral bodies.  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 26-33, 35)

47.     The Helix and Helix Mini ACP Systems meet the following eight limitations of claim 78 of the '586 patent: (1) A plate system adapted for use in the anterior human cervical spine for contacting the anterior aspect of at least two cervical vertebral bodies, [said plate system comprising:]; (2) a plate having a longitudinal axis and a length sufficient to span a disc space and overlap portions of at least two adjacent vertebral bodies; (3) said plate having a lower surface for placement against the vertebral bodies and an upper surface opposite said lower surface; (4) said lower surface being concave along a substantial portion of the longitudinal axis of said plate; (5) at least two bone screws each having a central longitudinal axis and being adapted to engage each of the at least two vertebral bodies, respectively; (6) each of said bone screws having a leading end for insertion into the vertebral body and a trailing end opposite said leading end; (7) each of said bone screw receiving holes having a central longitudinal axis and being adapted to receive one of

said bone screws to attach said plate to the vertebral bodies; (8) and a plurality of locking elements each adapted to lock to said plate only one each of said bone screws inserted into one each of said bone screw receiving holes.  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 40-45, 49-50)

48.     The Helix and Helix Mini ACP Systems meet the following twelve limitations of claim 148 of the '586 patent:  (1) A plate system adapted for use in the anterior human cervical spine for contacting the anterior aspect of at least two cervical vertebral bodies, [said plate system comprising:]; (2) a plate having a longitudinal axis and a length sufficient to span a disc space and overlap portions of at least two adjacent vertebral bodies; (3) said plate having a lower surface for placement against the vertebral bodies and an upper surface opposite said lower surface; (4) said lower surface of said plate being concave along a substantial portion of the longitudinal axis of said plate; (5) at least two bone screws each having a central longitudinal axis and being adapted to engage each of the at least two vertebral bodies, respectively; (6) each of said bone screws having a leading end for insertion into the vertebral bodies and a trailing end opposite said leading end; (7) said trailing end having a top at least one upper facing surface oriented toward said upper surface of said plate and a bottom surface opposite said at least one upper facing surface oriented toward said lower surface of said plate; (8) at least two bone screw receiving holes extending through said plate from said upper surface to said lower surface; (9) at least a first of said bone screw receiving holes adapted to overlie a first of the vertebral bodies and at least a second of said bone screw receiving holes adapted to overlie a second of the vertebral bodies; (10) and a plurality of locking elements each adapted to lock to said plate only one each of said bone screws  inserted into one each of said bone screw receiving holes; (11) said locking elements each having a central longitudinal axis that passes through one of said bone screw receiving holes, respectively, to retain said one of said bone screws to said plate; (12) and at least one of said locking elements being above said bottom surface of said trailing end of said bone screw.  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 54-62, 64, 65, 68)

49.     NuVasive sells and offers for sale Helix and Helix Mini ACPs to medical professionals.  Helix and Helix Mini ACPs include preinstalled canted coil springs.  NuVasive

sells and offers for sale bone screws to medical professionals. NuVasive provides tools for use with the Helix and Helix Mini ACPs.  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 71)

50.     Helix and Helix Mini ACPs may be used with either fixed angle screws or with variable angle screws.  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 75)

51.     A canted coil spring is pre-installed in a recessed portion of the bone screw holes of the Helix and Helix Mini ACP.  (NuVasive's Response to Medtronic's Alleged Undisputed Material Facts # 78)

52.     The term "translateral" was unknown to persons of ordinary skill in the art before the '973 patent was filed.  (NuVasive's Response to Warsaw's Additional Material Facts and Evidence No. 29)

53.      In an unrelated action, NuVasive submitted declarations of Drs. William D. Smith and Mark D. Peterson in support of NuVasive's Motion for Stay of Permanent Injunction Pending Appeal.  (NuVasive's Response to Undisputed Material Facts No. 18)

54.     Paragraph 2 of the declaration of Dr. Smith states: "I attended Georgetown University Medical Center.  For seven years, I also did my residency at Georgetown University Medical Center in neurological surgery.  I completed my residency in 1994 and have since worked continuously as a neurological surgeon in Arizona and Nevada. My specialty is neurological surgery, including surgery of the spine."  (NuVasive's Response to Undisputed Material Facts No. 18)

