Todd G. Miller (SBN 163200), miller@fr.com
Craig E. Countryman (SBN 244601), countryman@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Phone: 858-678-5070/Fax: 858-678-5099

Frank E. Scherkenbach (SBN 142549), scherkenbach@fr.com
Fish & Richardson P.C.
One Marina Park Drive
Boston, MA 02210-1878
Phone: 617-542-5070/Fax: 617-542-8906

John M. Farrell (SBN 99649), farrell@fr.com
Jonathan J. Lamberson (SBN 239107), lamberson@fr.com
Keeley I. Vega (SBN 259928), kvega@fr.com
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Phone: 650-839-5070/Fax: 650-839-5071

Attorneys for Defendant/Counterclaimant/Counterclaim Defendant
NUVASIVE, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARSAW ORTHOPEDIC, INC.,<br><br>     Plaintiff,<br> v.<br>NUVASIVE, INC.,<br><br>     Defendant.<br>NUVASIVE, INC.,<br><br>     Counterclaimant,<br> v.<br>MEDTRONIC SOFAMOR DANEK USA, INC.,<br><br>     Counterclaim Defendant.<br>AND RELATED COUNTERCLAIMS. | Case No. 3:08-CV-1512 MMA (MDD)<br><br>**NUVASIVE'S OPENING BRIEF REGARDING ONGOING ROYALTIES AND PREJUDGMENT INTEREST**<br><br>Judge:  Hon. Michael M. Anello<br>Courtroom: 5, 3rd floor |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. ONGOING ROYALTIES ...................................................................................... 2

   A. Statement of Law ......................................................................................... 2

   B. The Court Should Not Impose An Ongoing Royalty At This Time ............ 2

   C. If The Court Is Inclined To Set An Ongoing Royalty, It Must Perform A Proper *Georgia-Pacific* Analysis .......................................... 4

      1. The '973 Patent .................................................................................. 5

      2. The '933 Patent .................................................................................. 7

      3. The '586 Patent .................................................................................. 9

      4. The '236 Patent ................................................................................ 10

III. PRE-JUDGMENT INTEREST ............................................................................ 11

   A. Any Award of Pre-Judgment Interest is Inappropriate ............................. 11

      1. The Jury's Award Is Presumed To Include Interest ........................ 11

      2. Warsaw's Delay in Filing Suit Bars Prejudgment Interest .............. 12

   B. If the Court is Inclined to Award Interest, it Should Do So at the Rate Specified in 28 U.S.C. § 1961 ........................................................... 13

IV. CONCLUSION ................................................................................................... 13

**TABLE OF AUTHORITIES**

**CASES**

*Amado v. Microsoft Corp.*,
  517 F.3d 1353, 1362 (Fed. Cir. 2008) .................................................................. 5

*Cordance Corp. v. Amazon.com, Inc.*,
  730 F. Supp. 2d 333 (D. Del. 2010) ..................................................................... 3

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) .......................................................................... 13

*Dairy Queen, Inc. v. Wood*,
  369 U.S. 469 (1962) ............................................................................................. 4

*Dimick v. Schiedt*,
  293 U.S. 474 (1935) ............................................................................................. 4

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ............................................................................................. 2

*Excelsior College v. Frye*,
  2007 WL 672517 (S.D. Cal. Feb. 21, 2007) ...................................................... 13

*Gen. Motors Corp. v. Devex Corp.*,
  461 U.S. 648 (1983) ........................................................................................... 12

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116, 1120 (S.D.N.Y. 1970*)* ......................................................... 4

*Graco Children's Prods., Inc. v. Century Prods. Co.*,
  1996 U.S. Dist. LEXIS 10356 (E.D. Pa. July 23, 1996) ................................... 12

*Grosz-Salomon v. Paul Revere Life Ins. Co.*,
  237 F.3d 1154 (9th Cir. 2001) ............................................................................ 13

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
  166 F. Supp. 2d 1008 (D. Del. 2001) ........................................................... 11, 12

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  609 F. Supp. 2d 951 (N.D. Cal. 2009) ................................................................. 3

*Joyal Prods. v. Johnson Elec. North Am., Inc.*,
  2009 U.S. Dist. LEXIS 15531 (D.N.J. February 26, 2009) ................................. 5

