1  Luke L. Dauchot (S.B.N. 229829)
   luke.dauchot@kirkland.com
2  Alexander F. MacKinnon (S.B.N. 146883)
   alexander.mackinnon@kirkland.com
3  Nimalka R. Wickramasekera (S.B.N. 268518)
   nimalka.wickramasekera@kirkland.com
4  KIRKLAND & ELLIS LLP
   333 South Hope Street
5  Los Angeles, California  90071
   Telephone: (213) 680-8400
6  Facsimile: (213) 680-8500

7
   Attorneys for Plaintiff/Counterclaim
8  Defendants/Counterclaimants

9             UNITED STATES DISTRICT COURT

10         SOUTHERN DISTRICT OF CALIFORNIA

11 WARSAW ORTHOPEDIC, INC.,            ) CASE NO. 3:08-CV-01512-MMA
                                       ) (MDD)
12           Plaintiff,                )
          vs.                          ) **WARSAW'S OPENING BRIEF**
13                                     ) **REGARDING ONGOING**
   NUVASIVE, INC.,                     ) **ROYALTIES AND**
14                                     ) **PREJUDGMENT INTEREST**
             Defendant.                )
15 ──────────────────────────────     )
   NUVASIVE, INC.,                     )
16                                     ) Date:  TBD
             Counterclaimant,          ) Time:  TBD
17        vs.                          ) Judge:  Honorable Michael M. Anello
   MEDTRONIC SOFAMOR DANEK USA,        )
18 INC.                                )
                                       )
19           Counterclaim Defendant.   )
                                       )
20                                     )
   ──────────────────────────────     )
21 AND RELATED COUNTERCLAIMS           )

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ............................................................................1

II.     PRIOR PROCEEDINGS IN THIS CASE ......................................2

III.    ARGUMENT.....................................................................................3

      A.      An Ongoing Royalty Should Provide Full Compensation For Post-Verdict Infringement. ............................................................4

      B.      At A Minimum, Royalties Of 36% For The '973 Patent, 11% For The '933 Patent, And 7% For The '586 Patent Are Necessary To Provide Compensation For NuVasive's Ongoing Infringement. .........6

            1.      The Post-Verdict Facts Substantially Change The Hypothetical Negotiation. ...........................................................7

            2.      The Jury's Verdict—And The Risk Of Willful Infringement—Significantly Alter The Hypothetical Negotiation.............................................................................11

            3.      The Proposed Ongoing Royalty Rates Are Reasonable And The Minimum Necessary To Provide Full Compensation For NuVasive's Ongoing Infringement...........................................12

      C.      Specific Quarterly Reporting And Payment Terms Are Needed To Administer The Ongoing Royalties. ...................................................16

      D.      The Court Should Apply The California Statutory Rate of 7% To Calculate Prejudgment Interest. ...........................................................18

IV.     REQUEST FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT..19

V.      CONCLUSION ...............................................................................21

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4   *Acumed LLC v. Stryker Corp.*,
5       2007 WL 4180682 (D. Or. 2007), *aff'd*, 551 F.3d 1323 (Fed. Cir. 2008) ............... 12

*Aero Prod. Int'l Inc. v. Intex Recreation Corp.*,
6       2005 WL 1498667 (N.D. Ill. June 9, 2005) ........................................................... 19

7   *Amado v. Microsoft Corp.*,
        517 F.3d 1353 (Fed. Cir. 2008) ......................................................... 4, 6, 8, 11
8
*Amado v. Microsoft Corp.*,
9       No. SA CV 03-242 DOC (Anx), 2008 WL 8641264 (C.D. Cal. Dec. 4, 2008)....5, 11

10  *Aro Mfg. Co. v. Convertible Top Replacement Co.*,
        377 U.S. 476 (1964) ............................................................................................ 9
11
*Bard Peripheral Vascular, Inc. et al. v. W.L. Gore & Assoc., Inc.*,
12      No. 2010-1510, slip op. (Fed. Cir. Feb. 10, 2012) .......................................... 6, 11

13  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*,
        2009 WL 920300 (D. Ariz. Mar. 31, 2009) ................................................. 12, 18
14
*Boston Scientific Corp. v. Johnson & Johnson*,
15      2009 WL 975424 (N.D. Cal. Apr. 9, 2009) ..................................................... 11

16  *Brooktree Corp. v. Advanced Micro Devices, Inc.*,
        757 F. Supp. 1101 (S.D. Cal. 1990) ................................................................. 18
17
*Bullock v. Philip Morris USA, Inc.*,
18      198 Cal.App.4th 543, 131 Cal.Rptr.3d 382 (2011) ......................................... 18

19  *Conceptus, Inc. v. Hologic, Inc.*,
        No. C 09-02280 WHA, 2012 WL 44064 (N.D. Cal. Jan. 9, 2012) ......................... 21
20
*Creative Internet Advertising Corp. v. Yahoo!, Inc.*,
21      674 F. Supp. 2d 847 (E.D. Tex. 2009) ............................................................... 16

22  *Datatreasury Corp. v. Wells Fargo & Co.*,
        Case No. 2:06-cv-72-DF-CE, Dkt. No. 2496 (E.D. Tex. Aug. 2, 2011) .................... 5
23
*Finjan, Inc. v. Secure Computing Corp.*,
24      626 F.3d 1197 (Fed. Cir. 2010) ........................................................................ 4

25  *Floe Int'l, Inc. v. Newman's Mfg. Inc.*,
        2006 WL 2855071 (D. Minn. Oct. 4, 2006) ..................................................... 19
26
*General Motors Corp. v. Devex Corp.*,
27      461 U.S. 648 (1983) .............................................................................. 4, 16, 18

28

ii

*Gyromat Corp. v. Champion Spark Plug Co.*,
   735 F.2d 549 (Fed. Cir. 1984) ............................................................... 18

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
   2009 WL 440473 (N.D. Cal. Feb. 23, 2009) ........................................... 19

*In re Hayes*,
   766 F. Supp. 818 (N.D. Cal. 1991) ......................................................... 18

*Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*,
   2009 WL 512156 (D.N.J. Feb. 27, 2009) ................................................... 5

*Keith v. Volpe*,
   858 F.2d 467 (9th Cir. 1988) ................................................................... 20

