1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   MEDTRONIC SOFAMOR DANEK USA,              CASE NO. 08 CV 1512 MMA (MDD)
     INC., et al.,
12                                             **MEMORANDUM OF DECISION**
              Plaintiff and Counterclaim Defendants,   **FOLLOWING BENCH TRIAL ON**
13                                             **INEQUITABLE CONDUCT**
              vs.
14

15   NUVASIVE, INC.,                           [FED. R. CIV. P. 52(a)(1)]

16              Defendant and Counterclaimant

17

18        On December 16, 2011, the Court held a one-day bench trial on NuVasive's allegations

19   that United States Patent number 5,860,973 ("'973 patent") is unenforceable due to inequitable

20   conduct.  NuVasive argues inventor Dr. Gary Karlin Michelson, and his agents, including Amedeo

21   Ferraro, Lewis Anten, and Thomas Martin, (collectively, "applicants"), engaged in three discrete

22   acts of misconduct during the prosecution of the '973 patent before the United States Patent and

23   Trademark Office ("PTO").  First, the applicants allegedly withheld a relevant 1982 article

24   authored by Dr. Henry V. Crock.  Second, the applicants allegedly misrepresented the state of the

25   prior art by stating that, "[i]n the past, spinal fusion implants have been inserted only from either

26   an anterior or posterior direction, from the front or back of the patient."  [PX0326, col. 1:21-23.]

27   Third, the applicants purportedly changed the priority date of the '973 patent from 1988 to 1995,

28   after prosecution of the patent on the merits had closed.

1   At trial,[1] attorneys Luke Dauchot, Alex MacKinnon, and Nimalka Wickramasekera

2   represented Warsaw, and attorneys Frank Scherkenbach, Todd Miller, and Keeley Vega

3   represented NuVasive.  Witnesses were sworn and called to testify; documents and other exhibits

4   were offered and received into evidence; and written closing arguments and proposed findings of

5   fact and conclusions of law were submitted by both parties on December 23, 2010.  Having

6   weighed the evidence presented in this case, for the reasons set forth below, the Court concludes

7   NuVasive did not carry its burden to prove the existence of inequitable conduct during the

8   prosecution of the '973 patent.

9   ### LEGAL STANDARD

10  Patent applicants and their agents owe a duty of candor, good faith, and honesty to the

11  PTO.  *Bristol-Myers Squibb Co. v. Phone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1233 (Fed. Cir.

12  2003).  If the applicant breaches this duty, his inequitable conduct may render his patent

13  unenforceable.  *Warner-Lambert Co. v. Schwarz Pharma, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir.

14  2005).  In 2011, the Federal Circuit recognized "the problems created by the expansion and

15  overuse of the inequitable conduct doctrine" and tightened the standard for establishing that a

16  patentee engaged in misconduct before the PTO.  *Therasense, Inc. v. Becton, Dickinson & Co.*,

17  649 F.3d 1276, 1285 (Fed. Cir. 2011).  In *Therasense*, the Federal Circuit noted that the judge-

18  made inequitable conduct doctrine emerged from a line of infringement cases that "dealt with

19  particularly egregious misconduct, including perjury, the manufacture of false evidence, and

20  suppression of evidence," but over time it grew to encompass a much broader scope of

21  misconduct.  *Id*. at 1287.  The appellate court therefore sought to redirect the overused doctrine

22  that has come to "plague[] not only the courts but also the entire patent system."  *Id*. at 1289, 1290.

23  Accordingly, after *Therasense*, "[t]o prove inequitable conduct, the accused infringer must provide

24  evidence that the applicant (1) misrepresented or omitted material information, and (2) did so with

25  specific intent to deceive the PTO."  *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318,

26  1334 (Fed. Cir. 2011) (citing *Therasense*, 649 F.3d at 1287).

27  / / /

28

---

[1] Unless noted otherwise, "trial" refers to the bench trial on December 16, 2011.

I.      **MATERIALITY**

In cases such as this, where the patentee allegedly failed to disclose prior art to the PTO, the party alleging inequitable conduct must establish that the undisclosed reference is "but-for" material. *Therasense*, 649 F.3d at 1291. Stated another way, the court must determine "whether the PTO would have allowed the claim if it had been aware of the undisclosed reference." *Id.* In making this determination, the court must give claims their broadest reasonable construction. *Id.* A party alleging inequitable conduct need not prove but-for materiality, however, when the patentee engages in affirmative egregious misconduct "such as the filing of an unmistakably false affidavit . . . After all, a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent." *Id.* at 1292 (citations omitted).