55.     Paragraph 4 of the declaration of Dr. Smith states: "When I first started my neurosurgery practice, all lower spine surgery was 'open surgery' wherein the spine was accessed from either the front (anterior) or the back (posterior). [Such open spinal surgery involved significant risks, including significant blood loss, high morbidity rates, and lengthy recovery periods.  The NEUROVISION® nerve monitor system was a groundbreaking development that allowed neurosurgeons to access the spine from the side (laterally) in a minimally invasive procedure. In accessing the spine from the side, there is little muscle dissection, less bone work

and smaller incisions, which results in less blood loss, less operative time, and less pain to the patient as compared to standard open spine surgery. NuVasive's XLIF® procedure takes advantage of the advances provided by the NEUROVISION® nerve monitoring technology and allows safer and less invasive surgeries in the lower spinal region]."  (NuVasive's Response to Undisputed Material Facts No. 18)

56.    Paragraph 2 of the declaration of Dr. Peterson states: "I attended medical school at Oregon Health Sciences University, graduating in 1988.  Subsequently, I did my residency and internship in the Department of Orthopedic Surgery at Akron City Hospital.  I completed my residency in 1993 and therefore had three fellowships in orthopedic and spinal surgery at the Royal Adelaide Hospital (in Adelaide, South Australia), Queens Medical Center (in Nottingham, England), and North Kansas City Hospital (in Kansas City, Missouri).  I have worked continuously since 1994 as an orthopedic surgeon in Medford, Oregon, specializing in spinal surgery." (NuVasive's Response to Undisputed Material Facts No. 18)

57.    Paragraph 4 of the declaration of Dr. Peterson states: "When I first started my orthopedic surgery practice, all lower spine surgery was 'open surgery' wherein the spine was accessed from either the front (anterior) or the back (posterior).  [The NEUROVISION® nerve monitor system was a groundbreaking development that allowed spinal surgeons to access the spine from the side (laterally) in a minimally invasive procedure (NuVasive's XLIF® procedure), with little muscle dissection, less bone work and smaller incisions. This resulted in less blood loss, less operative time, and less pain to the patient as compared to standard open spine surgery]." (NuVasive's Response to Undisputed Material Facts No.  18)

58.    U.S. Patent No. 4,501,269 to Bagby and U.S. Patent No. 5,192,327 to Brantigan are cited on the face of the '973 patent.  (NuVasive's Response to Undisputed Material Facts No. 21)

59.    U.S. Patent No. 5,192,327 to Brantigan ("the Brantigan '327 patent") issued on March 9, 1993.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #1)

60.    The Brantigan '327 patent issued from an application filed on March 22, 1991. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #2)

61.     The effective filing date under 35 U.S.C. §102(b) of each asserted claim of the '973 patent is not before February 27, 1995.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #3)

62.     The Brantigan '327 patent is prior art under 35 U.S.C. §102(b) to each asserted claim of the '973 patent.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #4)

63.     U.S. Patent No. 4,834,757 to Brantigan ("the Brantigan '757 patent") issued on May 30, 1989.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #5)

64.     The Brantigan '757 patent issued from an application filed on March 28, 1988. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #6)

65.     The Brantigan '757 patent is prior art under 35 U.S.C. §102(b) to each asserted claim of the '973 patent.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #7)

66.     U.S. Patent No. 5,015,247 ("the Michelson '247 patent") is prior art under 35 U.S.C. §102(b) to each asserted claim of the '973 patent.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #8)

67.     U.S. Patent No. 5,489,307 to Kuslich ("the Kuslich '307 patent") issued from an application filed on September 1, 1994.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #9)

68.     The Kuslich '307 patent was not cited by the patentee in an information disclosure statement in connection with the '973 patent prosecution.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #10)

69.     The Kuslich '307 patent issued from a U.S. patent application which was a continuation of another U.S. patent application filed on February 10, 1993.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #12)

70.     The Brantigan '327 patent is prior art to each asserted claim of the '973 patent under 35 U.S.C. §102(e).  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #15)

71.     The Brantigan '757 patent is prior art to each asserted claim of the '973 patent under 35 U.S.C. §102(e).  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #16)

72.     The Brantigan '327 patent discloses a spinal fusion implant.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #19)

73.     The Brantigan '327 patent discloses a spinal implant having an outer surface with a plurality of openings passing through said implant, said plurality of openings capable of retaining fusion promoting substances and capable of permitting bone growth in continuity from one of said adjacent vertebrae to the other of said two adjacent vertebrae to permit fusion of said two adjacent vertebrae to occur at least in part through said implants capable of engaging both of said vertebrae. Warsaw contends that the Brantigan '327 corpectomy devices do not have a plurality of openings capable of retaining fusion promoting substances and capable of permitting bone growth in continuity from one of said adjacent vertebrae to the other of said two adjacent vertebrae to permit fusion of said two adjacent vertebrae to occur at least in part through said implants capable of engaging both of said vertebrae. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #34)