*Laitram Corp. v. NEC Corp.*,
  115 F.3d 947 (Fed. Cir. 1997) ............................................................................ 13

*Orion IP, LLC v. Mercedes-Benz USA, LLC*,
  2008 U.S. Dist. LEXIS 108683 (E.D. Tex. March 28, 2008) .............................. 5

*Paice LLC v. Toyota Motor Corp.*,
　504 F.3d 1293 (Fed. Cir. 2007) .................................................................................. 2, 3

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
　2010 U.S. Dist. LEXIS 79039 (S.D. Cal. August 5, 2010) ....................................... 4, 5

*Ricoh Co. v. Quanta Computer, Inc.*,
　2010 U.S. Dist. LEXIS 38220 (W.D. Wis. April 19, 2010) ......................................... 3

*Studiengesellschaft Kohle v. Dart Industries, Inc.*,
　862 F.2d 1564 (Fed. Cir. 1988) ................................................................................... 13

*Telcordia Techs., Inc. v. Cisco Sys.*,
　612 F.3d 1365 (Fed. Cir. 2010) ..................................................................................... 3

*Telecordia Techs., Inc. v. Cisco Sys., Inc.*,
　592 F. Supp. 2d 727 (D. Del. 2009) .............................................................................. 3

*Transmatic, Inc. v. Gulton Indus., Inc.*,
　180 F.3d 1343 (Fed. Cir. 1999) ................................................................................... 13

*Voda v. Cordis Corp.*,
　2006 U.S. Dist. LEXIS 63623 (W.D. Ok. September 5, 2006) ................................ 3, 4

*z4 Techs., Inc. v. Microsoft Corp.*,
　434 F. Supp. 2d 437 (E.D. Tex. 2006) .......................................................................... 4

**STATUTES**

28 U.S.C. § 1961 ................................................................................................... 1, 13, 14

**OTHER AUTHORITIES**

Seventh Amendment ................................................................................................... 4

I.     INTRODUCTION

On January 26, 2012 the Court entered an Order requesting that the parties file simultaneous opening briefs on two issues: (i) what ongoing royalties the Court should impose for infringing sales made after the date of the jury's verdict (September 20, 2011); and (ii) the appropriate prejudgment interest on the damages awards. (D.I. 460.) The Court further stated in a footnote that it found that "the jury did not include prejudgment interest in its damages calculations." (*Id.*)

Regarding ongoing royalties, the law is clear that the Court must first give the parties time to negotiate an appropriate going forward royalty. The Court should exercise its considerable discretion and decline to address ongoing royalties until that negotiation has happened, and until after the appeal on the merits is concluded. If the Court chooses to address this issue now, however, NuVasive respectfully submits that the Court should adopt a rate of no greater than 2% for Helix and Helix Mini Anterior Cervical Plates ("ACPs") found to infringe the '586 patent, a rate of no greater than 3% for sales of the MaXcess retractors found to infringe the '933 patent, a rate of no greater than 10% for sales of the CoRoent XL implants found to infringe the '973 patent, and a rate of 5.5% for sales of the Medtronic NIM-ECLIPSE nerve monitoring systems found to infringe the '236 patent. These rates are consistent with the jury award.

Regarding prejudgment interest, NuVasive respectfully disagrees with the Court's finding that "the jury did not include prejudgment interest in its damages calculations." The jury was presented with multiple damages calculations from Warsaw that included prejudgment interest. The verdict form does not indicate whether or how much interest the jury awarded. Case law dictates that under these circumstances, the jury is presumed to have awarded Warsaw interest. This counsels against an award of prejudgment interest, lest Warsaw enjoy a possible double recovery. Independently, because Warsaw delayed for over four years before filing this lawsuit, it should not be permitted to obtain an award of prejudgment interest. If the Court is nonetheless inclined to award (additional) prejudgment interest, NuVasive respectfully submits that the Court should award interest at the rate specified by 28 U.S.C. § 1961, compounded monthly. This results in prejudgment interest of $1,286,488 for NuVasive's presently adjudged infringement of the Warsaw

patents, and $3,551 for Medtronic Sofamor Danek USA's presently adjudged infringement of the NuVasive '236 patent.