*Mondis Tech. Ltd. v. Chimei Innolux Corp. et al.*,
   Civil Action No. 2:11-cv-378-TJW-CE, Dkt. No. 11 (E.D. Tex. Sept. 30, 2011)..5, 6

*Paice LLC v. Toyota Motor Corp.*,
   504 F.3d 1293 (Fed. Cir. 2007) ..................................................... 4, 5, 16

*Paice LLC v. Toyota Motor Corp.*,
   609 F. Supp. 2d 620 (E.D. Tex. 2009).............................................passim

*Presidio Components Inc. v. Am. Technical Ceramics Corp.*,
   723 F. Supp. 2d 1284 (S.D. Cal. 2010) ................................................. 18

*Rite-Hite Corp. v. Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) ............................................................ 4, 9

*Stryker Corp. v. Davol, Inc.*,
   75 F. Supp. 2d 746 (E.D. Mich. 1999) ................................................... 12

*TruePosition, Inc. v. Andrew Corp.*,
   611 F. Supp. 2d 400 (D. Del. 2009) ....................................................... 19

*WiAV Solns. LLC v. Motorola, Inc.*,
   631 F.3d 1257 (Fed. Cir. 2010) ............................................................. 20

*Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*,
   No. 2:04-cv-01971-MCE-EFB, 2009 WL 981843 (E.D. Cal. Apr. 13, 2009).......... 18

**Statutes**

35 U.S.C. § 284...................................................................................... 4

**Rules**

Fed. R. Civ. P. 15(d) ......................................................................... 19, 20

**Constitutional Provisions**

Cal. Const. Art. XV §1 ........................................................................... 18

iii

1

## **TABLE OF EXHIBITS**

| **Exhibit No.** | **Ex. Page No.** |
|-----------------|------------------|
| Exhibit A | 1-26 |
| Exhibit B | 27-39 |
| PX1703 | 40-42 |
| PX1903 | 43-45 |
| PX2077 | 46-47 |
| PX2078 | 48-49 |
| PX2079 | 50-51 |
| PX2085 | 52-53 |
| PX2090 | 54-55 |

## I.     INTRODUCTION

On September 20, 2011, the jury returned a verdict that NuVasive infringed three valid patents of Warsaw and awarded damages to Warsaw for that infringement. On January 26, 2012, this Court denied Warsaw's motion for a permanent injunction. As a result, NuVasive continues to sell its infringing products in competition with, and to the significant detriment of, Warsaw.  The Court has instructed the parties to brief the issue of the amount of ongoing royalties for post-verdict infringement, and Warsaw submits this brief pursuant to that instruction.

It is a fundamental principle that ongoing royalties must fully compensate Warsaw for all injury caused by NuVasive's infringement, including loss of Warsaw's right to exclude an important competitor from using its patented technology.  The amount of compensation for NuVasive's post-verdict infringement should be consistent with the jury's total damages award and should take into account the fact that NuVasive has built and maintains a 90% market share through the unauthorized use of Warsaw's patented technology.  With this brief, Warsaw submits the expert declaration of Dr. Kevin Neels, who has assessed the *Georgia-Pacific* factors and the circumstances surrounding a hypothetical negotiation after the jury's verdict.  As described by Dr. Neels, the fact of the liability verdict and the change in market circumstances would lead to a dramatically different negotiation than was the case in determining pre-verdict royalties.  The verdict also creates a substantial risk to NuVasive of a second trial for post-verdict damages that would likely include enhancement for willfulness.  All of these factors support substantially greater royalty rates than those found for the pre-verdict infringement.

Based on Dr. Neels' analysis and the facts and arguments set out below, the ongoing royalties necessary to compensate Warsaw for post-verdict infringement would be at least 36% for the '973 patent, 11% for the '933, and 7% for the '586 patent.  Anything less would reward NuVasive's ongoing infringement and would encourage NuVasive to continue to infringe rather than to develop its own technology.

1

As shown by Dr. Neels' declaration and NuVasive's own financial reports, NuVasive has the ability to pay these rates and should not be permitted to earn a substantial profit from its ongoing infringement.  Following numerous California federal court decisions, this Court should also award prejudgment interest at a rate of 7%, which is the California statutory rate of interest.

Finally, in connection with post-verdict damages, Warsaw requests leave to file a supplemental complaint (i) adding Medtronic Puerto Rico Operations Co. and Medtronic Sofamor Danek USA, Inc. as plaintiffs and (ii) alleging a claim on behalf of all three plaintiffs against NuVasive for its post-verdict willful infringement.

## II.    PRIOR PROCEEDINGS IN THIS CASE

At trial, NuVasive did not deny infringement by its CoRoent XL line of implants, and the jury found the '973 patent valid and infringed.  With regard to the '933 patent, the jury found that NuVasive's MaXcess II and III retractors infringe that patent.  (Tr. at 1027:7-14 (Neels); Dkt. 397.)[1]  The jury also found that the Helix and Helix Mini ACP systems infringe the '586 patent.  (Tr. at 824:17-25 (Vito); Dkt. 397.)

The record at trial established that Warsaw and NuVasive are competitors with regard to the accused products, and that DLIF was the primary competition for NuVasive's XLIF for direct lateral spinal fusions.  (Tr. at 1016:1-21 (Neels), 1233:23-1234:4 (Valentine).)  The record further established that  NuVasive has quickly built a successful business and amassed a 90% share of the market for direct lateral surgeries in face of competing DLIF procedures using products made or sold on behalf of Warsaw.  (Tr. at 1089:23-1090:3 (Neels); PX2085, PX2090.)  NuVasive's gross margins on the infringing products are high, with CoRoent XL margins at approximately 95% and margins for the infringing retractors and plates at more than 80%.  (Neels Decl. Ex. 10; Tr. at 2040:11-2041:15 (Sullivan).)

---

[1] All pages of the trial transcript cited in this brief are attached as Exhibit A.