II.     **INTENT**

With respect to intent, the "accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Id.* at 1290 (citation omitted). Where, as here, the alleged inequitable conduct involves non-disclosure of information, "clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference." *Id.* (emphasis in original) (citation omitted). "While deceptive intent can be inferred from indirect and circumstantial evidence, that inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Am. Calcar, Inc.*, 651 F.3d at 1334 (internal marks omitted) (citing *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). *Therasense* also made clear that intent and materiality are separate requirements, and courts can no longer use a "'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, or vice versa." *Am. Calcar, Inc.*, 651 F.3d at 1334 (citation omitted).

With the aforementioned principles in mind, the Court issues the following findings of fact and conclusions of law with respect to NuVasive's allegations of inequitable conduct, as required by Federal Rule of Civil Procedure 52(a)(1).

1

<u>FINDINGS OF FACT</u>

2

**I.    '973 PATENT**[2]

3      1.      The 5,860,973 ("'973 patent") issued on January 19, 2009 from U.S. Patent

4  Application No. 741,301 ("'301 application"), which was filed on October 30, 1996.  [PX0326 at

5  01-02.]

6      2.      The '973 patent teaches "a spinal fusion implant that is inserted from the side of the

7  patient . . . referred to as the translateral approach to the spine."  [PX0326 at col.3:1-3.]

8      3.      The '973 patent states that, "all prior implants have been inserted from either the

9  front or the back of the patient."  [PX0326 at col.1:65-66.]

10      4.      Claim 1 of the '973 patent recites: "A translateral spinal implant for insertion from

11  the lateral aspect of the spine in the disc space between two adjacent vertebrae, said implant

12  having a length that is greater than one half the transverse width of the vertebrae, said length being

13  substantially greater than the depth of the vertebrae, and a height for contacting each of the two

14  adjacent vertebrae."  [PX0326 at col.11:21-27.]

15      5.      Dr. Michelson appointed Lewis Anten and Amedeo Ferraro to prosecute his

16  application for the '973 patent, and transact business with the PTO in connection with the

17  application.  [PX0325 at 34.]

18      6.      On July 25, 1997, Lewis Anten submitted an Associate Power of Attorney

19  appointing Thomas H. Martin as his associate attorney to assist in prosecuting the '973 patent.

20  [PX0325 at 142-143.]

21  **II.    CROCK PUBLICATIONS**

22      7.      In 1982, Dr. Crock published an article entitled "Anterior Lumbar Interbody

23  Fusion—Indications for its Use and Notes on Surgical Technique," which appeared in the peer

24  reviewed journal, Clinical Orthopaedics and Related Research, volume 165 at pages 157 through

25  163 ("Crock Article").  [DX5885; Tr. 9:25-10:10.]

26  / / /

27

28
       [2] The headings used herein are solely for ease of reference and should not be read to limit the
Court's findings of fact and conclusions of law to any particular allegation, argument, or discussion.

8.      In 1983, Dr. Crock published a book entitled, "Practice of Spinal Surgery," which contains a section entitled, "Technique of Anterior Lumbar Interbody Fusion" ("Crock Book"). [DX5091.]

9.      NuVasive alleges the applicants failed to disclose the Crock publications during the prosecution of the'973 patent, with the specific intent to deceive the PTO.

10.     The applicants did not provide copies of the 1982 Crock Article or the 1983 Crock Book to the patent examiners in connection with prosecution of the '973 patent.

11.     Dr. Crock, however, is mentioned by name in the '973 patent.  In the "Background of the Invention" section, under the heading "Description of the Related Art," the patent states: "In the past, spinal fusion implants have been inserted only from either an anterior or posterior direction, from the front or the back of the patient.  Such implants are well known in the art and may have cylindrical, rectangular and other shapes.  In the past, Cloward, Wilterberger, *Crock*, Viche, Bagby, Brantigan, and others have taught various methods involving the drilling of holes across the disc space between two adjacent vertebrae of the spine for the purpose of causing an interbody fusion."  [PX0326 at col.1:21-29 (emphasis added).]