74.     A person of ordinary skill in the art of the '973 patent would know the average lengths of vertebra in the human lumbar spine.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #37)

75.     The average dimensions of the human vertebrae are well-known, easily ascertainable, and well-documented in the literature.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #38)

76.     Punjabi et al. reports the average vertebral depth at L1 as $34 \pm 1.34$ mm and Berry et al. reports the depth as $31.9 \pm 3.7$ mm.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #39)

77.     Punjabi et al. reports the lateral width of L1 (the first vertebra in the lumbar region) as $41.2 \pm 1.03$ mm and Berry et al., Spine 1986, reports the lateral width of L1 as $45.2 \pm 4.6$ mm. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #40)

78.     The average transverse width of a T7 vertebrae in an adult human is 31.0 mm, as reported in Berry et al. in "A Morphometric Study of Human Lumbar and Selected Thoracic Vertebrae" (1987).  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #42)

79.     A person of ordinary skill in the art of the '973 patent would know the average lengths of vertebra in the human thoracic spine.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #44)

80.     A spinal surgeon is aware of and has access to the average sizes of the human vertebra at various levels.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #45)

81.     The Brantigan '757 patent discloses a spinal implant with surface roughenings for engaging two adjacent vertebrae and for maintaining said implant in place, said surface roughenings being present on at least a portion of the exterior of said implant.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #48)

82.     In the field of the '973 patent, a person of ordinary skill in the art at the time of the effective filing date of the application that lead to the '973 patent is a surgeon with extensive knowledge of human anatomy, the use of devices in the human spine, and the biomechanical, anatomical, and physiological implications of such use.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #49)

83.     The Brantigan '757 patent discloses a spinal implant with surface roughenings that include a plurality of ratchetings.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #51)

84.     The Brantigan '757 patent discloses a spinal implant with surface roughenings that include a plurality of ratchetings, in which said ratchetings face one direction.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #53)

85.     The Brantigan '757 patent discloses a spinal implant that is generally rectangular. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #64)

86.     The Brantigan '327 patent discloses a spinal implant in which said implant comprises a bone ingrowth material.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #67)

87.     The Kuslich '307 patent discloses a spinal fusion implant.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #69)

88.     The Kuslich '307 patent discloses spinal implants having lengths 10 mm, 12 mm, 14 mm, 16 mm, 20 mm, 24 mm, 28 mm, and 30 mm.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #75)

89.     The Kuslich '307 patent discloses a spinal implant with a height for contacting each of the two adjacent vertebrae.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #76)

90.     The Kuslich '307 patent discloses a spinal implant with a width that is at least as great as the height.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #77)

91.     The Kuslich '307 patent discloses a spinal implant having an outer surface with a plurality of openings passing through said implant, said plurality of openings capable of retaining fusion promoting substances and capable of permitting bone growth in continuity from one of said adjacent vertebrae to the other of said two adjacent vertebrae to permit fusion of said two adjacent vertebrae to occur at least in part through said implants capable of engaging both of said vertebrae. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #78)

92.     The Kuslich '307 patent discloses a spinal implant with surface roughenings for engaging two adjacent vertebrae and for maintaining said implant in place, said surface roughenings being present on at least a portion of the exterior of said implant.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #80)

93.     The Kuslich '307 patent discloses a spinal implant that has an internal chamber and an access opening for accessing said internal chamber.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #81)

94.     The Kuslich '307 patent discloses a spinal implant in which said implant has an internal chamber and an access opening for accessing said internal chamber and in which said

internal chamber is capable of containing fusion promoting material.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #82)

95.     The Michelson '247 patent discloses a spinal implant having a length of 26 mm. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #88)

96.     The Michelson '247 patent discloses a spinal implant with a height for contacting each of the two adjacent vertebrae.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #90)

97.     The Michelson '247 patent discloses a spinal implant with a width that is at least as great as the height.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #91)

98.     The Michelson '247 patent discloses a spinal implant having an outer surface with a plurality of openings passing through said implant, said plurality of openings capable of retaining fusion promoting substances and capable of permitting bone growth in continuity from one of said adjacent vertebrae to the other of said two adjacent vertebrae to permit fusion of said two adjacent vertebrae to occur at least in part through said implants capable of engaging both of said vertebrae. (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #92)