## II.     ONGOING ROYALTIES

### A.     Statement of Law

Subsequent to the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), it has become routine for district courts to deny injunctive relief, as the Court has done here. This has led to a number of cases in which district courts have faced the issue of accounting for post-verdict sales of adjudged infringing products.

The Federal Circuit has given little guidance on how to properly account for these sales. The case most directly on point is *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007). In *Paice*, the district court found that Toyota infringed a patent related to drive trains for hybrid electric vehicles. *Id*. at 1296. The district court declined to award injunctive relief, and instead imposed an ongoing royalty of $25 per accused vehicle. *Id*. at 1302-3. Paice challenged the imposition of this royalty. *Id*. at 1314.

The Federal Circuit began by noting that "[u]nder some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate." *Id*. But it went on to caution that, while such relief may in certain instances be "necessary to effectuate a remedy," that "does not justify the provision of such relief as a matter of course whenever a permanent injunction is not imposed." *Id*. at 1315. It explained:

> In most cases, where the district court determines that a permanent injunction is not warranted, the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement.

*Id*. The Federal Circuit then remanded the case to the district court because the court had not explained what methodology it used to select the $25 per vehicle ongoing royalty rate. *Id*.

### B.     The Court Should Not Impose An Ongoing Royalty At This Time

As the Federal Circuit cautioned in *Paice*, imposition of an ongoing royalty should not be routine. Relying on *Paice*, multiple district court decisions have declined to award an ongoing

royalty, and instead ordered the parties to attempt to negotiate an ongoing royalty. *See Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d 333, 344-48 (D. Del. 2010) (noting that "[l]ike the decision to grant or deny injunctive relief, it is within the court's equitable discretion to determine whether an ongoing royalty need be imposed," and denying the request for an ongoing royalty based in part on the fact that both parties were going to appeal to the Federal Circuit); *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 592 F. Supp. 2d 727, 748 (D. Del. 2009) (declining to adopt plaintiff's request for a compulsory license, and ordering the parties to negotiate the terms of a going forward royalty); *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 986-87 (N.D. Cal. 2009) ("In such situations, the best practice is to order the parties to negotiate the terms of an ongoing royalty for the court to impose"); *Ricoh Co. v. Quanta Computer, Inc.*, 2010 U.S. Dist. LEXIS 38220 at *11 (W.D. Wis. April 19, 2010) ("Under *Paice*, the general rule is 'to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty' … Accordingly, I will direct the parties to engage in negotiations regarding an appropriate royalty."). The Federal Circuit expressly affirmed the district court's denial of an ongoing royalty in *Telecordia*. *See Telcordia Techs., Inc. v. Cisco Sys.*, 612 F.3d 1365, 1379 (Fed. Cir. 2010) ("the district court did not abuse its discretion by directing the parties to negotiate the terms of the appropriate royalty"). Here, instead of forcing an ongoing royalty on the parties, the Court should instead allow Warsaw and NuVasive time to negotiate their own going forward royalty. This can proceed in parallel with the appeal on the merits.

Alternatively, given the substantial issues both parties intend to appeal, the Court could simply order the parties to report sales of any adjudged infringing products on a quarterly basis, without making any actual payments. *See Voda v. Cordis Corp.*, 2006 U.S. Dist. LEXIS 63623 at *20-21 (W.D. Ok. September 5, 2006). Both parties are large corporations with significant cash-on-hand with which to satisfy any future award, assuming any of the liability findings withstand appeal, and the Court can compensate for any delay by awarding interest.[1]

Finally, Warsaw has indicated that it intends to seek lost profits damages for future infringing sales. An ongoing royalty, however, is only appropriate in cases where the Court is

---

[1] The Court could also order the parties to place funds into a reserve or escrow account.