The jury specifically found that Warsaw was entitled to lost profits caused by NuVasive's infringing sales.  (Dkt. 397.)  For infringing sales that did not cause Warsaw to lose profits (either because of market share distribution or because they were made before Warsaw acquired the patents in suit), the jury determined that the following royalty rates were appropriate for NuVasive's pre-verdict infringement: 10% for the '973, 3% for the '933, and 2% for the '586.  (*Id.*)  In total, the jury awarded damages of $101,196,000.[2]

Despite the jury's verdict, NuVasive has continued to sell the infringing products.  NuVasive has not redesigned the infringing CoRoent XL implants or any of the other infringing products since trial.  According to NuVasive's CEO, Alexis Lukianov, only 40% of NuVasive's business is related to the infringing CoRoent XL and MaXcess products, of which only 20% would be subject to a royalty on the '973 patent.  (Neels Decl. Ex. 6 (Lukianov post-trial comments) at 5.)

This Court recently denied NuVasive's JMOL challenges to the damages award and other aspects of the verdict.  (Dkt. 460.)  The Court denied Warsaw's motion for permanent injunction as well.  (*Id.*)

## III.   ARGUMENT

Where, as here, the jury finds infringement and damages but a permanent injunction is denied, courts have recognized that an ongoing royalty award may be used as one way to compensate the patent owner for the post-verdict infringement. The Federal Circuit has provided guidance on the appropriate method for determining an ongoing royalty rate, and has cautioned that jury determinations of a reasonable royalty should ***not*** automatically be applied to post-verdict infringement.  *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361-62 (Fed. Cir. 2008) ("There is a fundamental

---

[2]  At trial, Warsaw presented evidence of NuVasive's infringing sales through June 2010 and later moved for supplemental damages for the period July 2010 through September 20, 2011.  (Dkt. 408.)  Although the Court denied Warsaw's motion for supplemental damages, the record regarding pre-verdict sales is limited to infringing sales through June 2010, and those are the sales that Dr. Neels has used to allocate the jury's damages award on a year-by-year basis.  (Neels Decl. ¶29.)

3

difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.").

### A. An Ongoing Royalty Should Provide Full Compensation For Post-Verdict Infringement.

The purpose of an ongoing royalty is to fully compensate the patent holder where the adjudged infringer continues infringing after an adverse jury verdict. "The law must ensure that an adjudged infringer who voluntarily chooses to continue his infringing behavior must adequately compensate the patent holder for using the patent holder's property. Anything less would be manifestly unjust and violate the spirit, if not the letter, of the U.S. Constitution and the Patent Act." *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009). Upon a finding of infringement, 35 U.S.C. § 284 directs courts to award "damages adequate to compensate" the patent owner for all of "the use made of the invention by the infringer," including post-verdict infringement. *Id.*; *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1213 (Fed. Cir. 2010) ("The district court should have awarded compensation for any infringement prior to the injunction."). "Adequate" compensation under section 284 requires that the patent owner be fully compensated: "Thus, while the statutory text states tersely that the patentee shall receive 'adequate' damages, the Supreme Court has interpreted this to mean that 'adequate' damages should approximate those damages that will ***fully compensate*** the patentee for infringement." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*citing General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 653 (1983)) (emphasis in original).

As an equitable remedy, the amount of an ongoing royalty rate may be determined by the Court without an additional jury trial. *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315-16 (Fed. Cir. 2007). In some cases, district courts have allowed the parties to attempt to negotiate an ongoing royalty in light of the jury verdict. *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d at 623 ("[T]he Court has

given the parties full and fair opportunity to set their own ongoing royalty rate.").  In this case, however, the parties are unlikely to reach an agreement through additional negotiations.  (Neels Decl. Ex. 6 at 12 ("I *do* want to be perceived as ***bull headed*** relative to settlement.")  Courts have also held short hearings to receive additional evidence relevant to the equitable determination of an ongoing royalty rate.  *Paice LLC*, 504. F.3d at 1315 ("Upon remand, the court ***may*** take additional evidence ***if necessary*** to account for any additional economic factors arising out of the imposition of an ongoing royalty.").

In many cases awarding ongoing royalties, the post-verdict rate is set significantly higher than the pre-verdict rate because of the changed economic circumstances and the impact of the jury's finding of liability.  A number of these cases are summarized in the table below:

| Case[3] | Jurisdiction | Date | Pre-Verdict Royalty | Ongoing Royalty |
|---|---|---|---|---|
| Amado v. Microsoft | C.D. Cal. | 2008 | $0.04 | $0.12 |
| Joyal Products v. Johnson Electric | D.N.J. | 2009 | 8% | 26% |
| Paice v. Toyota | E.D. Tex. | 2009 | $25 | $98 |
| Data Treasury v. Wells Fargo | E.D. Tex. | 2011 | $.002 per check | $.005 per check |
| Mondis v. Chimei Innolux | E.D. Tex. | 2011 | 0.5% | 1.5% |

In a decision issued on the date of this briefing, the Federal Circuit affirmed a district court ongoing royalty of 20% for products that competed with those of the patentee.  *Bard Peripheral Vascular, Inc. et al. v. W.L. Gore & Assoc., Inc.*, No. 2010-1510, slip op. at 37-39 (Fed. Cir. Feb. 10, 2012).  In *Bard*, the Federal Circuit found that the district court did not abuse its discretion in setting the ongoing royalty rates

---

[3] *See Amado v. Microsoft Corp.*, No. SA CV 03-242 DOC (Anx), 2008 WL 8641264, at *11 (C.D. Cal. Dec. 4, 2008); *Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*, 2009 WL 512156, at *13-14 (D.N.J. Feb. 27, 2009); *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009); *Datatreasury Corp. v. Wells Fargo & Co.*, Case No. 2:06-cv-72-DF-CE, Dkt. No. 2496, at 26, 33 (E.D. Tex. Aug. 2, 2011); *Mondis Tech. Ltd. v. Chimei Innolux Corp. et al.*, Civil Action No. 2:11-cv-378-TJW-CE, Dkt. No. 11 at 5 (E.D. Tex. Sept. 30, 2011).

and explaining the reasoning used to establish those rates.  Among the factors considered by the district court and noted with approval by the Federal Circuit were: "the parties' changed legal post-verdict status"; that the defendant "voluntarily chose to continue its post-verdict infringement unabated"; direct competition between the patentee and defendant; high levels of profitability by the defendant; the potential for greater losses to the defendant if the patentee prevailed in a second trial; and the lack of incentive for the patentee to accept a "below-market" deal.  *Id.*  In light of these factors and the reasoning of the district court, the Court of Appeals affirmed an ongoing royalty on competing products at twice the rate of the reasonable royalty found by the jury for pre-verdict sales.  *Id.*