12.     The applicants cited Dr. Crock's 1982 article in materials that they incorporated by reference into the application that eventually issued as the '973 patent.

13.     James Carmichael testified at trial as an expert in PTO practice and procedure, including the duty of candor and good faith.  [Tr. 202:22-206:15.]

14.     Carmichael provided credible testimony that PTO examiners are supposed to consider applications incorporated by reference and treat them as if fully set forth in the pending application.  [Tr. 211:7-14.]  The examiner is also supposed to review the incorporated patents for prior art.  [Tr. 210:22-211:2.]

15.     The '301 application (which issued as the '973 patent) is a continuation of U.S. Patent Application No. 479,596 ("'596 application"), filed on June 7, 1995.  [PX0326 at col.1:4-5.]

16.     When the '596 application was originally filed it stated: "This is a continuation in part of co-pending Application Serial No. 08/074,781 entitled THREADED SPINAL IMPLANT

1   filed on June 10, 1993, which is a continuation in part of Application Serial No. 07/698,674 filed

2   on May 10, 1994 which is a divisional of Application Serial No. 07/205,935 filed on June 13,

3   1988, now United States Patent No. 5,015,247 all of which are incorporated herein by reference."

4   [PX0325 at 09.]

5         17.     Dr. Michelson's application for the '973 patent therefore incorporated by reference

6   his then co-pending application 08/074,781, which became the '437 patent.  [PX0325 at 33-34;

7   PX0322 at 01, 09.]

8         18.     The '437 patent, filed on June 10, 1993 and issued to Dr. Michelson on January 16,

9   1996, is a continuation of the '247 patent, which issued from application 07/205,935, filed on Jun.

10   13, 1988.  [PX0298 col.1:5-9.]

11         19.     The '437 patent explicitly references the 1982 Crock Article, stating: "Crock

12   (Crock, H.V., "Anterior Lumbar Interbody Fusion—Indications for its Use and notes on Surgical

13   Techniques," "*Clinical Orthopedics*, Volume 165, pg. 157-163, 1981) described his technique and

14   instrumentation for Anterior Body Fusion of the lumbar spine, wherein he drilled two large holes

15   side by side across the disc space from anterior to posterior essentially unprotected and then

16   pounded in two at least partially cylindrical grafts larger than the holes prepared."  [PX0298 at

17   col.6:61-7:2; *see* Tr. 54:5-22.]

18         20.     The '473 patent contains an inadvertent typographical error that erroneously

19   identifies the year of publication for the Crock Article as 1981, instead of 1982.  [*Compare*

20   PX0298 at col.6:61-7:2 *with* DX5885; *see* Tr. 85:16-86:6; 156:22-157:8; 158:11-18; 159:2-8;

21   167:25-168:25; 169:10-18; 171:22-172:3.]

22         21.     Carmichael provided credible testimony that the examiner(s) considering the '301

23   application were supposed to review the prior applications cited by the applicants for prior art, and

24   therefore, they would have seen the citation to the 1982 Crock Article.  [Tr. 230:5-231:2.]

25         22.     Dr. Michelson provided credible testimony that he does not recall seeing the 1982

26   Crock Article prior to the current litigation.  [Tr. 172:10-23; 187:10-25; 188:15-19.]

27         23.     Dr. Michelson provided credible testimony that prior to filing the application for his

28   '973 patent, he read Dr. Crock's 1983 textbook.  [Tr. 167:22-168:17.]

24.     Dr. Michelson provided credible testimony that he believes he wrote the description that accompanies the citation to the 1982 Crock Article in the '473 patent.  [PX0298 at col.:6:61-7:2; Tr. 171:12-15; 186:5-13.]

25.     Dr. Michelson provided credible testimony that he believes the description to be an accurate representation of the relevant procedure discussed in the 1982 Crock Article and the 1983 Crock Book.  [Tr. 156:22-157:8; 158:11-18; 159:2-8; 167:25-168:25; 169:10-18; 171:16-173:23.]

26.     The same description of the Crock Article appears in several of Dr. Michelson's patents.  [*See, e.g.,* DX6446 at col.7:9-18; DX6452 at col.7:1-9; DX6456 at col.7:1-9; DX6458 at col. 7:3-11; PX0322 at col.6:61-7:2.]