99.     The Michelson '247 patent discloses a spinal implant with surface roughenings for engaging two adjacent vertebrae and for maintaining said implant in place, said surface roughenings being present on at least a portion of the exterior of said implant.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #94)

100.     The Michelson '247 patent discloses a spinal implant that has an internal chamber and an access opening for accessing said internal chamber.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #95)

101.     The Michelson '247 patent discloses a spinal implant in which said implant has an internal chamber and an access opening for accessing said internal chamber and in which said internal chamber is capable of containing fusion promoting material.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #96)

102.    The Michelson '247 patent discloses a spinal implant in which said implant comprises a bone ingrowth material.  (Warsaw's Response to NuVasive's Alleged Undisputed Material Facts #97)

103.    When operated in nerve proximity mode during a DLIF procedure, the NIM-ECLIPSE does not increase the stimulus signal intensity beyond a user-preset maximum. (Warsaw's Response to NuVasive's Alleged Additional Material Facts #88)

104.    MSD's Rule 30(b)(6) deponent testified he has seen the NIM X-Pak Probe used with the NIM-Eclipse in nerve proximity mode while observing a direct lateral procedure. (Warsaw's Response to NuVasive's Alleged Additional Material Facts #93)

105.    MSD instructs surgeons to redirect the probe when the current intensity level falls below 8 mA when using the NIM-ECLIPSE in nerve proximity mode during a DLIF procedure. (Warsaw's Response to NuVasive's Alleged Additional Material Facts #95)

106.    Dr. Toleikis opined that the Raymond '153 patent does not disclose the stopping step.  (Warsaw's Response to NuVasive's Alleged Additional Material Facts #97).

107.    Dr. Toleikis testified that "real time" means occurring not after the fact, but right at the point that it occurs.  (Warsaw's Response to NuVasive's Alleged Additional Material Facts #98).

108.    A surgeon performing a Direct Lateral Interbody Fusion procedure using the NIM-ECLIPSE in Nerve Proximity mode performs the step of: "electromyographically monitoring muscles coupled to said spinal nerve to determine if a predetermined neuro-muscular response is elicited by the stimulus signal."  (Warsaw's Response to NuVasive's Alleged Additional Material Facts #104)

/ / /

# VI.    ISSUES OF FACT TO BE TRIED[3]

The following issues of fact, and no others, remain to be litigated upon the trial.

## A.    Warsaw's '973 Patent

### 1.    Infringement

109.    In the event that infringement of the '973 patent is tried, the issue to be litigated is as follows:  Whether NuVasive has infringed claims 24, 35, 41, 42, 57, and 61 of the '973 patent by making, using, selling, or offering for sale in the United States, or importing into the United States, the CoRoent XL-Standard, CoRoent XL-Lordotic, CoRoent XL-Wide Standard, CoRoent XL-Wide Lordotic, CoRoent XL-Coronal Tapered Standard, CoRoent XL-Coronal Tapered Lordotic, CoRoent XL-Fixation, CoRoent XL-Keeled, and CoRoent XL-Thoracic products (collectively "CoRoent XL implants").

### 2.    Validity

110.    Whether any of claims 24, 35, 41, 42, 57, and 61 of the '973 patent is invalid as either anticipated or rendered obvious by the prior art.

111.    Whether each of the references and/or alleged prior uses upon which NuVasive relies constitutes prior art to the '973 patent.

112.    What was the scope and content of the prior art at the time the inventions of the '973 patent were made.

113.    What were the differences between the prior art and the claimed subject matter of the '973 patent as a whole.

114.    What is the level of ordinary skill in the art.

115.    Whether objective evidence (or secondary considerations) supports the non-obviousness of the claimed inventions of the '973 patent.

### 3.    Damages

116.    When did Medtronic first provide notice within the meaning of 35 U.S.C. § 287 to NuVasive.

---

[3] The parties do not intend the listing of an issue of fact in this section to operate as a concession that the issue of fact has legal significance.

117.    What is the amount of lost profit damages due to Warsaw, if any.

118.    What is the amount of reasonable-royalty damages due to Warsaw, if any.

### 4.    Enforceability (non-jury issues)

119.    Whether any person associated with the filing or prosecution of an application leading to the '973 patent committed inequitable conduct with respect to that application.