simply performing the ministerial task of multiplying two numbers together (i.e., a royalty base and a royalty rate). *See Voda*, 2006 U.S. Dist. LEXIS 63623 at *20-21; *Hynix*, 609 F. Supp. 2d at 986. Warsaw's lost profits claim, by contrast, raises numerous disputed issues of fact, such as the scope of the relevant market, the number of participants, and the number of unpatented items to include in the award. (*See* D.I. 407 at 27-40.) NuVasive has a Seventh Amendment right to a jury trial on these important disputes, and because the existing jury verdict gives the Court no way to know how these disputes were resolved (*see* D.I. 397), it would be inappropriate for the Court to award lost profits damages going forward without a separate jury trial. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478-79 (1962) (holding an accounting inappropriate under the Seventh Amendment where the jury could have determined the appropriate remedy); *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) (holding additur procedure to violate Seventh Amendment because "an increase by the court is a bald addition of something which in no sense can be said to be included in the verdict").[2] The more appropriate remedy, if Warsaw persists in its request for future lost profits, would be to sever and stay Warsaw's future damages claim and allow the appeal on the merits to proceed. *See z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 444-45 (E.D. Tex. 2006) ("In light of denying z4's proposed permanent injunction, an efficient method for z4's recovery of future monetary damages post-verdict is needed. The Court crafts such a remedy by severing z4's continuing causes of action for monetary damages due to Microsoft's continuing post-verdict infringement of z4's patent."). Staying any claim for future lost profits would preserve judicial economy in that it would allow the parties and the Court to benefit from the Federal Circuit's rulings on key issues, including the many disputes presented by Warsaw's lost profits claim.

### C. If The Court Is Inclined To Set An Ongoing Royalty, It Must Perform A Proper *Georgia-Pacific* Analysis

If the Court is inclined to set an ongoing royalty now, rather than after the appeal, it must do so using a proper *Georgia-Pacific* analysis. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D. N.Y. 1970); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,

---

[2] While the Federal Circuit in *Paice* determined that there was no Seventh Amendment violation caused by imposition of an ongoing ***royalty***, the *Paice* decision says nothing about the imposition of ongoing ***lost profits***; instead, the Supreme Court cases cited above show that such an award would be improper.

2010 U.S. Dist. LEXIS 79039 at *9-10 (S.D. Cal. August 5, 2010).  The Court should consider whether the post-trial hypothetical negotiation differs in any material respect from what the parties presented during trial, keeping in mind that even during trial damages were presented assuming that all patents were both valid and infringed.  *Id*.; *see also* Trial Tr. at 1076:20-1077:17 (Neels); 1904:6-10 (Sullivan).  In many cases, courts have found that (once a permanent injunction is denied) the bargaining position of the parties does not effectively change post-trial.  *See Presidio*, 2010 U.S. Dist. LEXIS 79039 at *14 ("with permanent injunction off the table, the bargaining position of a willing patentee and infringer are substantially the same as they would have been at the time the infringement began").  Accordingly, courts have adopted the same royalty rates determined by a jury as the appropriate amount for a going-forward royalty.  *See Orion IP, LLC v. Mercedes-Benz USA, LLC*, 2008 U.S. Dist. LEXIS 108683 at *12-14 (E.D. Tex. March 28, 2008) ("[Plaintiff] has not shown how the situation now is any different than that presented at trial, which justified the two percent royalty rate.  Accordingly, two percent remains an appropriate royalty rate for postverdict infringement.").[3]

Here, the jury made explicit findings on the royalty rates appropriate for each patent-in-suit, after finding validity and infringement, and neither party challenged these findings post-trial.  The royalty bases were similarly undisputed for all patents except for the '933 patent.  Now, with the denial of injunctive relief, the most appropriate result would be to adopt these rates going forward.  If the Court is inclined to reconsider the jury's decision, however, it must analyze the relevant *Georgia-Pacific* factors for each asserted patent.  Various relevant factors are discussed below.

### 1.      The '973 Patent

A *Georgia-Pacific* analysis suggests that the royalty rate for the '973 patent should be no greater than the 10% rate found by the jury.

---

[3] Some courts have adopted higher rates than those awarded by the jury, but typically they do so in situations where an injunction was entered, *see Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008) ("This is not a case like *Paice* … where the court's task was to assess an appropriate level of damages for ongoing infringement under circumstances in which an injunction was not warranted"), or where the defendant's infringement was found to be willful, *see Joyal Prods. v. Johnson Elec. North Am., Inc.*, 2009 U.S. Dist. LEXIS 15531 at *40-41 (D.N.J. February 26, 2009).  Neither situation applies here.