**B.    At A Minimum, Royalties Of 36% For The '973 Patent, 11% For The '933 Patent, And 7% For The '586 Patent Are Necessary To Provide Compensation For NuVasive's Ongoing Infringement.**

District courts have applied a "modified *Georgia-Pacific*" analysis to determine an ongoing royalty rate.  *Paice LLC*, 609 F. Supp. 2d at 624; *Mondis Tech. Ltd. v. Chimei Innolux Corp. et al.*, Civil Action No. 2:11-cv-378-TJW-CE, Dkt. No. 11 at 8-9 (E.D. Tex. Sept. 30, 2011); *Bard*, No. 2010-1510, slip op. at 37-39.  Under this approach, courts consider a hypothetical negotiation taking place after the jury's verdict of liability.  *Mondis*, Civil Action No. 2:11-cv-378-TJW-CE, Dkt. No. 11 at 7-8.  Modifications to the pre-verdict *Georgia-Pacific* analysis include consideration of (1) the different economic factors that are involved in a hypothetical negotiation between the parties after the jury's verdict on liability; and (2) the parties' changed legal status in light of the jury's finding of liability.  *Amado*, 517 F.3d at 1362; *Bard*, No. 2010-1510, slip op. at 37-39.  In the present case, both considerations demonstrate the need for ongoing royalties that are significantly higher than the pre-verdict royalties.

### 1. The Post-Verdict Facts Substantially Change The Hypothetical Negotiation.

In this case, the original *Georgia-Pacific* analysis assumed that the hypothetical negotiations would have taken place just before NuVasive began its infringing conduct—2004 for the '973 patent, 2005 for the '933 patent and 2007 for the '586 patent.  However, several key *Georgia-Pacific* factors have changed substantially from pre-infringement to post-verdict.  Pre-infringement, NuVasive was a start-up company without substantial ongoing business.  At that time, NuVasive was a competitor to Warsaw, albeit a small one without any significant market presence.  In addition, direct lateral surgery had not been established in the marketplace, and there was no guarantee regarding its future or the success of implants and retractors for use with direct lateral surgery.  In the post-verdict world, by contrast, NuVasive is a successful public company that has built a significant part of its business on the back of sales of the infringing products.  (PX2077-79; Neels Decl. ¶¶5-8, 12-15.)  As a result, NuVasive stands to lose much more post-verdict than it did pre-infringement, and would therefore be willing to pay much higher royalty rates for use of the patented technology.

Warsaw's post-verdict perspective is also much different than it would have had in pre-infringement negotiations.  Having now seen (i) NuVasive's rapid success in selling the infringing products, (ii) growth of the direct lateral market, (iii) the effect of NuVasive's infringing sales on Warsaw's profits and overall business, and (iv) NuVasive's 90% market share maintained with the patented technology, Warsaw would be far less willing to grant a license to NuVasive today than in 2004.[4]  Given the jury's award of lost profits and NuVasive's ever-increasing profitability, Warsaw would not be willing to license the patents in suit for anything less than a per unit amount consistent with the total damages awarded by the jury.  In fact, given NuVasive's sales success, dominant market share, increased ability to pay and the

---

[4] As Dr. Neels testified at trial, Warsaw does not license its patented technology to competitors like NuVasive.  (Tr. at 1018:9-1019:2 (Neels).)

7

potential for a willfulness enhancement in a second trial, Warsaw would likely seek higher rates than those derived from the total jury award.  (Neels Decl. ¶¶4-9, 12-20.)

Dr. Neels' declaration analyzes these facts in the context of key *Georgia-Pacific* factors that have changed between the pre-infringement and post-verdict hypothetical negotiations:

**Factor 1 (royalties received by the licensee for the patents in suit)**.  In addition to awarding lost profits, the jury determined reasonable royalty rates and royalty damages for NuVasive infringing sales for which Warsaw could not claim lost profits.  The jury found that the parties would have agreed to royalty rates of 10% for the '973, 3% for the '933 patent, and 2% for the '586 patent.  (Dkt. 397.)  While these rates would be one consideration under a *Georgia-Pacific* analysis, the Federal Circuit has held that it is error for a district court to start and end a post-verdict royalty analysis with the jury's royalty rates, because those rates were based on a hypothetical negotiation as of the first infringement.  *Amado*, 517 F.3d at 1362.  In *Amado*, the Federal Circuit directed the district court on remand to consider "the change in the parties' bargaining position, and the resulting change in economic circumstances, resulting from the determination of liability."  *Id.*

To be sure, the jury's award of lost profits (and a royalty remainder) would affect a post-verdict negotiation, and would significantly alter both parties' expectations and bargaining positions.  As Dr. Neels explains, Warsaw would be unlikely to agree to any per unit royalty rate that provided lower compensation than what could be derived from the jury's total award.  (Neels Decl. ¶¶3, 10-20.) NuVasive, on the other hand, would be faced with the possibility of a second trial, issue preclusion regarding infringement, validity, and entitlement to lost profits, and meritorious claims for willfulness and attorney fees.  *Paice LLC*, 609 F. Supp. 2d at 626.  This factor thus weighs heavily in favor of an increased royalty rate in a post-verdict negotiation.  (Neels Decl. ¶¶16-17.)

**Factor 5 (commercial relationship between the licensor and licensee)**.  Prior to the jury's verdict, NuVasive vigorously disputed Warsaw's entitlement to lost profits.  NuVasive's economic expert, Dr. Sullivan, made the same argument to the jury during his direct testimony.  (Tr. at 1980:3-1981:1 (Sullivan).)  In awarding lost profits to Warsaw, the jury rejected NuVasive's position and found that NuVasive's infringing sales proximately caused Warsaw to lose profits.  *See Rite-Hite Corp.*, 56 F.3d at 1545 (*citing Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)).  Thus, in the post-verdict negotiation, Warsaw's entitlement to lost profits has been established, as has the magnitude of harm caused to Warsaw by NuVasive's infringement.  With those issues resolved by the jury, this factor has also shifted significantly in favor of a higher royalty in a post-verdict negotiation.