27.     Figure 3 in the Crock Article is described as: "A lateral illustration of the orientation of dowel cavities transversely in the intervertebral space suitable for interbody grafting in the upper lumbar area."  [DX5885, p.160.]

28.     Figure 3 is not contained in the Crock Book.  [DX5091.]

29.     It is not material that Figure 3 depicted in the 1982 Crock Article is not contained in the 1983 Crock Book.

30.     To a person of ordinary skill in the art, the Crock Article and the Crock Book address anterior lumbar interbody fusion operations, not translateral spinal implant procedures. [DX5885; DX5091.]

31.     The Crock Article contains Figures 7A and 7B, which depict: "(A) Lateral view roentgenogram of the lumbar spine in a 45-year-old man, showing Grade 2 spondylolisthesis at L4-5.  (B) Interbody grafts have been inserted transversely (one year after operation).  [DX5885, p.162.]

32.     The same images in Figures 7A and 7B of the Crock Article appear in the Crock Book as Figures 5.7a and 5.7b, with the following description: "**a** A lateral radiograph of the lumbar spine in a 45 year-old man showing Grade to spondylolisthesis at L4/5. **b** Interbody grafts have been inserted transversely.  The tomogram shows the appearance one year after operation."  [DX5091, p.141.]

/ / /

33. To a person of ordinary skill in the art, neither set of images depicts the translateral insertion of spinal fusion implants as taught by the '973 patent.

34. Dr. Michelson provided credible testimony that he had no reason to hide Crock's publications from the PTO because Dr. Michelson did not, and still does not, read them to disclose a translateral spinal implant as taught by the '973 patent. [Tr. 165:20-166:8; 167:25-168:10; 168:14-23; 170:13-17; 175:3-7.]

35. Carmichael provided credible testimony that an applicant has no duty to disclose references that he does not know about. [Tr. 208:22-209:4.]

36. Dr. Michelson, Lewis Anten, Amedeo Ferraro, and Thomas Martin did not withhold the Crock publications from the PTO.

37. The record contains no evidence Dr. Michelson, Lewis Anten, Amedeo Ferraro, or Thomas Martin had a specific intent to deceive the PTO by withholding the Crock Article from the PTO during prosecution of the '973 patent.

**III.   STATE OF PRIOR ART**

38. NuVasive alleges the applicants intentionally and repeatedly misrepresented the state of the prior art to the PTO through statements representing that, "In the past, spinal fusion implants have been inserted only from either an anterior or posterior direction, from the front or the back of the patient." [PX0326 at col.1:21-23; PX0325 at 09-11.]

39. According to NuVasive, the applicants knew the statement was false because Dr. Michelson was aware of at least one publication by Dr. Crock and the Brantigan '327 patent, which both allegedly teach spinal fusion implants capable of insertion from the lateral aspect of the spine. [Doc. No. 451 ¶¶128-154.]

40. As discussed above, Dr. Michelson understood the Crock Article to describe a technique and instrumentation for anterior body fusion of the lumbar spine, wherein Dr. Crock drilled two large holes side by side across the disc space from anterior to posterior essentially unprotected and then pounded in two at least partially cylindrical grafts larger than the holes prepared. [PX0298 at col.6:61-7:2; *see* Tr. 54:5-22; 165:20-166:8.]

/ / /

41.     Dr. Michelson did not, and still does not, read the Crock Article nor the Crock Book to disclose a translateral spinal implant as taught by the '973 patent. [Tr. 165:20-166:8; 167:25-168:10; 168:14-23; 170:13-17; 175:3-7.]

42.     Dr. Michelson provided credible testimony he believed the statements (i.e. all of the prior implants have been inserted from the front or the back of the patient) to be true when he filed the '973 patent application. [Tr. 163:1-5, 23-25; 164:1-19.]

43.     Dr. Michelson provided credible testimony he still believes the statement is accurate. [Tr. 164:25-165:3.]

44.     Dr. Sachs provided credible testimony that Dr. Michelson's representation of the state of the prior art was accurate. [*See* Tr. 99:22-100:10; *see also* Tr. 101:22-102:8.]