### B.    Warsaw's '586 Patent

#### 1.    Infringement

120.    Whether Helix and Helix Mini anterior cervical plating systems made, used, sold or offered for sale in the United States, or imported into the United States, by NuVasive contain each and every element of claims 78, 103, 148, 167, 173, or 174 of the '586 patent and therefore infringe those claims, either literally or under the doctrine of equivalents.

#### 2.    Validity

121.    Whether any of claims 78, 103, 148, 167, 173, or 174 of the '586 patent is invalid as either anticipated or rendered obvious by the prior art.

122.    Whether each of the references and/or alleged prior uses upon which NuVasive relies constitutes prior art to the '586 patent.

123.    What was the scope and content of the prior art at the time the inventions of the '586 patent were made.

124.    What were the differences between the prior art and the claimed subject matter of the '586 patent as a whole.

125.    What is the level of ordinary skill in the art.

126.    Whether objective evidence (or secondary considerations) supports the non-obviousness of the claimed inventions of the '586 patent.

#### 3.    Damages

127.    What is the amount of lost profit damages sustained by Warsaw, if any.

128.    What is the amount of reasonable-royalty damages sustained by Warsaw, if any.

## C.   Warsaw's '933 Patent

### 1.   Infringement

129.   Whether MaXcess tissue retractors, or kits containing them, which are made, used, sold or offered for sale in the United States, or imported into the United States, by NuVasive, contain each and every element of claims 21, 24, or 57 of the '933 patent.

130.   Whether any third party performs each and every element of method claim 66 of the '933 patent and thus directly infringes that claim.

131.   Whether NuVasive indirectly infringes claim 66 of the '933 patent by inducing or contributing to third parties' alleged direct infringement of claim 66 of the '933 patent.

### 2.   Validity

132.   Whether any of claims 21, 24, 57, or 66 of the '933 patent is invalid as either anticipated or rendered obvious by the prior art.

133.   Whether each of the references and/or alleged prior uses upon which NuVasive relies constitutes prior art to the '933 patent.

134.   What was the scope and content of the prior art at the time the inventions of the '933 patent were made.

135.   What were the differences between the prior art and the claimed subject matter of the '933 patent as a whole.

136.   What is the level of ordinary skill in the art.

137.   Whether objective evidence (or secondary considerations) supports the non-obviousness of the claimed inventions of the '933 patent.

### 3.   Damages

138.   What is the amount of lost profit damages sustained by Warsaw, if any.

139.   What is the amount of reasonable-royalty damages sustained by Warsaw, if any.

## D.   NuVasive's '236 Patent

### 1.   Infringement

140.   Whether any third party directly infringed any of claims 1, 5 or 9 of the '236 patent.

141.    Whether Medtronic contributed to the literal infringement by third parties of claims 1, 5 or 9 of the '236 patent to the extent that Medtronic provided its NIM-Eclipse System for use during a Direct Lateral Interbody Fusion Procedure.

142.    Whether Medtronic induced the literal infringement by third parties of claims 1, 5 or 9 of the '236 patent to the extent that Medtronic provided its NIM-Eclipse System for use during a Direct Lateral Interbody Fusion Procedure.

### 2.    Validity

143.    Whether any of claims 1, 5 or 9 of the '236 patent is invalid as obvious under the prior art.

144.    Whether each of the references and/or alleged prior uses upon which Medtronic relies constitutes prior art to the '236 patent.

145.    What was the scope and content of the prior art at the time the inventions of the '236 patent were made.

146.    What are the differences between the prior art and the claimed subject matter of the '236 patent as a whole.

147.    What is the level of ordinary skill in the art.

148.    Whether objective evidence (or secondary considerations) supports the non-obviousness of the claimed inventions of the '236 patent.

149.    Whether claims 1, 5 or 9 of the '236 patent are invalid for insufficient written description.

### 3.    Damages

150.    What is the amount of reasonable-royalty damages sustained by NuVasive, if any.

## VII.   EXHIBITS

The exhibits to be offered at trial, together with a statement of all admissions by and all issues between the parties with respect thereto, are as follows:

### A.    Medtronic's Exhibit List

151.    Medtronic's list of exhibits that it may offer at trial (other than demonstrative exhibits) is attached as Exhibit 1.

**B.     NuVasive's Exhibit List**

152.    NuVasive's list of exhibits that they may offer at trial (other than demonstrative exhibits) is attached as Exhibit 2.