First, with respect to *Georgia-Pacific* factors 1 & 2 (licensing activity), NuVasive presented evidence of four relevant license agreements during trial:

- The first agreement was between Dr. Michelson and Sofamor Danek, dated December 31, 1993, and covered the '247 patent (a patent that at one time was called the "parent" of Dr. Michelson's '973 patent), as well as four additional U.S. and foreign patents and patent applications. (DTX-5239.) The royalty rate was 10%, but as Dr. Sullivan explained at trial, that rate must be viewed in light of the fact that the agreement covered multiple patents, and granted exclusive rights to those patents (whereas the hypothetical negotiation is for a non-exclusive license to the '973 patent only). (Trial Tr. at 1995:11-20 & 1996:20-1997:3.)

- The second agreement was between Dr. Michelson and Sofamor Danek, dated January 11, 1994, and covered a patent application entitled "Artificial Spinal Fusion Implants," as well as seven additional U.S. and foreign patents and patent applications. (DTX-5719.) Again, the rate was 10%, but that included multiple patents and granted exclusive rights to Sofamor Danek. (Trial Tr. at 1996:2-10.)

- The third agreement was a draft license for the '973 patent itself, as well as 19 additional U.S. and foreign patents and patent applications, sent from Medtronic to Dr. Michelson during their litigation. (DTX-5018.) The draft agreement proposed a lump sum payment of $6.295 million, and a royalty rate of 10%. (Trial Tr. at 1996:11-19.) Yet once again, the royalty rate for the '973 patent alone would necessarily be less because it represented only $1/19^{th}$ of the arms-length negotiation between Medtronic and Michelson for which an exclusive license was contemplated.

- The fourth agreement related to Telamon-C and Telamon-Ti spinal implants, and included royalty rates ranging between 2.5% and 5%. (DTX-5550.)

Warsaw did not present any of its own comparable license agreements, nor did it call Dr. Neels to rebut any of the agreements presented by NuVasive. These comparable agreements establish a range of appropriate royalties between 2.5% and 10%, but as noted above, all agreements with a 10% royalty rate include multiple patents and grant exclusive rights, which

makes them significantly different from the royalty at issue here.  These agreements, along with the 10% rate determined by the jury, establish a range between which Warsaw and NuVasive would bargain in a hypothetical negotiation.

Second, with respect to *Georgia-Pacific* factor 5 ("the commercial relationship between the licensor and licensee"), there has never been any evidence of competition between *Warsaw* and NuVasive, only between NuVasive and other Medtronic entities, most specifically MSD USA (the entity which actually carries out sales and has relationships with doctors and hospitals).  This lack of direct competition with Warsaw suggests a lower royalty rate.

Third, with respect to *Georgia-Pacific* factors 9 through 11 (related to the contribution of the patent-in-suit to the accused products), Dr. Neels never stated that the '973 patent was the basis for demand for an XLIF procedure; instead he stated that at least three products together were necessary for lateral procedures: an implant, a retractor, and nerve monitoring.  (Trial Tr. at 1033:23-1034:5.)  And substantial evidence presented during trial suggested that nerve monitoring was in fact the most important of the three.  (*See, e.g.,* PX-0044, DTX-6085, DTX-5504, DTX-5404, DTX-5296, DTX-5519, & DTX-5514.)  This suggests a lower royalty rate for the '973 patent.

Fourth, with respect to *Georgia-Pacific* factor 6 (the effect on unpatented products), both Dr. Sullivan and Dr. Neels agreed it was inappropriate to include unpatented items in the royalty base for the '973 patent, and only the accused CoRoent XL implants were included in their respective calculations.  (Trial Tr. at 1999:8-10.)

Given that the parties would likely negotiate in a range of 2.5% and 10%, and given that multiple *Georgia-Pacific* factors weight in favor of a lower rate, NuVasive respectfully submits that the Court should set a royalty rate of no greater than 10%, applied only to the accused CoRoent XL implants.

### 2. The '933 Patent

A *Georgia-Pacific* analysis suggests that the royalty rate for the '933 patent should be set at no greater than the 3% rate awarded by the jury.