Further, NuVasive's expanded portfolio of spinal products and 90% market share in the direct lateral segment of the market makes it a much more serious competitive threat to Warsaw in the post-verdict world.  (Neels Decl. ¶¶5, 12.)  And the knowledge that NuVasive is using profits from the sale of infringing CoRoent XL implants, MaXcess retractors, and Helix and Helix Mini plates to build a business designed to take market share from Warsaw and its licensees would also push Warsaw to ask for a higher royalty in the post-verdict negotiation.  (Neels Decl. ¶¶12, 15-17.)

**Factor 6 (effect of selling the patented specialty in promoting sales of other products)**.  NuVasive's ability to use infringing products to generate additional sales was amply demonstrated at trial.  The company has successfully marketed its entire suite of XLIF products, refusing to sell them separately.  (Tr. at 470:25-471:11 (Miles).)  It has also exploited relationships developed through the sale of these products to sell other parts of its expanding line of spine products.  (Neels Decl. ¶13.)

In a post-verdict negotiation, both parties would be aware of the record evidence regarding NuVasive's sales practices and the importance of the patented technology.  They would also know that NuVasive has marketed CoRoent XL as the "foundation of XLIF" and specifically promoted the patented pivoting feature of the

9

infringing MaXess retractors.  (PX1703, PX1903; Tr. 1028:22-1030:17 (Neels); 2039:18-20 (Sullivan).).  In addition, NuVasive's CoRoent XL brochures specifically promote the sale of supplemental fixation, which Mr. Lukianov admits generates 40% of XLIF revenue.  (PX1903; Neels Decl. Ex. 6 at 5.)  Thus, this factor also weighs heavily in favor of a higher post-verdict royalty to account for the power of the patented technology to generate sales of related products.

**Factor 8 (established profitability of the patented product, its commercial success and its current popularity)**.  NuVasive's damages expert, Dr. Sullivan, admitted at trial that NuVasive's gross margin on CoRoent XL is close to 95%, and his expert report showed gross margin levels nearly as high for infringing retractors and plates.  (Neels Decl. Ex. 10; Tr. at 2040:7-2041:15 (Sullivan).)  NuVasive sales records introduced at trial show infringing sales have grown quickly year-over-year, generating hundreds of millions of dollars in revenue.  (PX2077-79.)  Mr. Lukianov himself predicted further sales growth and additional market share taking in his post-verdict conference call with investors.  (Neels Decl. Ex. 6 at 7; Neels Decl. Ex. 9 at slide 11.)  Here again, the post-verdict market facts weigh in favor of a higher royalty rate.  (Neels Decl. ¶14.)

**Factor 11 (extent to which the infringer used the invention and any evidence probative of the value of that use)**.  Dr. Neels' review of NuVasive's SEC filings and the trial record has led him to the following conclusion:  "NuVasive's growth over the past five years has been driven in large measure by sales of products that use Warsaw's patented technology without Warsaw's permission. In a real sense the company has been built on its infringing sales."  (Neels Decl. ¶15.)  Again, both parties would have a much better understanding and appreciation of the extent of NuVasive's use of Warsaw's patented technology at a post-verdict negotiation than they did in 2004.

**Finally**, in the post-verdict world, NuVasive has a far greater ability to pay than it did when it began infringing.  In 2005, shortly after the first hypothetical

negotiation, NuVasive disclosed a $30 million operating loss on total revenues of $62 million.  (Neels Decl. Ex. 7; Neels Decl. ¶8.)   By 2010, however, NuVasive reported an operating profit of $32 million on total revenues of $478 million in its 10-K. (Neels Decl. Ex. 8; Neels Decl. ¶8.)  Since the first hypothetical negotiation, NuVasive's costs have declined as a percent of revenue, and its profitability has increased dramatically.  As a result, NuVasive's CEO confidently asserted to shareholders that the business will continue to grow, despite the jury's verdict and the anticipated ongoing royalty payments to Warsaw.  (Neels Decl. Ex. 6 at 7; Neels Decl. Ex. 9, at slide 20; Neels Decl. ¶8.)

        In short, the economic facts and the relationship between the parties are substantially different now than they were when NuVasive began its infringement. Considering these changed circumstances and their impact on the *Georgia-Pacific* factors, Dr. Neels concludes that the parties would have agreed to substantially higher post-verdict royalties compared to what would have been reasonable in 2004.  (Neels Decl. ¶¶3-17.)

    ### 2.  The Jury's Verdict—And The Risk Of Willful Infringement— Significantly Alter The Hypothetical Negotiation.

        According to the Federal Circuit, "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." *Amado*, 517 F.3d at 1361.  The Federal Circuit has also emphasized that trial courts must give a jury's finding of liability due consideration when setting ongoing royalty rates.[5] *Id.*; *Amado*, 2008 WL 8641264, at *5 ("[T]he Federal Circuit has made it clear that the Court should focus on the effect that the

---

[5] While some courts suggest that the jury's findings simply reinforce the *Georgia-Pacific* assumption that the asserted patents are valid and infringed, most courts have recognized the distinction between a party that seeks a license before using a patented invention, and a party that seeks a license only after having been found to infringe. *Boston Scientific Corp. v. Johnson & Johnson*, 2009 WL 975424 (N.D. Cal. Apr. 9, 2009) ("We must assume the jury's finding [of liability] means something."); *Bard*, No. 2010-1510, slip op. at 37-39.

1  *finding of liability* has on the parties' bargaining stances and economic positions . . .

2  .") (emphasis in original).

3      A finding of liability fundamentally alters the relationship between the parties

4  because any post-verdict infringement is voluntary and intentional, i.e., willful.  *Paice*,

5  609 F. Supp. 2d at 628 ("Toyota's continued infringement is both voluntary and

6  intentional. . . ."); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp 2d 746, 748 (E.D. Mich.

7  1999) ("Davol simply cannot have formed a good faith belief that its continuing sales .