45.     To a person of ordinary skill in the art, the Crock Article and the Crock Book address anterior lumbar interbody fusion operations—Dr. Crock's teachings are consistent with Dr. Michelson's representation that prior to his '973 patent spinal fusion implants were only inserted from the front or back of the patient. [DX5885; DX5091.]

46.     The '973 patent identifies Dr. Brantigan by name, and discusses three of Dr. Brantigan's patents, not including the '327 patent. [PX0326 at col.1:25-29, 37-44, 50-66.]

47.     To a person of ordinary skill in the art, Dr. Brantigan's use of the term "lateral" in the '327 patent does not mean the same thing as Dr. Michelson's use of the term "translateral" in the '973 patent.

48.     To a person of ordinary skill in the art, the Brantigan '327 patent does not teach spinal fusion implants capable of translateral insertion.

49.     To a person of ordinary skill in the art, the teachings of the Brantigan '327 patent are consistent with Dr. Michelson's representation of the state of the prior art.

50.     The record contains no evidence that Dr. Michelson was aware of the 1973 publication by H.B.S. Kemp et al., entitled "Anterior Fusion of the Spine for Infective Lesions in Adults" [DX6265] prior to this litigation. [Tr. 181:3-17.]

/ / /

08cv1512

51.     The record contains no evidence Dr. Michelson, Lewis Anten, Amedeo Ferraro, or Thomas Martin had a specific intent to deceive the PTO by allegedly misrepresenting the state of the prior art during prosecution of the '973 patent.

**IV.     PATENT PRIORITY DATE**

52.     NuVasive alleges the applicants changed the priority date of the '973 patent from 1988 to 1995, which caused new art that was not previously considered by the examiner  (i.e. the Brantigan '327 patent) to become prior art to the '973 patent.

53.     As discussed above, Dr. Michelson's application for the '973 patent incorporated by reference his then co-pending application 08/074,781, which became the '437 patent.  [PX0325 at 33-34; PX0322 at 01, 09.]

54.     The '437 patent is a continuation of the '247 patent, which issued from application 07/205,935, which was filed on Jun. 13, 1988.  [PX0298 at col.1:5-9.]

55.     Carmichael provided credible testimony that Michelson's inclusion of conditional claims of priority to his earlier applications in his Declaration and Power of Attorney [PX0325 at 33-34] was not improper, and indeed was "common" because the final form of the claims (and whether the disclosures in prior applications provide support for those final claims) is not finally determined until the claims are allowed.  [Tr. 211:25-213:11; 232:6-22.]

56.     Dr. Michelson provided credible testimony his attorneys determined whether the priority date of the '973 patent should be amended; Dr. Michelson was not personally involved in that decision.  [Tr. 160:25-161:11.]

57.     After the '973 patent issued, the applicants requested the PTO to amend the specifications in the patent "to delete the reference to the related applications filed prior to February 27, 1995."  [PX0325 at 159; 37 C.F.R. § 1.312.]

58.     In seeking the amendment, the applicants represented that "[a] review of the file history of [the '301] application by the Applicant's attorneys revealed that the reference in the specification to related applications filed prior to February 27, 1995 is not necessary to support the claims in their amended form."  [PX0325 at 159.]

/ / /

59.     Carmichael provided credible testimony that the applicants' request to amend the priority date "did not change the actual date that the examiners were using as the priority date when examin[ing] the '973 patent.  The examiners always used the 1995 date."  [Tr. 213:12-214:2; 223:12-224:18.]

60.     The record contains no evidence the applicants sought to amend the priority date of the '973 patent, after allowance, with the specific intent to deceive the PTO.

61.     Carmichael provided credible testimony the PTO is "very strict" about granting amendments under 37 C.F.R. 1.312 after allowance ("312 amendment"), and the PTO will not permit a 312 amendment where it will create additional work for the examiners, such as additional searches, consideration of new information, or review of new prior art not previously considered.  [Tr. 217:19-219:2.]

62.     In a communication mailed October 17, 1997, Examiner Truong indicated the applicants' desired 312 amendment had been considered and entered.  [PX0325 at 162-163.]

63.     Carmichael credibly opined that the PTO would never have granted the applicants' request to remove the references to related applications filed prior to February 27, 1995 "if it changed the actual priority date that had been used all along in the examination."  [Tr. 219:3-18.]