**C.     Stipulated Procedures Concerning Exhibits**

153.    The listing of an exhibit by a party on its exhibit list does not waive any objections to that exhibit should the opposing party attempt to offer it.  Subject to applicable objections, however, any party may use any document on any party's exhibit list.  The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding that document.  The parties also agree that listing a document on a party's exhibit list is not an admission that the document is admissible as evidence.  Only those documents that appear on an exhibit list may be offered into evidence at trial unless otherwise agreed by the parties and upon leave of Court for good cause shown.

154.    The parties shall identify and exchange demonstrative exhibits that will be used in opening statements by noon on August 29, 2011, and shall exchange their objections to these demonstrative exhibits by 8 p.m. on August 29, 2011, and shall meet and confer on any objections at some time thereafter.  The parties shall identify and exchange demonstrative exhibits to be used on direct examination by no later than 9 a.m. one calendar day before the demonstrative exhibits will be used on direct examination, and shall exchange objections to these demonstrative exhibits by 7 p.m. one calendar day before the demonstrative exhibits will be used.  The parties shall meet and confer on any objections at some time thereafter, and any unresolved objections shall be presented to the Court the day the demonstrative exhibits are to be used.  The parties need not exchange demonstrative exhibits for use in cross examination or closing arguments.

155.    If a party identifies and exchanges demonstrative exhibits to be used on direct examination by 9 a.m. two calendar days before the demonstrative exhibits will be used on direct examination, the other party shall exchange objections to these demonstrative exhibits by 7 p.m. two calendar days before the demonstrative exhibits will be used.  The parties shall meet and confer on any objections at some time thereafter, and any unresolved objections shall be presented to the Court the day before the demonstrative exhibits are to be used.

156.    The parties shall identify all exhibits to be used on direct examination, by exhibit number and intended witness, by 7 p.m. two calendar days before their use.  Except for exhibits used during cross examination or demonstrative exhibits used during cross examination, no exhibits will be used at trial unless so identified or otherwise permitted to be used upon good cause shown.  The parties shall provide any objections to exhibits by 7 p.m. one calendar day before an exhibit's use.  The parties will meet and confer on any objections at some time thereafter and will present any unresolved issues to the Court the morning of the proposed use of the disputed exhibit.

157.    The parties agree that notice of a party's intended use of blow-ups (enlargements) of admitted trial exhibits and of ballooning, excerption, highlighting, etc. of such exhibits need not be given (and need not be exchanged as a demonstrative exhibit), as long as the party has identified its intention to use the trial exhibit according to the preceding paragraphs.  The notice provisions of these paragraphs also shall not apply to demonstrative exhibits created in the courtroom during testimony or opening or closing statements at trial.

158.    Legible photocopies of United States and foreign patents may be offered and received into evidence in lieu of certified copies thereof, subject to all other objections which might be made to the admissibility of certified copies.  Legible photocopies of United States Patent Applications and the contents of associated Patent and Trademark File Histories may be offered and received into evidence in lieu of certified copies thereof, subject to all other objections which might be made to the admissibility of certified copies.

159.    The parties request that counsel be permitted to move, and the Court admit if appropriate, evidence on the morning following use of the evidence, to the extent not admitted at the time of use.

160.    Exhibits that have not been previously produced during discovery, if any, will be exchanged before noon on August 1, 2011.

161.    The parties will exchange objections to exhibits by August 12, 2011, or at a time thereafter set by the Court at the Pretrial Conference.

162.    Any document not specifically identified on an exhibit list still may be used at trial for the purposes of impeachment, if otherwise competent for such purposes.

# VIII.   WITNESSES

### A.      Medtronic's Witnesses

163.    Medtronic's witness list is attached hereto as Exhibit 3.

### B.      NuVasive's Witnesses

164.    NuVasive's witness list is attached hereto as Exhibit 4.

### C.      Stipulated Procedures Concerning Witnesses To Be Called In Person

165.    The listing of a witness on a party's witness list does not require that party to call that witness to testify, either live or by deposition.  However, either party may call at trial any witness appearing on the other party's trial witness list.

166.    By 7:00 p.m. two calendar days before calling a witness identified on their witness list, the calling party shall notify opposing counsel in writing of its intention to call that witness, along with an identification of the trial exhibits that it expects to use on direct examination of that witness.  For example, if a party intends to call such a witness on a Wednesday, it shall notify counsel by 7:00 p.m. Monday.  Also, by way of example, if a party intends to call such a witness on Monday, it shall notify counsel by 7:00 p.m. on Saturday.  Except as the Court may order otherwise upon good cause shown, the calling party shall not call a witness live at trial unless so identified or unless the other party failed to timely inform the calling party that it intended to finish its case as set forth below.  Such notice will include the order in which the witnesses will be called, which order will not be changed, absent good cause shown.