First, with respect to *Georgia-Pacific* factors 1 & 2 (licensing activity), NuVasive presented evidence of two relevant agreements during trial:

1      • The first agreement was a purchase agreement for the '933 patent itself, executed on
2         May 1, 2004 between '933 inventor Dr. Branch and Warsaw, for a lump sum payment of
3         $400,000. (DTX-5484; Trial Tr. at 1997:15-1998:5.)
4      • The second agreement was between an inventor, Chad Prusmack, and Globus Medical
5         for five patent applications related to "minimal access retractor systems" and other
6         products, dated November 1, 2006. (DTX-5478.) It had a royalty rate of 1.5%. (Trial
7         Tr., 1998:6-10.)

8    Warsaw did not present any of its own comparable license agreements, nor did it call Dr.
9    Neels to rebut the agreements presented by NuVasive. These comparable agreements, as well as the
10   jury verdict, establish a range of between 1.5% and 3% for the '933 patent.

11       Second, with respect to *Georgia-Pacific* factor 5 ("the commercial relationship between the
12   licensor and licensee"), as noted above, there has never been any evidence of competition between
13   Warsaw and NuVasive, only between NuVasive and other Medtronic entities. This lack of direct
14   competition with Warsaw suggests a lower royalty rate.

15       Third, with respect to *Georgia-Pacific* factors 9 through 11 (related to the contribution of the
16   patent-in-suit to the accused products), as noted above, Dr. Neels never stated that the '933 patent
17   was the basis for demand for an XLIF procedure; instead he stated that at least three products
18   together were necessary for lateral procedures: an implant, a retractor, and nerve monitoring. (Trial
19   Tr. at 1033:23-1034:5.) Substantial evidence presented during trial suggested that nerve monitoring
20   was in fact the most important of the three. (*See, e.g.,* PX-0044, DTX-6085, DTX-5504, DTX-
21   5404, DTX-5296, DTX-5519, & DTX-5514.) This suggests a lower royalty rate for the '933 patent.

22       Fourth, with respect to *Georgia-Pacific* factor 6 (the effect on unpatented products), the
23   parties disputed whether the royalty base for the '933 patent should include only retractors, or
24   whether additional unpatented items should also be included. Specifically, Warsaw proposed a
25   royalty that included not only retractors, but also CoRoent implants and NuVasive's XLP plating
26   system. (Trial Tr. at 1057:5-18.) The jury verdict form does not indicate how the jury resolved this
27   dispute. (*See* D.I. 397.) NuVasive has previously presented the reasons why it believes it is legally
28   inappropriate to include unpatented items in the damages calculations. (*See* D.I. 407 at 33-37.) For

8

the XLP plating system in particular, Warsaw never presented evidence on when or how often this fixation system is used in an XLIF procedure, or what drives demand for this product. For this reason, NuVasive respectfully believes that any going forward royalty should be limited to only those MaXcess retractors found to infringe the '933 patent.

Given that the parties would likely negotiate in a range of 1.5% to 3%, and given that several factors weight in favor of a lower royalty rate, NuVasive respectfully submits that the Court should set a royalty rate no greater than the 3% awarded by the jury.

### 3. The '586 Patent

A *Georgia-Pacific* analysis suggests that the royalty rate for the '586 patent should be set at no greater than the 2% rate found by the jury.

First, with respect to *Georgia-Pacific* factors 1 & 2 (licensing activity), NuVasive presented evidence of two relevant agreements during trial:

- The first agreement was dated January 1, 2001, and related to anterior cervical plates (ACPs) including the Medtronic ZEPHIR ACP. (DTX-5481.. This agreement included one U.S. patent at a royalty rate of 1.7%. (Trial Tr. at 1998:11-15.)

- The second agreement was dated April 25, 2008 and relates to the Medtronic Venture ACP. (DTX-5548.) It includes three patent applications, and has a royalty rate of 1.75%. (Trial Tr., 1998:16-21.)

Again, Warsaw did not present any of its own comparable license agreements, nor did it call Dr. Neels to rebut the agreements presented by NuVasive. These agreements, along with the 2% royalty rate determined by the jury, set a range of between 1.7% and 2% for the hypothetical negotiation.

Second, with respect to *Georgia-Pacific* factor 5 ("the commercial relationship between the licensor and licensee"), as above, there has never been any evidence of competition between Warsaw and NuVasive, only between NuVasive and other Medtronic entities. This lack of direct competition suggests a lower royalty rate.