8  . . were not infringing.  Rather, its conduct can only be characterized as stubborn,

9  intractable, contumacious, and yes, willful.").  Thus, courts have stressed that an

10  adjudged infringer who continues infringing after an adverse jury verdict faces the

11  possibility of a second lawsuit alleging willful infringement, *res judicata*, and seeking

12  attorney fees for an exceptional case.  *Paice LLC*, 609 F. Supp. 2d at 626 ("Toyota

13  never considers the fact that its continued infringement is willful and that a new

14  lawsuit by Paice would likely result in treble damages and could potentially be

15  considered an exceptional case.").  In light of the risk of additional litigation seeking

16  treble damages and attorney fees—and the changed economic factors discussed

17  above—ongoing royalty rates in this case must be substantially higher than the

18  reasonable royalty rates awarded by the jury and must provide full compensation to

19  Warsaw.

20      **3.    The Proposed Ongoing Royalty Rates Are Reasonable And
             The Minimum Necessary To Provide Full Compensation For
21           NuVasive's Ongoing Infringement.**

22      District courts have recognized that ongoing royalties must fully compensate

23  the patent holder for the loss of the fundamental patent right to exclude competitors.

24  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 2009 WL 920300, at * 8

25  (D. Ariz. Mar. 31, 2009) (*citing Acumed LLC v. Stryker Corp.*, 2007 WL 4180682, at

26  *4 (D. Or. 2007), *aff'd*, 551 F.3d 1323 (Fed. Cir. 2008) ("Intellectual property enjoys

27  its highest value when asserted against a direct competitor in the plaintiff's market.")).

28  These courts have also noted that denial of a permanent injunction with imposition of

an ongoing royalty effectively forces a patent owner to grant a license to a competitor that it should, by rights, be able to exclude from the marketplace.  *Id.*

An ongoing royalty rate that would allow NuVasive to continue its infringement—and compete using Warsaw's technology—at a pre-verdict royalty rate would essentially negate the jury's finding of wrongdoing and would deprive Warsaw of the full compensation that the jury found necessary to remedy NuVasive's infringement.  In a second trial against NuVasive for post-verdict infringement, the principles of *res judicata* would bar NuVasive from challenging, inter alia, liability, validity, and entitlement to lost profits.  *Paice LLC*, 609 F. Supp. 2d at 626.  As a result, in a post-verdict hypothetical negotiation Warsaw would, at a minimum, require royalty rates that would provide per unit compensation consistent with the jury's total damages award in this case.

Accordingly, Dr. Neels has calculated the floor for ongoing royalty rates by starting with the jury's verdict of $101 million (for lost profits and royalties on remaining sales) and then determining the rates under each patent that would yield that total verdict award if all damages were in the form of royalties.  (Neels Decl. ¶¶19-20.)  To do this, Dr. Neels used three undisputed data points:  (1) the quantity of NuVasive infringing sales for each accused product between May 2004 and June 2010; (2) the jury's total damages award; and (3) the jury's royalty rates.  Dr. Neels first determined the damages that would have resulted if the jury's royalty rates (10% for the '973, 3% for the '933, and 2% for the '586) were applied to all NuVasive infringing sales considered by the jury—yielding an amount of $27,877,405.  (Neels Decl. ¶19.)  He then compared this hypothetical all-royalty award ($27,877,405) to the jury's actual damages award ($101,196,000), resulting in a ratio of 3.63.  Multiplying the jury's pre-verdict royalty rates by the 3.63 ratio leads to the following ongoing royalty rates: 36% for the '973 patent, 11% for the '933[6], and at 7% for the '586

---

[6] To provide full compensation for use of the '933 patent, this rate would apply to sales of infringing retractors, loaner fees for kits including infringing retractors, and any disposables paid for or used with infringing retractors.

patent.  (Neels Decl. ¶19.)  By using the jury's pre-verdict royalty rates and the total damages award, this approach preserves the relative value that the jury determined was appropriate for each patent.  It also results in ongoing royalty rates that will necessarily yield the same per unit compensation as that provided by the total verdict.  (Neels Decl. ¶19-20.)

Dr. Neels also considered NuVasive's ability to pay these ongoing royalty rates.  At the outset, there is no doubt that NuVasive now has an ability to pay much higher royalties than it did when it began infringing as a start-up company.  Today, NuVasive is a $500 million dollar-per-year company with $525 million in cash reserves, a diversified product line, significant bottom-line profits, and multiple streams of revenue.  (Neels Decl. Ex. 6 at 11 ("We want to reiterate our 2011 revenue guidance of $530 to $540 million.")  NuVasive's current financial position is so strong that Mr. Lukianov told investment analysts in post-trial comments that the jury's verdict of $101 million will have no effect on NuVasive's current business.  (Neels Decl. Ex. 6 at 7.)  The fact that NuVasive believes that it can still profit and continue to grow its business despite the jury's verdict underscores its current financial capabilities.

According to its most recent financial data filed with the SEC, NuVasive can afford to pay much higher royalty rates than those in the verdict and still make a profit.  (Neels Decl. ¶¶8, 24-25.)  Dr. Neels reviewed NuVasive's 2010 10-K filing, which shows that NuVasive made an incremental profit of 30 cents for every dollar of revenue across its entire product line.  (Neels Decl at ¶24.)   According to Mr. Lukianov, only 40% of XLIF revenue is attributable to CoRoent XL, while 60% of XLIF revenue is based on supplemental fixation[7] and neuromonitoring.  (Neels Decl. Ex. 6 at 5.)  Because only CoRoent XL and pivoting MaXcess retractors are subject to an ongoing royalty, NuVasive can afford to pay royalties of 36% for the '973 patent and 11% for the '933 patent and still make a profit on each XLIF.  (Neels Decl. ¶26.)

---

[7] As distinct from anterior cervical plates that are subject to an ongoing royalty under the '586 patent.

14

There is also undisputed evidence that NuVasive's incremental costs are decreasing from year-to-year and its profit margins are increasing. (Neels Decl. ¶25.) From NuVasive's 2010 SEC filing, it is seen that NuVasive's costs and profitability are headed towards the lower cost and higher profit levels of similar, more established spinal companies like Zimmer, Synthes, and Stryker. (Neels Decl. ¶25.) NuVasive's CEO, Mr. Lukianov, similarly informed investment analysts that NuVasive has the ability to reduce costs and increase profits while offsetting the anticipated ongoing royalties due to Warsaw as a result of the jury's verdict. (Neels Decl. Ex. 6 at 7.) Thus, NuVasive's ability to pay ongoing royalties on infringing products will be even greater in the next several years as its business matures and its cost and profit rates approach the levels of the more established companies in the spinal business. (Neels Decl. ¶¶25-27.)