64.     Carmichael's opinion is bolstered by his credible testimony that the PTO took actions during the examination process, such as considering U.S. Patent No. 4,911,718 (Lee) and U.S. Patent No. 4,834,757 (Brantigan) as prior art, which indicate the examiners never applied a 1988 priority date.  [Tr. 220:5-221:1; 233:24-235:2; *cf.* Tr. 235:3-236:9; *see also* PX0325 at 46-50, 53, 82-83.]

65.     On July 28, 1997, the PTO received an Information Disclosure Statement, submitted by Thomas Martin, disclosing several references to the PTO, including U.S. Patent No. 5,015, 247 (Michelson) and U.S. Patent No. 5,192,327 (Brantigan).  [PX0325 at 144-147; Tr. 214:3-11.]

66.     The same day, July 28, 1997, Examiner Truong initialed each reference on the July 1997 Information Disclosure Statement indicating he had considered each of the references listed.  [PX0325 at 146-147; Tr. 214:3-216:4.]

67.     On August 6, 1997, the PTO mailed a Notice of Allowability for the '301 application.  [PX0325 at 156-157.]

68.     NuVasive has not proven Dr. Michelson, Lewis Anten, Amedeo Ferraro, or Thomas Martin failed to disclose any material information or submitted false information to the PTO in connection with the conditional priority claims or the subsequent 312 amendment.

69.     The record does not contain evidence that proves  Dr. Michelson, Lewis Anten, Amedeo Ferraro, or Thomas Martin acted with the specific intent to deceive the PTO with respect to the conditional priority claims or the subsequent 312 amendment.

CONCLUSIONS OF LAW

70.     NuVasive did not prove by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin misrepresented or omitted material information during the prosecution of the '973 patent with the specific intent to deceive the PTO.

71.     NuVasive did not prove by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin submitted materially false information to the PTO.

72.     NuVasive did not prove by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin engaged in affirmative acts of egregious misconduct.

73.     Dr. Michelson, Lewis Anten, Amedeo Ferraro, and Thomas Martin did not engage in inequitable conduct during the prosecution of the '973 patent.

**I.      CROCK PUBLICATIONS**

74.     NuVasive did not prove by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin knew of the 1982 Crock Article, knew it was material, and made a deliberate decision to withhold it from the PTO.

75.     NuVasive did not prove by clear and convincing evidence that  Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin knew of the 1983 Crock Book, knew it was material, and made a deliberate decision to withhold it from the PTO.

/ / /

76. Even if the PTO did not consider the 1982 Crock Article during prosecution of the '973 patent, NuVasive failed to prove that the 1982 Crock Article is "but for" material to the patentability of the technology at issue.

77. Even if the PTO did not consider the 1983 Crock Book during prosecution of the '973 patent, NuVasive failed to prove that the 1983 Crock Book is "but for" material to the patentability of the technology at issue.

**II.    STATE OF PRIOR ART**

78. NuVasive did not prove by clear and convincing evidence that the representation, "all prior implants have been inserted from either the front or the back of the patient" is false.

79. NuVasive did not prove by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin made the representation that "all prior implants have been inserted from either the front or the back of the patient" with the specific intent to deceive the PTO.

**III.   PATENT PRIORITY DATE**

80. NuVasive did not prove by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin misrepresented or omitted material information in connection with amending the specification of the application that led to the '973 patent, after the PTO issued the Notice of Allowance.

81. NuVasive did not prove by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin acted with the intent to deceive the PTO in connection with amending the specification of the application that led to the '973 patent, after the PTO issued the Notice of Allowance.

/ / /

/ / /

/ / /

08cv1512

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>C</u>ONCLUSION

For the reasons set forth above, the Court finds NuVasive has not demonstrated by clear and convincing evidence that Dr. Michelson, Amedeo Ferraro, Lewis Anten, or Thomas Martin engaged in inequitable conduct during the prosecution of the '973 patent.  Accordingly, the '973 patent is not rendered unenforceable on this ground, and judgment shall be entered in favor of Warsaw, and against NuVasive on the issue of inequitable conduct.

**IT SO ORDERED.**

DATED:  February 14, 2012

Hon. Michael M. Anello
United States District Judge

08cv1512