167.    A party shall provide reasonable notice if for any reason it does not intend to call a witness that it had previously indicated would appear live.  In that event, the other party may designate and offer deposition testimony from such witness (subject to the Federal Rules of Evidence).  Counter-designations may also be provided.  In the event that such designations cannot be completed by the times agreed to below, the parties shall work in good faith to set deadlines for the disclosure of such designations, counter-designations, counter-counter-designations, and objections.

168.     By 9:00 a.m. two calendar days before it intends to rest its case, the resting party shall give the other party notice of its intention to rest.  This notice is intended so that the parties have an opportunity to comply with the other provisions of this stipulation.

**D.     Stipulated Procedures Concerning Depositions**

169.     The requirement under Fed. R. Civ. P. 26(a)(3) to exchange designations of deposition testimony at least 30 days before trial shall be waived by both parties, and shall be replaced instead by the following stipulated procedure:

170.     In order to offer deposition testimony at trial, the party that seeks to play (or read) deposition testimony must in writing notify the opposing party of its intention to do so no later than 7:00 p.m. four calendar days before the offer.  By 7:00 p.m. four calendar days before deposition testimony is to be read or played, the party offering the deposition testimony will designate the specific portions of the deposition that will be offered at trial.  By 7:00 p.m. three calendar days before the deposition testimony is to be read or played, the party against whom the deposition testimony will be offered will provide its objections and counter-designations.  By 7:00 p.m. two days before the deposition testimony is to be read or played, the party offering the deposition testimony will identify its objections to counter-designations and any counter-counter designations.  By 11:59 p.m. two days before, the party against whom the deposition testimony will be offered will provide any objections to counter-counter designations.  The parties shall meet and confer at some time thereafter, and will present any unresolved issues to the Court the day before the proposed offer of deposition testimony at trial.

171.     No party will designate more deposition testimony under this procedure than can be reasonably expected to be offered at trial.  New deposition designations may not be added without good cause.

172.     At trial, the compilation of deposition testimony by the parties shall be read or played in page order.  No objections or exchanges between counsel will be played or read.  If a party designates deposition testimony, and the other party counter-designates, both the designation and counter-designation will be read or played together in page order.  The time allotted by the Court for each side's presentation shall be reduced by the length of its designations or counter-

designations, as measured by the lines of testimony each party designates as a percentage of the total number of lines read or played.

173.     Nothing in the foregoing procedures shall preclude a party from using deposition testimony at trial for purposes of impeachment.

**E.     Stipulation Concerning Authenticity/Business Record Status**

174.     Medtronic admits the authenticity of each document that on its face appears to have been generated by Medtronic (including documents generated by its employees during the course of their employment for Medtronic and/or by a Medtronic entity that is not a party to this case) and produced in this case by Medtronic.

175.     Medtronic admits the business record status of each document that on its face appears to have been generated by Medtronic (including documents generated by its employees during the course of their employment for Medtronic and/or by a Medtronic entity that is not a party to this case) concerning a matter pertaining to a regularly conducted business activity of Medtronic, or its affiliated entities, and produced in this case by Medtronic subject to the caveat that Medtronic may object to the admissibility of any specific statement in a document to the extent it can show that such statement does not fall within Fed. R. Evid. 803(6) or should otherwise not be admitted (e.g., pursuant to Rule 402 or 403, Fed. R. Evid.).

176.     NuVasive admits the authenticity of each document that on its face appears to have been generated by NuVasive (including documents generated by its employees during the course of their employment for NuVasive) and produced in this case by NuVasive.

177.     NuVasive admits the business record status of each document that on its face appears to have been generated by NuVasive (including documents generated by its employees during the course of their employment for NuVasive) concerning a matter pertaining to a regularly conducted business activity of NuVasive and produced in this case by NuVasive subject to the caveat that NuVasive may object to the admissibility of any specific statement in a document to the extent it can show that such statement does not fall within Fed. R. Evid. 803(6) or should otherwise not be admitted (e.g., pursuant to Rule 402 or 403, Fed. R. Evid.).

178.    The parties further stipulate that any documents subject to the above admissions and not otherwise subject to the above caveats may be entered by either party into evidence without the need to lay any further foundation at trial.