Third, with respect to *Georgia-Pacific* factors 9 through 11 (related to the contribution of the patent-in-suit to the accused products), Dr. Neels never stated that the '586 patent was the basis for

9

demand for NuVasive ACP's, and he agreed that Medtronic was able to achieve a dominant share of the ACP market without using the '586 patent. (Trial Tr., 1087:19-1088:4.) This suggests a lower royalty rate for the '586 patent.

Fourth, with respect to *Georgia-Pacific* factor 6 (the effect on unpatented products), both Dr. Sullivan and Dr. Neels agreed it was inappropriate to include unpatented items in the royalty base for the '586 patent. (Trial Tr. at 1999:8-10.)

Given the jury award of 2%, and given the existence of several factors suggesting a lower royalty rate is appropriate, the Court should award an ongoing royalty of no greater than 2%.

### 4. The '236 Patent

A *Georgia-Pacific* analysis suggests that the royalty rate for the '236 patent should be set at 5.5%.

First, with respect to *Georgia-Pacific* factors 1 & 2 (licensing activity), NuVasive presented evidence of two relevant agreements during trial:

- The first agreement was dated April 6, 2001 and related to a patent on "Physician-Directed Intraoperative Spinal Cord and Nerve Root Monitors." (DTX-5551.) This agreement called for a royalty of 6% on the nerve monitoring system and ancillary equipment and disposable peripheral supplies sold with the nerve monitoring system for use in spinal applications. (Trial Tr. at 1917:24-1918:20.)
- The second agreement related to "instruments which allow[] for the delivery of an electrical stimulus while simultaneously creating a hole in bone." (DTX-5626.) It called for a royalty of 5%. (Trial Tr. at 1918:21-1919:8.)

Again, Warsaw did not present any of its own comparable license agreements, nor did it call Dr. Neels to rebut the agreements presented by NuVasive. These agreements, along with the 5.5% royalty rate determined by the jury, set a range of between 5% and 6% for the hypothetical negotiation.

Second, with respect to *Georgia-Pacific* factor 4 ("the licensor's established policy and marketing program to maintain his patent monopoly"), there was no evidence at trial that NuVasive had ever licensed its nerve monitoring technology. This suggests a higher royalty rate.

Third, with respect to *Georgia-Pacific* factor 5 ("the commercial relationship between the licensor and licensee"), unlike the situation with Warsaw, NuVasive *does* directly compete with MSD USA, which sells competing products directly to surgeons and hospitals. This suggests a higher royalty rate.

Fourth, with respect to *Georgia-Pacific* factors 9 through 11 (related to the contribution of the patent-in-suit to the accused products), substantial evidence presented during trial suggests that nerve monitoring is in fact the most important part of a direct lateral procedure, (*see, e.g.,* PX-0044, DTX-6085, DTX-5504, DTX-5404, DTX-5296, DTX-5519, & DTX-5514), which suggests a higher royalty rate.

Fifth, with respect to *Georgia-Pacific* factor 6 (the effect on unpatented products), Medtronic did not challenge the items Dr. Sullivan included in his royalty calculations, either during or after trial. The Court should therefore use this same royalty base in determining its going-forward royalty.

Given a likely negotiation range of between 5% and 6%, a rate of 5.5% (as determined by the jury) is reasonable and supported by substantial evidence. This royalty rate should be applied to the same base NuVasive presented during trial.

## III. PRE-JUDGMENT INTEREST

### A. Any Award of Pre-Judgment Interest is Inappropriate

#### 1. The Jury's Award Is Presumed To Include Interest

During trial, Warsaw presented two different damages calculations to the jury, both of which included interest. (Trial Tr. at 1058:25-1063:2). The verdict form gives no indication of whether or how much interest the jury actually awarded. (D.I. 397.) Under similar circumstances, at least two district courts have rejected awarding prejudgment interest. *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 166 F. Supp. 2d 1008, 1041 (D. Del. 2001) ("At trial, Honeywell's expert, Julie Davis, testified to the jury that she included prejudgment interest in her damages calculation. In light of this testimony, the court finds that the jury reasonably would have included prejudgment interest in its damages award"); *Graco Children's Prods., Inc. v. Century Prods. Co.*, 1996 U.S.