In sum, the ongoing royalty rates necessary to compensate for NuVasive's post-verdict infringement are at a minimum 36% for the '973 patent, 11% for the '933 patent, and 7% for the '586 patent. (Neels Decl. ¶¶19-20.) Each of those rates is equal to or slightly less than the rates necessary for full compensation under the jury's damages award and fully justified by the circumstances that would exist in a post-verdict hypothetical negotiation. (Neels Decl. ¶¶4-9, 19-20.) When compared to the post-verdict damages that Warsaw can seek in a second trial—including trebling for willfulness—these rates are a substantial discount from NuVasive's potential liability for ongoing infringement. Considering NuVasive's vastly improved financial condition in September 2011 (as compared to May 2004), a 36% royalty on a product that represents only 20% of the company's current revenue stream will still allow NuVasive to have the financial capability to sell the infringing products and fund its research and development from profits on its other products and services. (Neels Decl. ¶¶21-27; Neels Decl. Ex. 6 at 5.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C. Specific Quarterly Reporting And Payment Terms Are Needed To Administer The Ongoing Royalties.

To administer awards of ongoing royalties, courts typically order quarterly reporting of sales and payment of royalties.  *See, e.g.*, *Paice*, 504 F.3d at 1313-14; *Creative Internet Advertising Corp. v. Yahoo!, Inc.*, 674 F. Supp. 2d 847, 861-62 (E.D. Tex. 2009).  Courts have also given the patentee the right to request an audit of infringing sales.  *Paice*, 504 F.3d at 1313-14.  Quarterly payments are consistent with the statutory goal of compensating Warsaw for NuVasive's ongoing infringement and will prevent NuVasive from benefitting from the time value of any money derived from its ongoing sales of infringing products.  *Cf. Gen. Motors Corp.*, 461 U.S. 648 at 655-56.  The ongoing royalty rate proposed in this brief should be applied to all post-verdict sales of NuVasive products found to infringe Warsaw's patents, as well as any additional products that are not colorably different from the infringing products. *Creative Internet Advertising*, 674 F. Supp. 2d at 855.

Thus, the following provisions are necessary for the efficient and accurate administration of these ongoing royalties:

- **TERM**:  NuVasive's obligation to pay ongoing royalties should be effective as of September 20, 2011 (the date of the jury's verdict) through the life of each infringed Warsaw patent.

- **PRODUCTS SUBJECT TO ROYALTY**:  All products found to infringe the Warsaw patents, as well as any additional products that are not colorably different from the infringing products should be subject to ongoing royalties.

- **DEFINITION OF SALES SUBJECT TO ROYALTY**:  The sales subject to the royalty obligations need to be defined so that there is no incentive for NuVasive to shift revenue away from royalty bearing products into non-royalty bearing products or services (e.g., by reducing the sales price of CoRoent XL by 90% and increasing the price of non-infringing products necessary for XLIF).

- **PAYMENT TIMING**:  Quarterly, beginning no later than the 30th day following the close of the calendar quarter.
- **ACCOUNTING OF INFRINGING SALES**:  Quarterly, beginning no later than the 30th day following the close of the calendar quarter, NuVasive should provide Warsaw with an orderly accounting of infringing sales subject to the ongoing royalties, including sales and sales revenues for each infringing product.
- **ESCROW**:  Payments made should be escrowed with a mutually agreeable agent until there is a final and non-appealable judgment in this phase of the case.
- **AUDIT RIGHTS**:  NuVasive should keep complete, true, and accurate books of account and records, including but not limited to, unit sales, dollar sales and average selling price for infringing products, for the purpose of determining the royalty amounts payable to Warsaw.  NuVasive should certify its compliance annually 60 days after the close of its financial year.  Such certification should be accompanied by any underpayments for the preceding four quarters.  If NuVasive's certification process reveals an underpayment in excess of 5% of the amount owed, NuVasive should be ordered to pay interest on the unpaid royalties at the California statutory interest rate of 7% simple interest.  Warsaw should have the right to audit NuVasive's records of infringing sales and royalty payments once per financial year at its own expense.
- **MARKING**:  NuVasive must mark all products covered by Warsaw's patents in accordance with 35 U.S.C. §287 and must include reference to use of the Michelson technology on each of its infringing products.
- **DISPUTE RESOLUTION**:  The Court should retain jurisdiction to enforce or modify this order and to resolve any disputes arising from this order.

### D.   The Court Should Apply The California Statutory Rate of 7% To Calculate Prejudgment Interest.

The Supreme Court has held that the purpose of prejudgment interest is to compensate the patent owner for the "foregone use" of the damages award between the time of infringement and the date of the judgment. *Gen. Motors Corp.*, 461 U.S. at 655-56. "Once the jury makes a finding of infringement, the infringing defendant has been reduced to no more than a borrower who has received the undeserved benefit of using the monies of the rightful patent holder free and clear of interest." *Bard*, 2009 WL 920300, at \*2. An award of prejudgment interest is thus required to compensate Warsaw for the lost use of the damages award, and also to ensure that NuVasive does not gain a windfall from the interest-free use of the money it derived from selling infringing products. *Id.* (*citing Gen. Motors*, 461 U.S. at 655, n.10).

Federal district courts throughout California have consistently applied the California statutory rate of 7% simple interest to compensate patent owners for the lost use of monetary awards for patent infringement. *Presidio Components Inc. v. Am. Technical Ceramics Corp.*, 723 F. Supp. 2d 1284, 1330 (S.D. Cal. 2010); *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, No. 2:04-cv-01971-MCE-EFB, 2009 WL 981843, at \*7 (E.D. Cal. Apr. 13, 2009); *In re Hayes*, 766 F. Supp. 818, 824 (N.D. Cal. 1991); *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 757 F. Supp. 1101, 1103 (S.D. Cal. 1990). The California rate for prejudgment interest is established in the California Constitution, and federal courts have considered that rate to be the default for prejudgment interest in patent cases. Cal. Const. Art. XV §1; *see also Bullock v. Philip Morris USA, Inc.*, 198 Cal.App.4[th] 543, 573, 131 Cal.Rptr.3d 382, 406 (2011); *In re Hayes*, 766 F. Supp. at 824; *Brooktree*, 757 F. Supp. at 1103. The Federal Circuit has also approved use of state statutory interest rates for prejudgment interest and has held that prejudgment interest applies to the jury's total damages award including lost profits. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 551, 557 (Fed. Cir. 1984).