**F.      Other Stipulations**

179.    For those witnesses whose deposition testimony will be read to the jury, the parties shall be permitted to make transition statements to introduce the witnesses and their role in the litigation.  However, counsel shall not be permitted to argue or comment on the evidence during transition statements.

180.    Subject to the Court's permission, the parties shall be allowed to provide a joint jury notebook to each of the jurors, which shall contain only the patents-in-suit.  The jurors shall be permitted to take handwritten notes during the presentations of the parties.  The jury will be permitted to bring these notebooks and handwritten notes into the deliberation room.

181.    The parties request that the trial be open to the public and not sealed unless a party requests that a particularly sensitive portion be sealed and not open.  If a party makes such a request, subject to the Court's approval, and for good cause shown as required under the governing law of the Ninth Circuit, the courtroom will be cleared of those individuals not qualified under the Protective Order entered in this case, except that each party may designate one corporate representative who may remain in the courtroom throughout the entirety of the trial.  Each party must notify the opposing party of the identity of this corporate representative before trial.

182.    Transcripts of any sealed testimony, and exhibits entered while the courtroom is sealed, shall remain under seal until thirty (30) days after the conclusion of the trial.  Prior to the time, the parties may designate, by page and line designations, the portions of the transcript they seek to have filed under seal and the exhibits they seek to have placed under seal, subject to Court approval.  Counsel for the parties shall be responsible for supplying the envelopes and labels necessary for any materials placed under seal.

183.    Counsel may use PowerPoint presentations in their opening and closing statements.  In addition, if not otherwise admitted by stipulation or otherwise, the parties may request the Court

to pre-admit into evidence certain exhibits prior to opening statements so that such evidence may be shown to the jury during opening statements.

## IX.   ISSUES OF LAW TO BE LITIGATED

The following issues of law, and no others, remain to be litigated upon the trial:

184.   Whether any of claims 24, 35, 41, 42, 57, or 61 of the '973 patent is invalid for obviousness under 35 U.S.C. § 103.

185.   Whether any of claims 78, 103, 148, 167, 173, or 174 of the '586 patent is invalid for obviousness under 35 U.S.C. § 103.

186.   Whether any of claims 21, 24, 57 or 66 of the '933 patent is invalid for obviousness under 35 U.S.C. § 103.

187.   Whether any of claims 1, 5 or 9 of the '236 patent is invalid for obviousness under 35 U.S.C. § 103.

188.   Whether NuVasive's infringement of the '973 patent should be enjoined.

189.   Whether NuVasive's infringement of the '586 patent should be enjoined.

190.   Whether NuVasive's infringement of the '933 patent should be enjoined.

191.   Whether Medtronic's infringement of the '236 patent should be enjoined.

192.   Whether, and at what royalty, a compulsory license should be imposed regarding the '973 patent.

193.   Whether, and at what royalty, a compulsory license should be imposed regarding the '586 patent.

194.   Whether, and at what royalty, a compulsory license should be imposed regarding the '933 patent.

195.   Whether, and at what royalty, a compulsory license should be imposed regarding the '236 patent.

196.   The amount of prejudgment interest due on account of the damages caused by NuVasive's infringement.

197.   The amount of prejudgment interest due on account of the damages caused by Medtronic's infringement.

198.   Whether the issue of prejudgment interest should be presented to the jury.

199.   Whether this case is exceptional pursuant to 35 U.S.C. § 285, and whether Medtronic or NuVasive is entitled to attorneys' fees and costs.

200.   Whether Warsaw's '973 patent is unenforceable due to inequitable conduct.

201.   Whether Warsaw is entitled to lost profits damages.

202.   To the extent that any of the issues of fact identified above might be characterized instead or additionally as issues of law, such issues are incorporated by reference here as issues of law.

## X.   SUPPLEMENTING THE PLEADINGS

203.   The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings with respect to the four patents at issue in Phase I and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

## XI.   JURY TRIAL

204.   Trial is to be by jury, except for NuVasive's inequitable conduct defense for the '973 patent, which is to be tried to the bench after the jury renders its verdict.

## XII.   BIFURCATION

205.   Pursuant to Docket No. 304, the trial of this case in Phase I will not be bifurcated.

## XIII.   LENGTH OF TRIAL

206.   The time allocated for trial is 10 court days; this includes the time needed to select the jury.  The 10 court days shall be split equally between the two sides; each side shall have 25 hours.

207.   The Court will not be dark on September 1 and 2 as previously indicated.

DATED:  August 12, 2011

Hon. Michael M. Anello
United States District Judge