Dist. LEXIS 10356 at *104-107 (E.D. Pa. July 23, 1996) ("Graco has already asked for, and presumably received, prejudgment interest from the jury in this case").

The *Graco* case is particularly instructive. In that case, the plaintiff asked the jury to award $3 million in lost profits damages, but the jury returned a verdict of $2.1 million. *Id*. The plaintiff then asked for prejudgment interest, but the Court rejected that request, noting that because the plaintiff repeatedly included interest in its damages calculations (both through its damages expert and through closing arguments), the Court would presume the jury award included interest. *Id*. The Court noted that "the parties could have solved the problem … if they had included a separate interrogatory for prejudgment interest in their verdict form," but since they did not, the court said that the plaintiff "shoulders the consequences of this confusion and uncertainty because it provided the jury with damage figures that included interest estimates." *Id*. "Thus, this court will presume that the jury's award included an interest augmentation and that an award of prejudgment interest would constitute an unauthorized doubling of damages." *Id*.

Here, the parties vigorously disputed whether the question of interest should go to the jury, and the Court ultimately determined that the jury should not be asked to decide the appropriate interest ***rate***. (Trial Tr. at 1959:16-1965:5). However, the jury was not instructed to exclude interest. And because Warsaw persisted in presenting damages figures to the jury that included interest, even after this Court's ruling with respect to the rate, Warsaw shoulders the blame for any uncertainty, and its request for prejudgment interest should be denied.

### 2. Warsaw's Delay in Filing Suit Bars Prejudgment Interest

Another circumstance that justifies the denial of pre-judgment interest is "where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983). Here, Warsaw delayed for over four years between the time when the accused CoRoent XL implants were first introduced and the filing of this infringement lawsuit, and three years after the launch of the MaXcess II retractor. This delay by itself justifies the denial of pre-judgment interest. *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001) (affirming district court's denial of pre-judgment interest where patentee delayed for two years).

**B.  If the Court is Inclined to Award Interest, it Should Do So at the Rate Specified in 28 U.S.C. § 1961**

Determining the appropriate rate for pre-judgment interest is not an issue unique to patent law, and therefore the law of the regional circuit applies. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343, 1347-48 (Fed. Cir. 1999) ("neither pre- nor post-judgment interest awards are unique to patent law…prejudgment interest, like all monetary interest, is simply compensation for the use or forbearance of money owed").  In the Ninth Circuit, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *See Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001).  Applying Ninth Circuit law, courts in this district have based pre-judgment interest on 28 U.S.C. § 1961. *See Excelsior College v. Frye*, 2007 WL 672517, at *4 (S.D. Cal. Feb. 21, 2007) (applying the Ninth circuit rule that pre-judgment interest rate is the rate specified by 28 U.S.C. § 1961 in a copyright infringement action).  The Federal Circuit has upheld the award of pre-judgment interest at this rate. *See Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) ("As to the choice of prejudgment interest rate, the district court, in exercises of its discretion, awarded prejudgment interest and set the rate at the U.S. Treasury bill rate, compounded annually"). NuVasive's damages expert has calculated interest using the rate specified in 28 U.S.C. § 1961, compounded monthly, resulting in prejudgment interest of $1,286,488 for NuVasive's presently adjudged infringement of the Warsaw patents, and $3,551 for MSD USA's adjudged infringement of the NuVasive '236 patent.

**IV.  CONCLUSION**

For the reasons stated above, the Court should decline to award prejudgment interest, and should decline to award a going-forward royalty at this time.  If the Court is inclined to grant an ongoing royalty, it should do so at a rate of no more than 2% for the '586 patent, no more than 3% for the '933 patent, no more than 10% for the '973 patent, and 5.5% for the '236 patent.  If the Court is inclined to grant prejudgment interest, it should do so at the rate specified in 28 U.S.C. § 1961.

1 | Dated:  February 10, 2012

FISH & RICHARDSON P.C.

By: *s/ Jonathan J. Lamberson*
    Jonathan J. Lamberson

Attorneys for Defendant/Counterclaimant/
Counterclaim Defendant NUVASIVE, INC.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on February 10, 2012 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civ LR 5.4(d). Any other counsel of record will be served by U.S. mail or hand delivery.

By: *s/ Jonathan J. Lamberson*
     Jonathan J. Lamberson