18

Thus, the prejudgment interest rate in this case should be set at 7% and should be applied to the jury's entire award of $101,196,000, as well as any ongoing royalties due for the period between the jury's verdict and the entry of a 54(b) judgment. *See TruePosition, Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400, 414 (D. Del. 2009); *Floe Int'l, Inc. v. Newman's Mfg. Inc.*, 2006 WL 2855071, at *1 (D. Minn. Oct. 4, 2006); *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2009 WL 440473, at *10 (N.D. Cal. Feb. 23, 2009); *Aero Prod. Int'l Inc. v. Intex Recreation Corp.*, 2005 WL 1498667, at *2 (N.D. Ill. June 9, 2005). In order to calculate prejudgment interest using the 7% rate, the jury's award must first be allocated across the damages period, which started in May 2004. (PX2077-79.) The jury's damages award can be allocated across this period in proportion to NuVasive's total accused sales for each fiscal year. Dr. Neels has performed that allocation in Exhibit 4 to his Declaration. (Neels Decl. Ex. 4.) Once the award has been allocated across years in this manner, prejudgment interest can be calculated by taking 7% of the cumulative damages award for each fiscal year prior to judgment. Dr. Neels has determined the total of such damages through today in Exhibit 5 to his Declaration.[8] (Neels Decl. Ex. 5.) Applying the California statutory interest rate, Dr. Neels has thus calculated prejudgment interest to date as $19,872,210, subject to additional interest on post-verdict damages.

## IV.   REQUEST FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT

Warsaw requests leave to file the attached proposed supplemental complaint under Fed. R. Civ. P. 15(d). (Exhibit B.) This supplementation addresses certain events that have occurred since the First Amended Complaint concerning post-verdict infringement. (Dkt. 11.)

First, Medtronic Puerto Rico Operations Co. ("MPROC") and Medtronic Sofamor Danek USA, Inc. ("USA") signed agreements in February 2011 and acquired

---

[8] Because prejudgment interest accrues through the date of final judgment, the final amount of prejudgment interest will be higher than it is today, but it can be calculated in the same manner.

rights that give them standing as exclusive licensees of the patents in suit.  The supplemental complaint therefore adds MPROC and USA as plaintiffs.  MPROC and USA were parties to the original complaint and first amended complaint, but were dismissed before trial for lack of standing.  (Dkt. 1, 11, 183.)  The Order Granting Joint Motion For Dismissal specifically provided that the parties could be added back into the case if they subsequently acquired standing.[9]  Since their dismissal, MPROC and USA have acquired exclusive licenses to the Warsaw patents-in-suit, and are now proper plaintiffs for the post-verdict period.  *WiAV Solns. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265-66 (Fed. Cir. 2010).  There is no unfair prejudice to NuVasive in allowing a supplemental complaint to add MPROC and USA as plaintiffs seeking compensation for NuVasive's post-verdict infringement.  Fed. R. Civ. P. 15(d); *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988).

Second, the supplemental complaint adds specific allegations for all three parties (Warsaw, MPROC, and USA) asserting willful infringement by NuVasive in the post-verdict period and seeks damages based on NuVasive's continuing sale of the infringing products.  As holders of exclusive rights in the patents in suit, these companies have claims against NuVasive for ongoing infringement and may seek full recovery for this infringement before a jury, including recovery of lost profits, reasonable royalties, willfulness enhancement and attorney fees.  Warsaw's submission of this brief regarding ongoing royalties does not waive its right to pursue these infringement claims via a supplemental complaint and a separate jury trial if the ongoing royalty rates are set at levels insufficient to provide full compensation for NuVasive's post-verdict infringement.  *See Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2012 WL 44064, at *4 (N.D. Cal. Jan. 9, 2012).

---

[9] "The dismissal is without prejudice to the Medtronic Dismissed Parties asserting claims under the patents in suit in the future based on agreements that are executed after the date of this order, and that transfer sufficient rights under those patents to confer standing on the Medtronic Dismissed Parties."  (Dkt. 183 at 2.)

## V.      CONCLUSION

For the reasons set forth above, it is Warsaw's position that ongoing royalty rates of 36% for the '973 patent, 11% for the '933 patent, and 7% for the '586 patent are the minimum required to compensate Warsaw for NuVasive's post-verdict infringement.  Warsaw also requests that the Court award prejudgment interest based on the California statutory rate of 7% simple interest through the date of final judgment in this phase of the litigation.  Finally, Warsaw requests that the Court grant leave to file a supplemental complaint (1) adding MPROC and USA as plaintiffs and (2) alleging claims on behalf of Warsaw, MPROC, and USA for NuVasive's post-verdict, willful infringement.

DATED:  February 10, 2012               Respectfully submitted,


                                        _/s/ Alexander F. MacKinnon_____
                                        Luke L. Dauchot
                                        Alexander F. MacKinnon
                                        Nimalka R. Wickramasekera
                                        KIRKLAND & ELLIS LLP

                                        Attorneys for Plaintiff/Counterclaim
                                        Defendants/Counterclaimants,
                                        WARSAW ORTHOPEDIC, INC.;
                                        MEDTRONIC SOFAMOR DANEK USA,
                                        INC.; MEDTRONIC PUERTO RICO
                                        OPERATIONS CO.; AND MEDTRONIC
                                        SOFAMOR DANEK DEGGENDORF, GMBH

1

## <u>CERTIFICATE OF SERVICE</u>

2          I am employed in the County of Los Angeles; I am over the age of eighteen
3  years and not a party to the within entitled action; my business address is 333 South
4  Hope Street, Los Angeles, California 90071.
5          On February 10, 2012, true and correct copies of the foregoing document were
6  served to all counsel of record who are deemed to have consented to electronic service
7  via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of
8  record will be served by electronic mail, facsimile, U.S. Mail and/or overnight
9  delivery.
10        ☒      FEDERAL:  I declare under penalty of perjury under the laws of the
11  United States of America that the foregoing is true and correct.
12        Executed on February 10, 2012, in Los Angeles, California.

13
14                                    <u>      /s/ Alexander F. MacKinnon      </u>
                                             Alexander F. MacKinnon
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE                                        CASE NO: 3:08-CV-01512