```
 1                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF CALIFORNIA
 2

 3   WARSAW ORTHOPEDIC, INC.,          )
                                       )
 4                      Plaintiff,     )  CASE NO. 08CV1512-CAB
                                       )
 5           vs.                       )
                                       )
 6   NUVASIVE, INC.,                   )
                                       )
 7                      Defendant.     )
                                       )
 8   _____)
     AND CROSS-RELATED ACTIONS.        )
 9

10                   TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE CATHY ANN BENCIVENGO
11               FRIDAY, DECEMBER 4, 2015, 2:00 P.M.
                        SAN DIEGO, CALIFORNIA
12
     For The Plaintiff:
13        Kirkland & Ellis LLP
          Luke Dauchot
14        Justin Singh
          Sharre S. Lotfollahi
15        333 South Hope Street
          Los Angeles, California 90071
16

17   For The Defendant:
          Wilson Sonsini Goodrich & Rosati
18        Paul D. Tripodi, II
          Robert R. Cleary, Jr.
19        Christina Dashe
          633 West Fifth Street, Suite 1550
20        Los Angeles, California 90071

21   Proceedings recorded by stenography, transcript produced by
     computer assisted software
22   _____

23             Mauralee Ramirez, RPR, CSR No. 11674
                  Federal Official Court Reporter
24                 333 West Broadway, Suite 420
                    San Diego, California 92101
25                   ordertranscript@gmail.com
```

<pre>
 1        San Diego, California; Friday, December 4, 2015; 2:00 P.M.

 2            THE CLERK:  So we're back on the record this afternoon

 3   on Matter No. 12 on our calendar, 08CV1512-CAB, Medtronic

 4   Sofamor Danek USA, Inc., et al. versus NuVasive, Inc., on

 5   calendar for motion hearing.

 6            Counsel, please state your appearances.

 7            MR. DAUCHOT:  Good afternoon, your Honor.  Luke

 8   Dauchot, with Justin Singh and Sharre Lotfollahi on behalf of

 9   the plaintiff.

10            MR. TRIPODI:  Good afternoon, your Honor.  Paul

11   Tripodi on behalf of NuVasive, Inc.  With me today are Robert

12   Cleary and Christina Dashe and our client representatives today

13   in court are James Garrett and Jonathan Spangler.  They're also

14   accompanied by Kate (inaudible.)

15       (Court reporter interruption.)

16            MR. TRIPODI:  Kate Courlan, C-o-u-r-l-a-n.

17            THE CLERK:  Counsel, I'll ask since this is a large

18   courtroom, we get a lot of echo up here, so if you could make

19   sure you speak a little bit closer to the microphone, we would

20   appreciate it.

21            THE COURT:  Don't you feel special we're in this big

22   new courtroom?  That's because they're putting all the

23   equipment in my old courtroom.  We're getting the monitors put

24   in the jury box, so we don't have to mess with screens anymore.

25   The lectern will have a projector.  It's all cool stuff, but
</pre>

 1   it's going to take about two and a half months.  I get to sit

 2   in here in the meantime.  And this place echos, so when you're

 3   speaking at the lectern make sure that you pull the mic up, so

 4   everybody can hear.

 5         I have a lot of paper in front of me on something I

 6   think comes down to a very specific question.  The issue here

 7   is, who are the proper parties to the hypothetical negotiation.

 8   And I understand from the briefing, there is no dispute, that

 9   the day of first infringement would have been in 2004, and the

10   question is, who would NuVasive have sat down at the table

11   with?  Would it have been Warsaw, an entity of Warsaw, or the

12   inventor who owned at the patents at that time.

13         And ownership does not appear to be so much the

14   dispute.  The patent was still owned by the inventor, by

15   Mr. Michelson, or Dr. Michelson, but there's a question here as

16   to whether or not there's an exclusive license to this patent

17   that would have given Warsaw the right to enforce the patent,

18   to practice the patent, and, therefore, exclude someone else,

19   and have the right to license at that point.

20         I have looked at the decision from the District Court

21   in Tennessee that addressed the license agreement between the

22   Warsaw entity and Dr. Michelson to try to ascertain if this

23   particular patent, the '973 Patent, comes within the scope of

24   that license agreement.  And what I don't have, and probably

25   would be helpful for me to try to understand this, is kind of

 1    the family tree as to those patents that the judge there

 2    determined were the subject matter of the license agreement and

 3    which are fairly narrow.  I mean, he identified a fairly

 4    specific patent and patent specifics, and the license extends

 5    out to continuations of those patents and additional patents

 6    that would flow from them.

 7         And I couldn't piece it together based on the

 8    information I had.  I have serial numbers and I have

 9    application numbers, but it was difficult for me to make that

10    determination, and I couldn't tell.  Primarily the reference I

11    had from the plaintiffs was that the provision in paragraph 3.2

12    of the license agreement, the Schedule No. 6 that refers to an

13    application covering quote, "Lateral Discectomy and Interbody

14    Fusion Implants, Instrumentation, and Method" is either a

15    priority patent to this patent, or is that application?  The

16    titles don't match, so I can't assume it's the same application

17    that resulted in this patent.

18         So since it's your client's family history here,

19    perhaps you should take the lead to explain it.

20         MR. DAUCHOT:  Sure, your Honor.  Let me take a step

21    back.  And actually NuVasive is absolutely right, I was part of

22    that litigation involving Dr. Michelson.  It's spelled

23    Mickelson (phonetic), but it's pronounced Michaelson

24    (phonetic).

25         THE COURT:  Thank you.

1          MR. DAUCHOT:  So Judge McCullough issued three

2    opinions, I think, that were referenced in the briefing.

3    Actually two.  One question involved this issue about future

4    inventions, and there was another one about an exclusive

5    license.  I'll begin with the first one.  The fundamental issue

6    addressed by Judge McCullough -- let me take a step back.  One

7    of the main spitting matches between Medtronic, I guess I was

8    opposed to them in that litigation, and Dr. Michelson was as

9    follows:

10          Medtronic took the position that by virtue of the

11   agreements that were signed by Dr. Michelson and then Sofamor

12   Danek, it was before they were acquired by Medtronic, it was

13   entitled to all of Dr. Michelson's future inventions, okay?

14   And so that was one of the key spitting matches.

15          What Judge McCullough -- and we had the agreements,

16   and there was a 1993 license agreement, and there was a 1994

17   purchase agreement okay?  What the Court ruled was that no,

18   Medtronic was not entitled to future inventions by virtue of

19   the language in these agreements.  And what the Court ruled was

20   that what Medtronic had rights to under the '93 agreement is

21   the series of technology identified in §3.2.

22          As your Honor pointed out, and when we go to the '94

23   agreement, it's Appendix Exhibits A and B to the agreement.

24   There is a reference to continuations in part, all right?  And

25   let me put some perspective around that issue.  Medtronic took

1   the position in the litigation that if, down the road, there

2   were continuations in part, okay, that were applied for or

3   issued, that it was entitled to rights to those continuations

4   in part.

5          And what sets the continuations in part apart is it's

6   the CIP, right?  Because as your Honor knows, when you're

7   talking about a CIP, you're talking about an application later

8   filed that includes new matter.  That's why it's a CIP as

9   opposed to a straight continuation.  If it were a straight

10  continuation, all of the invention, the inventive technology is

11  contained within the four corners of the original application,

12  so you can file a continuation and get new claims based on the

13  original disclosure.  The CIP, on the other hand, you file the

14  application, but you're adding new matter to it, and so you're

15  not entitled to the earlier priority date.

16         And the real question was, does Medtronic get its

17  hands on the CIP's?  And the Court ruled no, no.  Because if we

18  read these agreements, Medtronic is entitled to two things.

19  One, the technology of the inventions that Dr. Michelson had at

20  the time of the agreements, and Judge McCullough is clear about

21  that in the opinions as described in the attachments under the

22  definition of medical device or technology.  And in the event

23  that there are later continuations, Medtronic is entitled to

24  that as well because it all refers to the original inventions.

25         So now we get to the question of where the '973 fits

1    in.  No. 1, it's important to note, none of the parties -- and

2    both parties, Medtronic and Dr. Michelson, have always been

3    consistent that the '973 technology was technology captured by

4    these two agreements.  And that was a position that both of the

5    parties had back during the original litigation in Memphis.  In

6    fact, one of Dr. Michelson's complaints in that litigation, a

7    side issue, is Medtronic hadn't exercised its best efforts in

8    developing that technology.  The jury found against

9    Dr. Michelson on that point, as an aside.  But nobody ever

10   disputed that in the first trial.  Nobody ever disputed that

11   issue here in this case.

12          So if we look at the agreement, we know why, in fact,

13   we have contemporaneous evidence, right, your Honor?  We point

14   to the memorandum dated January 11th of 1994 by Larry Boyd

15   where he describes what Dr. Michelson had brought to the table

16   and what Medtronic, or SDI at the time, had acquired by virtue

17   of the agreements.

18          And in that memo, we do see references to

19   Dr. Michelson's translateral technology, which included three

20   things.  No. 1, the implant.  And in fact, his testimony in the

21   first trial is that the implant had been developed in the

22   summer/early fall of 1993.  I think I have that right.  I know

23   I have that right.  And then you have on top of the implant,

24   which is the subject of the '973, you also have the instruments

25   and the methods.

1          And our position is that all of that translateral

2    technology, in fact, it's been Medtronic's position as well,

3    falls for purposes of the 1993 agreement under the application

4    that's referenced as translateral technology -- I don't have

5    the exact language here -- for which there are applications to

6    be filed.  Okay.  That's always been the understanding.

7          Now if we look at the 1994 agreement, the purchase

8    agreement.  If you look at that, under that agreement, what you

9    see is in that Attachment B, there is a reference to push-in

10   implants or applications that claim cylindrical push-in

11   implants.  And what push-in means, your Honor, is that it's not

12   threaded stuff.  It's literally implants that push in.

13         Granted, NuVasive, at issue here, I don't think we

14   have any cylindrical push-in implants at issue, but that's not

15   the point, if you read Exhibit B, the rights are to

16   applications.

17         THE COURT:  Well, no.  It says application, singular.

18   The Court reads that while it hadn't been filed yet and,

19   therefore, didn't have the number, it's referring to something

20   very specific in Schedule B of the purchase agreement.  It's

21   under B2, U.S. Patent Application Entitled or Covering The

22   quote "Non-threaded Cylindrical Implant" unquote and

23   parenthetical push implant.  So is that referring to the

24   application that resulted in the '973 Patent?

25         MR. DAUCHOT:  Well, the short answer to that is it

1    doesn't specifically say there.  It doesn't.  But the parties

2    always treated it as such.  There was never really an issue

3    that the '973 technology -- and, in fact, if you look at the

4    '973 application, and even though the application itself is a

5    CIP, that's not the issue.  The issue is, did the technology

6    exist at the time of the agreement.  That's a separate issue.

7         But that application, if you look at it, does, in

8    fact, describe cylindrical push-in implants.  It doesn't

9    describe a whole lot else.  But that's not the point.  The

10   point is -- and you're right, I'll take your word for it.

11   Actually its applications, I'm told by my colleague, your

12   Honor.

13        THE COURT:  Well, okay.  I'm reading this from the

14   Court's order.

15        MR. DAUCHOT:  Hey, Justin, can you put it up on the

16   Elmo for the Court.  We'll put our Elmo to use.

17        If that's okay, your Honor?

18        THE COURT:  Yes, go right ahead.

19        MR. DAUCHOT:  And so it's just no question.  And I

20   don't think that there's no question but that the '973

21   application does cover cylindrical push-ins.  And I don't think

22   NuVasive has debated that -- well, NuVasive's principle

23   challenge -- well, let's take a step back actually.

24        Justin, can you put up, while we're at it, Schedule 32

25   for the '93 agreement.  All right.  So just so we're all -- so

```
 1    here we are talking about --

 2              THE COURT:  No. 6.

 3              MR. DAUCHOT:  Yes.  And there's just no issue but that

 4    the '973 covers lateral interbody fusion implants.

 5              THE COURT:  Was that a specific application that

 6    existed and just had not yet been assigned a number?

 7              MR. DAUCHOT:  I don't think it even had been filed,

 8    and that's why it said file or to be filed.  And the question

 9    was, and here's the point, you're right, here it refers to a

10    single application.

11              THE COURT:  No, I was reading the judge's order from

12    November 3rd, and it said at page 9 where the district judge

13    had summarized in the order the language of the agreements and

14    specifically had -- all of the applications were in singular.

15              MR. DAUCHOT:  Well, on this one, it does say

16    application singular, but there's an easy explanation for that.

17    At the time -- and I think, look, at some point, there is some

18    testimony about it, but there's an issue about whether or not

19    you need to file, you can file a singular application to cover

20    it, or you need to cut it down to a number of applications

21    because the PTO won't let you, you know, fees and that type of

22    thing.

23              But I'm fairly certain that as of the time of this

24    agreement, the application or applications including the '661,

25    which is the instrumentation one, hadn't been filed.
```

1          Justin, correct me if I'm wrong, but I'm pretty sure

2     none of them had.

3          And so that's why I said, filed or to be filed.  And

4     I'll get corrected if I'm wrong about that one.  But the point

5     is, that folks knew about the technology.  It was front and

6     center.  Dr. Michelson had disclosed it to them.  And that's

7     really the import of the January 1994 memorandum from Mr. Boyd

8     where he says, look, this is all part of the technology that

9     we're going to get.

10          So as we -- so again, I know that there is a

11     reference, apparently, I saw it in the briefing, that at some

12     point Medtronic took the position that they didn't acquire

13     rights to the '973 in the Medtronic litigation.  The fact is,

14     Medtronic did.  And we point to the pretrial submission that

15     Medtronic filed where they claimed rights to the '973.  So

16     that's really the explanation.

17          And Judge McCullough, again, the issue about CIP's

18     and, if we read Judge McCullough's order and you obviously read

19     it, your Honor, the question really is, is Medtronic entitled

20     to new stuff, new technology, new inventions after the date of

21     these agreements.  And to the extent these new inventions are

22     covered by CIP, no, you're not entitled to them, but that is

23     not to say if you have an existing invention as of the time of

24     the agreements that happens to be captured in a filed

25     application, which is a CIP, that Medtronic isn't entitled to

1    it.  And those are two fundamentally different issues.

2         And certainly, that isn't that order.  I think that is

3    how NuVasive is reading it, and that's not what the order says.

4    We're talking about CIP technology that wasn't already granted

5    via these two vehicles.  Does that help clarify it, your Honor?

6         THE COURT:  When the litigation in 2004 was going on,

7    there's an order from April of that date that talks about eight

8    patents in particular and who holds the title to them.

9         MR. DAUCHOT:  Right.

10        THE COURT:  This patent is not one of them; yet, this

11   patent had already issued.

12        MR. DAUCHOT:  It had.

13        THE COURT:  So was there ever any contest between

14   Dr. Michelson and Warsaw over the ownership of this patent?

15        MR. DAUCHOT:  No.  And what that order was about was

16   as follows:

17        The patents that are expressly referenced in that

18   order are actually a subset of what was licensed.  These are

19   patents, and I'm going off of memory here because I didn't go

20   back, but my memory is, Dr. Michelson had asserted patents over

21   and against Medtronic on an alternative infringement basis,

22   right?  Sort of saying, look, you guys are breaching the

23   agreement.

24        If there's a breach, you know, it's sort of the

25   alternative pleading.  And I know this for a fact, there were

1    patent infringement claims asserted in the litigation.  The

2    '973 was not asserted against Medtronic by Dr. Michelson

3    because Medtronic had not, as far as Dr. Michelson knew at that

4    point in time, done enough or commercialized it.

5            Now there's an issue as to whether Medtronic did or

6    did not, but Dr. Michelson did not assert that patent.  In

7    fact, to the contrary, Dr. Michelson was asserting that

8    Medtronic hadn't done enough to develop that technology.  But

9    that is why the '973 isn't referenced in that order.  It's

10   limited to the patents that Dr. Michelson chose to assert

11   against Medtronic.  And that's where you see the reference from

12   Judge McCullough, who concludes that it was not an exclusive

13   license to these patents by virtue of the Zimmer, later

14   Spine-Tech, agreement.

15           And you know, I think that's another argument that

16   NuVasive makes, look, we're not an exclusive licensee by virtue

17   of the license that Dr. Michelson gave prior to the '93 and '94

18   agreements.  And that just doesn't work, because if you look at

19   that agreement, that doesn't cover the '973 technology.  It's

20   limited to a discreet number of patents that Judge McCullough

21   touched about upon in the order that you now have before you,

22   your Honor.

23           THE COURT:  All right.  The April order is to some

24   extent less helpful because in my understanding of this whole

25   sort of web of license rights and exchange, because it focuses

1  largely on this "option to purchase" language.  And whether or

2  not these patents were transferred under an option, they tried

3  to exercise it, and it was denied, and, of course, the whole

4  thing spiraled into cross-motions for various other

5  infringement and breach of contract actions, the original order

6  that --

7          MR. DAUCHOT:  The November order.

8          THE COURT:  The November order where the actual

9  contract was the subject matter of litigation as to what is the

10 scope of this contract, what was transferred or licensed

11 pursuant to the '93 and then the '94 agreements.  And so as I

12 understand it, your position is that the disclosures in the

13 schedule that is the 3.2 disclosure schedule to the '93 license

14 agreement, this ultimately issued patent, the '973 Patent,

15 would have been within the family under §6 of U.S. Patent

16 Applications related to lateral discectomy.

17         MR. DAUCHOT:  Absolutely.  And if it's not perfectly

18 clear from Judge McCullough's order, the briefing between the

19 parties makes it very clear.  Look, I was there.  I lived it.

20 As NuVasive notes, the issue really was Dr. Michelson in 1997

21 creating something, inventing something completely new that

22 wasn't on the table.

23         And the issue was, is Medtronic entitled to claim that

24 technology by virtue of the '93 and '94 agreements?  The

25 parties weren't talking about technology that at the time

1    existed that Dr. Michelson had shown them that they were

2    actively discussing and working with.  That wasn't the issue.

3    The issue was stuff that comes down the road.  And Medtronic --

4    and that's where you see Judge McCullough's -- he goes

5    extensively into the difference between a medical device and

6    technology.

7            Medtronic was taking the position that technology is

8    no different than the medical device because they were seizing

9    on a reference to future stuff in the technology definition to

10   try to, you know, make this continuation in part argument.

11   That's what was going on.  The focus really was not on what

12   existing technology had, in fact, been licensed over to Sofamor

13   Danek.  Is that helpful, your Honor?

14           THE COURT:  Yes.  Thank you.

15           Why don't you ...

16           MR. TRIPODI:  If you don't mind, let's just leave this

17   one up for now.

18           THE COURT:  Sure.

19           MR. TRIPODI:  If we could scroll down to pick up the

20   top of the disclosure of 3.2.  I don't know who is in control

21   of the exhibit.  Oh, it's on the Elmo.  All right.

22           THE COURT:  And just for record, this schedule is in

23   the filed documents at Docket 681-2, page 2424.  All right.

24           MR. TRIPODI:  So, your Honor, I've been thinking a lot

25   about this question, and I'm going to analogize it initially to

1    something the Court is familiar with, and later I may get a

2    chance to comment again.  This is a lot like claim construction

3    in this sense, we need to get it right or we end up back here

4    again.  And I appreciate that the Court -- it's clear that you

5    have a good understanding of these agreements already, and I'm

6    going to try my best to help confirm what you already appear to

7    understand.

8              And I would like to do that, and I think hopefully if

9    I do my job, everything in the end will be logically internally

10   consistent, okay?  These are not easy documents to comprehend.

11   I think, with the benefit of Western District of Tennessee

12   orders, it becomes easier, but there are still things that have

13   to be looked at and thought through.

14             Now you had mentioned the issues of applications with

15   serial numbers but not specifically identified.  What I would

16   like to do is talk first about -- before we go to schedule 3.2,

17   I would like to talk just briefly about spinal elements -- or

18   excuse me, Spine-Tech.  We'll talk about spinal elements at

19   another hearing.

20             Spine-Tech took a license from Dr. Michelson in 1992.

21   That's Warsaw's opposition, Exhibit 10.  And that license at

22   the time, it was always contemplated that in addition to

23   Spine-Tech, Dr. Michelson would license someone else.

24   Initially Dr. Michelson had licensed a company called Zimmer.

25   And then Zimmer terminated that license, and Dr. Michelson went

1    out and licensed Medtronic.  So even in the very beginning of

2    this, you have Spine-Tech with a license and you have Medtronic

3    with a license, and that's where we start.

4         So I want to follow the Spine-Tech piece of that

5    through.  Spine-Tech receives the license in 1992, and what

6    Spine-Tech was after was the '247 Patent and everything that

7    flowed from them, okay?  And if we look at the language of the

8    Spine-Tech license in Exhibit 10, it becomes clear that

9    Spine-Tech got a different grant then the folks at Medtronic

10   got.  If you look at Exhibit 10 in the Spine-Tech license, it

11   includes any patents, and I to want make sure I get the

12   language absolutely correct.  It includes any patents that

13   claim, I believe, it's claim priority.  It's all -- this is on

14   page -- Exhibit 10, page 123.  It says all U.S. and foreign

15   patents or applications claiming priority to U.S. Patent

16   505247409.

17        THE COURT:  Okay.  Stop for just a second.

18        MR. DAUCHOT:  Your Honor, we can put it up on the Elmo

19   for you.

20        THE COURT:  It's probably easier for me to read it on

21   the hard copy.  It's just that there's like 57,000 numbers.

22   Could you use the CM-ECF number at the top of the page.

23        MR. TRIPODI:  61-3 of 85.

24        THE COURT:  You know, at the top, it says it's a filed

25   document, and it's page blank of that.

```
 1            MR. TRIPODI:  Page 3 of 85.

 2            THE COURT:  Thank you.  That way it helps me find it

 3    more quickly.  Okay.  I am now at that page.

 4            MR. TRIPODI:  And it's displayed up here.  If you look

 5    at paragraph H, there is the Michelson license technology.

 6    That's what Spine-Tech is getting, and it includes the '247

 7    Patent.  That's the grandaddy patent at the center of all these

 8    discussions.  And it includes anything claiming priority to

 9    that patent.  So that's our starting point with Spine-Tech.

10    Now I believe Mr. Dauchot said Spine-Tech never got any rights

11    to the '973.

12            Can you grab the 1999 for me.

13            I'll put up in a second, the 1999 document, but I want

14    to give the Court the benefit of some background first.  So

15    Spine-Tech gets this license, and everything is going along

16    great, and they get the benefit of everything that issues, that

17    claims priority.  It doesn't say it's a continuation.  It says

18    claims priority to the '247.

19            In 1995, Gary Michelson files for the patent

20    application that ultimately becomes the '973, and he claims

21    priority all the way back to the '247, grandaddy -- great

22    grandaddy actually.  Michelson has many, many patents.  And

23    later, right before the '973 Patent is about to issue,

24    Michelson changes the priority claim.  He no longer claims

25    priority to the '247.  He shortens the priority claim so that
```

1    it only goes back as to an application, No. 479596.  For the

2    sake of the record, that's the '661 Patent.

3              THE COURT:  Okay.

4              MR. TRIPODI:  And we're just following the Spine-Tech

5    piece of this.  Now Spine-Tech and Dr. Michelson get into

6    litigation, and Spine-Tech is apparently upset that this

7    priority claim has been changed, so in 1999, as part of the

8    settlement of that litigation -- and this is Exhibit 7.  Let me

9    make sure I get this -- this is Exhibit 7 to NuVasive's reply.

10   At page 7 of the exhibit, there is a clarification that the

11   parties enter into.

12             THE COURT:  Okay.

13             MR. TRIPODI:  When you're ready, your Honor, I'll

14   continue.

15             THE COURT:  That's okay.  Go ahead.

16             MR. TRIPODI:  So in 1999, Spine-Tech and Dr. Michelson

17   clarify that pursuant to the license agreement that they had

18   entered in 1992, and this is the -- starting in paragraph 5, it

19   begins Michelson and Karlin agree that any patent issuing from

20   a patent application that at any time in its pendency

21   referenced U.S. Patent Application No. 025935 now issued as the

22   '247 Patent, the grandaddy, shall continue to be licensed to

23   Spine-Tech.  That is the '973 Patent.  And that is in the

24   settlement, because Dr. Michelson had changed his priority

25   claim.  He had dropped the '247 from the chain and was now

1  relying on the '661.

2         THE COURT:  I am so sure I did not follow any of that.

3  So...

4         MR. TRIPODI:  So the '973 would have originally been

5  covered under the Spine-Tech agreement.

6         THE COURT:  Okay.

7         MR. TRIPODI:  Dr. Michelson changed the priority claim

8  though, so it no longer claimed priority to the '247.

9  Spine-Tech says, wait a minute, that's our patent.  And as part

10 of this settlement, they confirm that it doesn't have to

11 currently claim priority to the '247.  It simply had to claim

12 priority at any point in time, even if amended or corrected.

13        THE COURT:  Okay.  So when it says in this paragraph 5

14 of this agreement that any patent issuing from a patent

15 application at any time of the pendency referenced application

16 205935, that's the application for the '247 Patent?

17        MR. TRIPODI:  Right.  Which is specifically listed in

18 paragraph 5.  There is no doubt that is, in fact, covered by

19 this paragraph.

20        So when Medtronic now says that Spine-Tech has no

21 rights in the '973 Patent, that's false.  The '973 Patent

22 claimed priority, which was originally filed the whole way back

23 to the '247, and this agreement was explicitly written to make

24 that clear.

25        So if the Court is comfortable, I'll move to the

1    Medtronic side.

2            THE COURT:  Well, I'm not sure what all of that

3    proved.  So are you saying the '973 Patent does flow from the

4    '247?

5            MR. TRIPODI:  It does.  And I have a document that

6    will show that.

7            THE COURT:  How does that help you?  Isn't that their

8    whole position is that this technology is all part of the same

9    family tree, and so when it was licensed to Warsaw, it included

10   this patent?  It was part of the application history that

11   followed?

12           MR. TRIPODI:  The '973 Patent was not applied for

13   until 1995, two years after the agreement with Medtronic.  So

14   even though their position is that it was old technology, it

15   actually wasn't filed until two years later, okay?  It was not

16   in existence.

17           THE COURT:  Well, that's fine.  Again I'm trying to

18   get back in the 1993 and the '94 agreements between Medtronic

19   and Dr. Michelson.  They talk about applications filed or to be

20   filed, and referenced certain kinds of inventions.  And their

21   position, as I understood that they just laid out here, was

22   that this particular, the scope of this particular invention,

23   while it not been reduced to an application in 1993 or '94, was

24   thoroughly contemplated by the parties as something that was

25   going to fall in the scope of those general descriptions.  And

1   it was no surprise and there has never been any argument

2   between these parties that when this application was filed, it

3   would go to them as part of their license agreement.

4           MR. TRIPODI:  And that, quite frankly, is wishful

5   thinking on Medtronic's part, but that is their argument.

6           THE COURT:  I don't know how anything you just showed

7   me disproves that.

8           MR. TRIPODI:  It doesn't.  And let me clarify, this

9   includes whether or not they're exclusive licensee.

10          THE COURT:  I want to know if they're a licensee

11  before we deal with whether they're exclusive.  You took the

12  train down a different track.  Can we go back to whether these

13  license agreements cover these patents.

14          MR. TRIPODI:  We can.  And with the Court's

15  indulgence, what I've just explained, what happened in

16  Spine-Tech, is all going to be relevant to understanding the

17  Medtronic part.

18          THE COURT:  I understand that in the context of this,

19  what you're saying is that this application when this agreement

20  was entered into in 1999, and by then, this patent had issued.

21          MR. TRIPODI:  Right.  And Spine-Tech was upset.

22          THE COURT:  That this patent, the original application

23  referenced back to the '247, even though it was subsequently

24  altered?

25          MR. TRIPODI:  It was altered to eliminate the

1    reference to the '247 for the purpose of extending its life.

2         THE COURT:  They specifically wrote something to

3    include at any time so that it would be captured within the

4    rights Spine-Tech had to practice these inventions under their

5    cross-license.

6         MR. TRIPODI:  Okay.  So now let me move to the

7    question then that you asked initially, which relates to these

8    numbers in the agreements in the '93, '94 Michelson/Medtronic

9    agreements.  We're very lucky we have the benefit of not only

10   the two Western District of Tennessee opinions, but we also

11   have the benefit of the Oxland expert report, which talk a lot

12   about what each of these paragraphs mean.

13        So let's start with the schedule disclosure, Schedule

14   3.2.  So Mr. Dauchot has already set the stage.  Michelson had

15   licensed his then existing technology, which is itemized in

16   both of these agreements in Schedule 3.2 in the '93 agreement

17   and in Schedules A and B in the '94 agreement.  He said, this

18   is what I am licensing to you.  And then in 2001, the battle

19   between Michelson and Medtronic erupt over what came later was

20   Medtronic's property or Michelson's property.

21        If we look at 3.2, and I'll just walk through it for

22   you, No. 1, clearly is the '247 Patent.  No. 2 is a threaded

23   spinal implant.  And if we look at those application numbers,

24   those are unrelated patents.  And Medtronic has not asserted

25   that they're at all related to the '973.

1          In fact, for the Court's benefit, the serial No.

2     07205935 is the '247 Patent Application.  The 07698674 is an

3     abandoned application that never issued as a patent, and the

4     top one, 07, it says 468240.  That's actually an error.  It's

5     07968240 issued as U.S. Patent 5741243.  These all three are

6     related to the '247.

7          In No. 3, paragraph, 3 we have the European patent

8     application.  In paragraph 4, a Canadian patent application.

9     In paragraph 5, this is related to an application entitled

10    Apparatus and Method of Inserting Spinal Implants, which became

11    U.S. Patent 5484437.  And then we get to paragraph 6.  As

12    you've read in the order from the Tennessee court, paragraph 7,

13    8, and 9 are catchalls, okay?  And the reference here to the

14    prior agreement is a reference to the Spine-Tech agreement.

15         THE COURT:  Right.

16         MR. TRIPODI:  So let's talk about paragraph 6 then,

17    because that's what Medtronic now asserts covers the '973.  So

18    the first important point is that the Western District of

19    Tennessee held that paragraph 6 relates to the '661 Patent,

20    okay?

21         THE COURT:  I couldn't find that.

22         MR. TRIPODI:  Let's find that reference for you.  And

23    if we go also to the Oxland report.  In fact, it's in the 2004

24    order.

25         THE COURT:  You gave me a reference to the April

1    order, I thought, to say that somewhere the Court determined

2    that paragraph 6 was the '661 Patent, but '661 doesn't appear

3    in that order I could find, so I couldn't piece that together.

4          MR. TRIPODI:  So while we're locating that for you.

5    As I recall the Court's order, your Honor, the Court said that

6    the paragraph 6 refers to a single application and that that

7    application matured into the '661 Patent.

8          This is Exhibit 6 in footnote 1.  I'll put that up.

9          THE COURT:  Okay.  So this is what you pointed me to.

10   So is one of these application numbers the '661?  Because I was

11   looking in there for somewhere where it says in this footnote

12   that paragraph 6 ultimately issued as the '661 Patent.

13         MR. DAUCHOT:  Yeah, it is.

14         THE COURT:  And I can't backtrack through the patent

15   to find out what the patents are.

16         MR. DAUCHOT:  The '836 is the '661.

17         THE COURT:  Okay.

18         MR. TRIPODI:  Thank you.

19         So what the Court has said in footnote 1 then, from

20   that, they have explained what's in paragraph 5 and paragraph

21   6.  And as I understand Medtronic's current argument, they're

22   saying, but paragraph 6 relates to more than paragraph 6

23   included the '973.  That is contradicted, No. 1, by this

24   footnote and the word "application" instead of "applications"

25   plural, but it is also inconsistent with what the Medtronic

 1    expert Oxland said in his expert report at the time of the

 2    litigation.

 3         THE COURT:  So if paragraph 6 in the Schedule 3.2

 4    talks about a U.S. Patent application of a particular title

 5    filed or to be filed was determined to be Application 394836

 6    which turned into the '661 Patent, then it's your position that

 7    that's what was licensed?

 8         MR. TRIPODI:  Right.  And as my colleagues have

 9    pointed out, there's also a reference in the 2003 order to this

10    schedule.  This is Exhibit 2.  It's page 21 of 41.  I'll put it

11    up as well.

12         THE COURT:  I have it.

13         MR. TRIPODI:  That says the definition of a medical

14    device, and then it says, disclosure schedule 3.2 has nine

15    paragraphs.  The first paragraph is one patent, the second

16    paragraph is three patent applications, and paragraphs 3

17    through 6 each list one patent application.  I'm going to show

18    you now what the Medtronic expert, Mr. Oxland, said at that

19    time about paragraph 6.

20         THE COURT:  Well, let me just -- hold that thought.

21         MR. TRIPODI:  Okay.

22         THE COURT:  So do you agree that the '661 Patent is a

23    patent?  You may be arguing maybe more than one patent could be

24    issued from this.  That would be contrary to the Court's

25    analysis.  Because he did say there's one application here or

1    is the -- well, the '661 issued.  That would be within

2    paragraph 6?

3            MR. DAUCHOT:  Yes.

4            THE COURT:  Okay.  Is the '973 a continuation or

5    divisional of the '661 or the application to the '661?

6            MR. DAUCHOT:  It's the CIP.

7            THE COURT:  So it's a not a continuation or a

8    divisional of that, so it wouldn't necessarily fall within the

9    scope of what the district judge said is the chain of title

10   that would maybe come from that paragraph 6 application?

11           MR. DAUCHOT:  Well, yeah, I mean, I think the short

12   answer is, if you take Judge McCullough literally about a

13   single application.  It's hard for me to answer these questions

14   because I know what the focus was.  This was neither here nor

15   there.  But the '661 certainly falls within it.  There was no

16   issue about it, but the implant was too.

17           And the Oxland report that he's referring to was

18   drafted in February of 2004, and the parties agreed by the time

19   this thing got around to trial in the pretrial order, that the

20   '973 was part of the stuff that was licensed.  So that

21   position, Medtronic ultimately abandoned.

22           MR. TRIPODI:  I disagree with that as well, your

23   Honor.

24           THE COURT:  You read contracts unless there is

25   ambiguity as to what they say on their face.  This contract

1    talks about an application, you know, U.S. Patent application,

2    not applications, covering this description.  And there is an

3    application that was filed that falls under paragraph 6 that

4    issued as a patent that is not the '973.

5            MR. DAUCHOT:  There's two answers to that.  No. 1, and

6    look, if we need to go back and find the evidence, we can go

7    back and find it.  The issue was at the time, the

8    instruments -- there's a reference here, your Honor.  Let's

9    take a step back.  There's a reference when you look at the

10   application, the application reference says instruments,

11   methods, and devices.

12           THE COURT:  Implants, actually.

13           MR. DAUCHOT:  The '661 does not claim devices.  There

14   was a separate application filed on the devices, but that

15   language, okay, it says application in the singular.  But it

16   talks about an application covering the three, and I don't have

17   it here.  I didn't -- you know, but in the back of my mind, I

18   want to say that at some point in time, it was anticipated that

19   all three of these things would be captured in a single

20   application, and only after that, was there a discussion made

21   to file a separate application on the device that is expressly

22   referenced in that paragraph.

23           Now if you want to get -- if we also look, there's

24   also, I think, a catchall about technology that is referenced

25   in these applications, and certainly the '661 addresses the

1    implant, but, you know ...

2         THE COURT:  No, that's fine.  I understand your point.

3    The description of the application that was before the Court at

4    the time covers implants, instrumentation, and method.  The

5    '661 is a portion of that, and it's your position the '973 is

6    the fusion implant portion of what was contemplated by that

7    application at the time.

8         MR. DAUCHOT:  That's exactly right.  That's the device

9    that's referenced.  And, in fact, to go back even further, Dr.

10   Michelson -- this was all the subject of the first trial -- he

11   showed them the device.  He had the jumbo lateral.  He

12   explained the concept behind the '973.  But we can slide into

13   that.

14        THE COURT:  That's fine.

15        I interrupted you, and you were going to explain why

16   that's not right.

17        MR. TRIPODI:  Once again, it's an interesting

18   argument.  It contradicts the plain language of the contract,

19   and there's nothing other than attorney argument to support

20   that position.  In fact, the documents that they've cited which

21   are parol evidence don't contain the facts that Medtronic would

22   like to see them contain.  They don't talk about the jumbo

23   implant, they don't talk about the '973.

24        The '973, once again remember, Michelson and Medtronic

25   are -- the reason these orders exist is they are fighting over

1    after-developed technology, right?  The '973 is a continuation

2    in part.  So it would not fall under the clause that allows

3    Medtronic to capture continuations, as the Court ruled in the

4    Western District of Tennessee.  Continuations in part are

5    outside of the grant.  So that means that the '973, according

6    to this contract, is not covered.  And that's consistent with

7    what their expert said about paragraph 6.

8           And as I mentioned, this, is Exhibit 5.  Okay.  So

9    let's start with, if we can, your Honor, with the assumptions

10   that the expert made.  Because while everyone is trying to

11   distance themselves now from the Oxland report, the Oxland

12   report starts from the premise in paragraph 1 that the

13   definition of medical device is limited to those things that

14   are specifically identified in Schedule 3.2, nothing more,

15   which is what the Court ultimately found.

16          THE COURT:  All right.

17          MR. TRIPODI:  Okay.  And then based on that assumption

18   which is consistent with the Court's order, he identifies the

19   patent and includes the application numbers which should be

20   useful to the Court.  That's under Medical Devise Heading A

21   License Agreement Disclosure Schedule 3.2.

22          THE COURT:  Okay.

23          MR. TRIPODI:  Okay.  And this confirms that Oxland

24   who -- you know, this is 2003 I believe that Oxland was opining

25   this.  Even though at that point in time, the '973 Patent was

1    in existence, he did not include that here.

2              THE COURT:  Okay.

3              MR. TRIPODI:  So hopefully it's clear at this point

4    between what the Western District of Tennessee said this

5    schedule includes and what Medtronic's own expert said it

6    includes, the '973 Patent is not part of that.  And, in fact,

7    to have included it in paragraph 6 would have been inconsistent

8    with the Court's order on continuations in part.  As I

9    mentioned at beginning, it's all logically consistent.  We

10   don't have to rely on argument about what could have, should

11   have applied, have been covered.  It all makes sense that

12   Oxland, the expert, didn't include the '973 because the 973 was

13   a continuation in part.

14             I don't believe at this point there is an argument

15   pending about whether Schedule A or Schedule B include -- or

16   excuse me.  I don't believe there is any argument that Schedule

17   A in the 1994 license includes the '937, but there was an

18   argument made about schedule B.  Schedule B, that's at Exhibit

19   4.

20             THE COURT:  Um-hmm.

21             MR. TRIPODI:  Once again, looking at the Oxland

22   report.  So once again, Schedule B, Medtronic argued today and

23   they argued in their papers, albeit without any evidence to

24   support it, that heading No. 2 includes push implants and that

25   the '973 must be included here because it has a disclosure of

1    push implants.  There is nothing to support that, and, in fact,

2    if you look at the Oxland report -- this is Exhibit 5, heading

3    B -- once again, Oxland is relying on the same assumption about

4    the meaning of medical device as it relates to the '94

5    agreement that the Court ultimately found that medical devices

6    are the specific things identified in the schedules.  So if we

7    look at what Oxland says in schedule B, he doesn't identify

8    which paragraph these come from, but he does say this is what's

9    covered, and there is no mention of the '973 Patent.

10          THE COURT:  Does it matter to you that he says "at

11   least the following"?  He doesn't say "only the following."

12          MR. TRIPODI:  It is an expert report, and he has left

13   the door open, I have to concede that.  But there's no evidence

14   in the record to contradict the fact that even at this point in

15   time when the '973 existed, Oxland didn't name it.  It's only

16   the convenience of this litigation that leads it to be

17   asserted.

18          THE COURT:  The description in Schedule B and I think

19   on those schedules, then on 3.2, which was very specific, there

20   were specific patents and applications assuming that Judge

21   McCullough was -- that they were identified later in the '661

22   as paragraph 6 and not the '973, schedule B seems much more

23   generic in its description of what applications would fall.

24   And I'm looking -- okay.  It's --

25          MR. TRIPODI:  If I could have just a second, your

1    Honor?

2        (Defense attorney discussion off the record.)

3            THE COURT:  So if No. 2 of Schedule B is patent

4    applications, plural, which is what the actual schedule says in

5    Exhibit 4 as opposed to what the judge wrote in his order where

6    he indicated a singular patent application.  So it contemplated

7    multiple applications covering non-threaded cylindrical push

8    implants filed or to be filed and this translateral spinal

9    implant of Patent '973 falls within that description, why isn't

10   it covered in that license?

11           MR. TRIPODI:  First of all, it does not fall within

12   that description, in our view, and there is no evidence.

13   There's attorney argument that it should or that they wish it

14   did, but given --

15           THE COURT:  Well, it was never litigated between

16   Warsaw and Dr. Michelson that this patent wasn't covered by the

17   license agreement, right?

18           MR. TRIPODI:  That issue, as I understand it, did not

19   come up because at the time, Medtronic was not using any IP in

20   the lateral space.  They were getting sued on implants that

21   were very different from the implants that are at issue in this

22   litigation.

23           And if the Court will indulge me for a second, that's

24   part of the reason that in our view it ought to be Dr.

25   Michelson and NuVasive sitting down at the table, because

1    Michelson had developed the '973.  It was a continuation in

2    part that was filed long after these agreements were entered

3    into.  He was the guy who was at war with Medtronic saying, you

4    have done nothing to develop my IP or my technology, I want

5    this all back, and, by the way, you've been underpaying me.

6         And if anyone is going to sit down at the negotiating

7    table and deciding what price -- he hated Medtronic at this

8    point.  Unless there is unequivocal evidence that they owned

9    this patent, it should be Dr. Michelson at the table.  And that

10   is the negotiation that the documents support.  There's no

11   evidence.  Other than conjecture, there is no evidence that

12   paragraph 2, which can be traced to a patent, and it should be

13   U.S. Patent 5785710.

14        THE COURT:  Okay.

15        MR. TRIPODI:  What we would like to see, your Honor,

16   is a trial at which Dr. Michelson, the inventor of this

17   technology, sits down at the table with a willing licensee,

18   someone who wants to change the industry, and they decide on a

19   number.

20        Just to preview, and I don't know if -- the Court is

21   well aware, I assume, that we filed Daubert motions.  The

22   effect of putting Medtronic at the table is that Medtronic now

23   wants its lost profits as part of the negotiation.  It doesn't

24   change NuVasive's view of the negotiation, per se.  It changes

25   their view.

1          They say, look, you're a competitor of ours, we would

2     not have licensed you because we would have lost lots and lots

3     and lots of money, so you should be paying us for what we're

4     giving up.  If Dr. Michelson is at that table, it is a

5     negotiation between the inventor and the company who wants to

6     use his invention.

7          THE COURT:  If Dr. Michelson in 2001 through '04,

8     however long this litigation took, was suing Medtronic saying,

9     you're not putting best efforts towards this technology, and

10    particularly that would be the technology disclosed in the

11    '973, then if even if they were the licensee and they weren't

12    exploiting it, how can they argue at the negotiation table that

13    you're taking our profits and our work from us if you're

14    telling me they weren't even using this technology, it wasn't

15    even in their arsenal of weaponry to compete with you.

16         MR. TRIPODI:  Right.

17         THE COURT:  So doesn't that in and of itself kind of

18    resolve this issue of what a willing licensor is going to

19    offer, because they're not going to say, look, we're out in the

20    market, we're selling this product, and if we license you to

21    it, then you know the license amount is going to have to

22    reflect some of what we're giving up in market share.  If

23    they're not in the market and that's the facts, then that's a

24    pretty poor argument.

25         MR. TRIPODI:  And as you will see in connection with

1  the briefing on the Daubert motions that is not what the expert

2  Dr. Neels has done.  He has basically taken Medtronic's lost

3  profits from the point that they entered the market years later

4  and used those as part of his reasonable royalty negotiation

5  and said, we never would have licensed you for a small amount

6  because we lost all of this money.  So in a perfect world,

7  you're absolutely right, if they're not in the market yet and

8  they're a willing licensor, they should be licensing without

9  regard to lost profits.

10         THE COURT:  That's not what we're here to talk about

11  today.

12         MR. TRIPODI:  Right.

13         THE COURT:  So in essence, the Court is in agreement

14  with counsel right now, with NuVasive, that paragraph 6 does

15  not appear to have been an application that resulted in the

16  '973 but rather in the '661 and that there's no evidence that

17  that application which the district court in 2004, after all of

18  these things had already issued, saw that as being more than

19  one application.  It was one application that turned into a

20  patent.  That patent was the '661, and the '973 is not a

21  continuation or divisional of that application that turned into

22  the '661, so I don't see how it was licensed under the 1993

23  agreement.

24         The 1944 agreement when you get to paragraph 2 that

25  talks about patent applications filed or to be filed on these

1   push implants, all I have from both of you is argument that it

2   either does or doesn't cover the '973.  You say it doesn't

3   because there's no writing that says it does.  They say it does

4   because it's descriptive subject matter of that provision.

5           MR. TRIPODI:  I would clarify the point this way, we

6   have a prelitigation document from Medtronic's own expert that

7   lists what he believes to be covered by Schedule B.  What you

8   have today is argument from Medtronic that contradicts that

9   report.  The '973 is never mentioned, and it would make

10  sense -- I mean, if you were Medtronic and you're arguing that

11  the '973 is disclosed, first, they want it in paragraph 6, then

12  they want it in paragraph 2 as a push implant.  The bottom line

13  is, we're not coming in with just the attorney argument.  We're

14  coming here with the expert report from Medtronic's own expert.

15          THE COURT:  All right.  So in this expert report, that

16  was Exhibit 5 or is Exhibit 5 where he's talking about the

17  purchase agreement schedules and he's listing what that

18  incorporates.

19          MR. TRIPODI:  And he also goes through for each of the

20  items in Schedule B.  He goes through and talks about what is

21  disclosed.  And when I said earlier that we believe it to be

22  the '710 Patent that's covered in item 2, he talks about the

23  '710 Patent under heading 4.

24          THE COURT:  Yes.

25          MR. TRIPODI:  Okay.  And he talks about the method of

1    insertion, involving push impact into each device into the

2    prepared spaces.  Clearly this body of patents that he's

3    talking about are unrelated to the '973.

4           THE COURT:  Why are we talking about these particular

5    patents?  Are these the patents that are the subject matter of

6    the litigation?

7           MR. TRIPODI:  They are not.  Well, I'm sorry.  I may

8    have been confused by the Court's question.  He's talking about

9    this because he's trying to clarify what he believes to be

10   covered by each of these schedules under the definition of

11   medical device.

12          And I have not been there, I don't know all the

13   details, but ultimately Medtronic wanted to exercise an option.

14   They had to buy what was in these license agreements, and Dr.

15   Michelson had refused to sell, and so there was a dispute

16   pending about, you know, and you saw that in the second of the

17   court orders.  You commented on it.

18          THE COURT:  Yes.

19          MR. TRIPODI:  But if you look through this body of

20   patents, these are not things that are related to the '973.

21          THE COURT:  Okay.

22          MR. TRIPODI:  There are some other nuances to these

23   issues, but I do want to make sure that the Court has a comfort

24   level with -- this is a very complicated series of agreements,

25   a very complicated set of facts, but as I said when I started,

1    when you break them down using the orders, they become

2    logically consistent, and that is what we like contracts to be.

3             THE COURT:  All right.  Thank you.

4             Counsel, you referenced, I don't know whether it was

5    testimony or whatever.  I'm not putting my hands on it.

6    Something from Dr. Michelson --

7             MR. DAUCHOT:  No.

8             THE COURT:  -- expressing his --

9             MR. DAUCHOT:  Just one point with Dr. Oxland.  I mean,

10   to give you background on the license agreement.  Medtronic

11   going into trial, as part of the pretrial order, stipulated

12   that the '973 Patent was licensed under the license agreement.

13            MR. TRIPODI:  Your Honor, if I can lodge an objection?

14            MR. DAUCHOT:  Can I finish?

15            THE COURT:  I'm sorry.

16            MR. TRIPODI:  I would like to object to the anecdotal

17   information that's not in the record.  I don't have any way to

18   challenge it.  If Mr. Dauchot could point to the paper, I would

19   be much more comfortable.

20            MR. DAUCHOT:  It's Exhibit 21 to our sur-reply.  We

21   filed a motion for leave.

22            THE COURT:  I know.  I got the sur-reply, the papers.

23   I did not get exhibits to it.

24            MR. DAUCHOT:  Okay.

25            MR. SINGH:  Your Honor, it's Docket 699-3.

```
1          MR. DAUCHOT:  The final pretrial order signed by Judge
2   McCullough in June 2004.  By that point in time, Medtronic was
3   taking the position that it did, in fact, have rights to the
4   '973 of the license agreement.  And if I could just give a
5   little bit more color to this Oxland report question.
6          THE COURT:  Okay.  Wait a second.  Was the ownership
7   of the '973 in dispute in that litigation?
8          MR. DAUCHOT:  No, no.
9          THE COURT:  So the fact that Danek or Medtronic was
10  saying that they had a right to that, and it's in the pretrial
11  order, it's not a disputed fact, it's not a fact the Court
12  found, it's just a statement, unchallenged statement that was
13  made by Danek.
14         MR. DAUCHOT:  Okay.  Well, look, both parties
15  stipulated.  The signatories have rights under the license
16  agreement.  Nobody disputed it.
17         THE COURT:  All right.  So --
18         MR. DAUCHOT:  And if I could put some background to
19  the Oxland report?  I didn't mean to speak over you.
20         THE COURT:  That's okay.  Go ahead.
21         MR. DAUCHOT:  The Oxland report, look, the background,
22  it deserves a little bit of context here.  Dr. Michelson took
23  the position that the '973, that Medtronic didn't exercise its
24  best efforts, and an initial tack on the part of Medtronic was
25  to say, well, we never got rights to the '973, we never got
```

1   rights to the device, we just got rights to the instruments and

2   methods under '661, and so to the extent that Dr. Michelson

3   complains that we didn't do our utmost to develop the devices,

4   hey, we never got rights to them.  Medtronic ultimately

5   abandoned the position going into trial.  I mean, it just

6   didn't -- you know, that dog didn't hunt.  It didn't work, so

7   they gave up on it, and they said, fine, we've got rights to

8   the '973.

9          And the fact of the matter is, the '973 is related.

10  You know, when we say continuations in part aren't a piece of

11  it, if you go back and look at it, your Honor, the '661 is, in

12  fact, related to the '973.  Yes, the '973 is a CIP.  The issue

13  is not whether the '973 is a CIP.  The issue is whether the

14  technology covered by the 973 CIP to the '661 is captured in

15  the license agreement and the purchase agreement.  And the fact

16  that the '973 -- so the issue goes back to what existed at the

17  time.

18         And, you know, your Honor, we can focus on application

19  alone.  And I get the idea that, you know, we don't want a

20  situation where we go through this whole trial and the Federal

21  Circuit reverses it.  I get the import.  But it's just not a --

22  it's just not an issue.  And I keep saying that.  It doesn't

23  make it so.  But I lived it and I know that at the time we got

24  to trial, you know, the '973 is a bundle of rights that went

25  over to Medtronic.  And Dr. Michelson was frustrated that

1    Medtronic didn't exercise its best efforts, and the jury

2    ultimately disagreed with the position, and Dr. Michelson lost

3    on that issue.  Fine.

4         But again, you know, we can -- and at some point in

5    time when we look at this, and if we want to leave for the jury

6    to decide, hey, it's going to be a question of fact for the

7    jury.

8         THE COURT:  No, this is a question of contract

9    interpretation.  I think it's a matter of law.

10        MR. DAUCHOT:  Unless there's ambiguity.  I would take

11   the position you have both parties marching into this trial

12   with Medtronic being faced with a failure to exercise best

13   efforts and saying, yes, indeed, we own rights to the '973.  I

14   mean, Mr. Tripodi is right, there was an Oxland report that I

15   think was created in 2003, well before the case went to trial.

16   By the time they got to 2004, they had abandoned that position.

17        But, you know, at a minimum, you have the intent of

18   the parties matters when you have both parties saying, yes.

19   And at the time, it wasn't as if it was in Medtronic's best

20   interest to say, hey, we have rights to the '973 indeed and can

21   argue to the contrary, right, looking at the failure to

22   exercise best efforts.

23        So I can only -- you know, I can only-- so when we

24   talk about whether or not as a matter of law this agreement

25   captures the '973, the license agreement does, look, we have

1  paragraph 6 of disclosure 3.2.  Nobody in this courtroom is

2  saying that paragraph 6 does not reference translateral

3  devices.  It's there.  It's in black and white.  And if we want

4  to say, well, its the application that covers the three, ergo,

5  the fact that you had one -- you know, the idea was to turn it

6  into two applications covering one device, and the other one

7  instruments and methods.  Okay, that means you don't have a

8  license to it.  Your Honor, look --

9            THE COURT:  Wait.  Okay.  I now have this portion of

10  the pretrial order from the Tennessee case and what you have up

11  here, this is paragraph 31, these appear to be contentions, not

12  stipulated facts.  So Danek is contending in the first part of

13  this paragraph that it has properly exercised its options under

14  Section 2.4 of the license agreement to purchase the technology

15  that is the subject of the license agreement and contends it's

16  entitled to a decree of specific performance, directing KTI to

17  assign to Danek all patents that allocations and such that are

18  the subject, including but not those limited -- not limited to

19  those listed.  And the '973 is in that list.  So isn't this

20  what you were arguing about though?  You were contending you

21  were entitled to these patents under the purchase option

22  agreement, and the Court said, no.

23            MR. DAUCHOT:  The Court never said no, and Dr.

24  Michelson said yes.  Danek contends Dr. Michelson agreed.

25            THE COURT:  Wait.  I'm sorry.

1          MR. DAUCHOT:  I don't think the Court ever said --

2          THE COURT:  Hold on.

3          MR. DAUCHOT:  Sure.

4          THE COURT:  The order that you all gave me from the

5   judge said the purchase option agreement did not give rise to

6   you getting these patents.

7          MR. DAUCHOT:  It doesn't say that.  Judge McCullough

8   never ruled that.  It was never ruled.  It was never ruled on.

9   The Court never ruled that.  And I haven't seen it where.

10         THE COURT:  If it's a contention that you're entitled

11  to these and the other side should be directed to assign them

12  to you --

13         MR. DAUCHOT:  Right.

14         THE COURT:  -- it seems to me that within that

15  contention, there is an agreement, because if it falls within

16  the scope of the agreement and it was clear, why haven't

17  they -- why aren't they asking the Court to order Dr. Michelson

18  to assign these patents to you, if they were already yours to

19  be had?

20         MR. DAUCHOT:  Because Dr. Michelson when we got to the

21  issue, their point was, you haven't exercised your best

22  efforts, therefore, I'm entitled to all of it back.  That was

23  the predicate.  So Dr. Michelson said, look, if you're not

24  going to exercise your best effort, hand it back, you breached,

25  you're not entitled to it.  And Medtronic was basically taking

1    the position, look, we have rights to it, there was no breach,

2    so we want a decree.  And in fact, the reason they stick it

3    that way is because the whole lawsuit was filed as a DJ on the

4    part of Medtronic against Dr. Michelson where Medtronic wanted

5    a declaration of rights as to a bunch of things.  But that was

6    the spitting match going on.

7              THE COURT:  All right.  Okay.  So what this is, that

8    is the list of patent applications, et cetera, that were the

9    subject of the license agreement that you subsequently -- that

10   Medtronic subsequently wanted assigned, wanted full and not

11   just exclusive license, but wanted ownership to, and that is

12   where the dispute was because it wasn't that you didn't have a

13   license to them, it was he was refusing to assign them because

14   he said you weren't acting under the license in good faith.

15             MR. DAUCHOT:  Yes, yes.  But that's the point, that's

16   the point, Dr. Michelson said, look, you know, the idea was --

17   look, the idea was, Medtronic, you violated these agreements,

18   hand me back all the technology.  Medtronic is taking the

19   position, we didn't breach anything, and we want an order.

20   Because one of Medtronic's big deals here was, this was a big

21   cloud on all of their technology, and they wanted the cloud

22   resolved.  It was about removing that cloud and just getting an

23   order once and for all to get all the stuff their way.  Nobody

24   was taking the position -- I sound like a broken record, so

25   I'll stop.  The patents --

1          THE COURT:  And let me just ... subsequently, this

2    patent was assigned to you?

3          MR. DAUCHOT:  Absolutely.  But Mr. Tripodi is right

4    that the -- well, not subsequently.  Medtronic had rights as of

5    that time.  Everybody agreed the rights were being challenged

6    on the basis of the performance issue, and subsequently after

7    this litigation was done, there was a settlement agreement

8    where Medtronic ended up acquiring everything, and everything

9    was just put to bed and out to rest.  It was all resolved.  And

10   Mr. Tripodi is quite right, that took place after the date of

11   the hypothetical motion.

12         THE COURT:  Were there any recitals in the settlement

13   agreement as to this being a dispute as to whether these were

14   under a license agreement?

15         MR. DAUCHOT:  I don't know.  The short answer is, I

16   certainly don't remember it.  I know my colleagues have looked

17   at it.  No, that issue was -- I just don't think it was teed

18   up.

19         THE COURT:  All right.  So let's go forward at this

20   point from the assumption that the license that you had in '94

21   or even '93 contemplated and covered what ultimately issued as

22   the '973 patent --

23         MR. DAUCHOT:  Right.

24         THE COURT:  -- as you had a license to practice it

25   and, therefore, the argument, their next level of argument is,

1    you're not an exclusive licensee because Spine-Tech also had

2    the right to practice the invention.

3              MR. DAUCHOT:  Sure.  There are two short answers to

4    that.  No. 1, the Spine-Tech agreement pertained to threaded

5    technology.  Something that counsel didn't note.  The license

6    was not as broad as counsel represented it to be.  It's

7    actually limited to threaded technology, and so Spine-Tech

8    never, never had rights to the push-in stuff.  And the push-in

9    stuff, we you know, is what is at issue in this case.  We're

10   not accusing any of the -- NuVasive doesn't have the threaded

11   stuff.  So that's answer No. 1.

12             And point No. 2, the -- okay.  We can read the

13   agreement, but if, in fact, Medtronic has rights to it, then it

14   wasn't, you know, Dr. Michelson's to give away, regardless of

15   what he chose to do in '99.  But the fact of the matter is, the

16   '99 agreement that counsel referenced doesn't apply to

17   non-threaded stuff.  The purchase agreement, the '93 agreement,

18   the license agreement pertains to the threaded technology,

19   okay?

20             And the 1994 purchase agreement, non-threaded.  That

21   was the division.  Spine-Tech and initially Zimmer got rights

22   to the threading.  And that's clear.  That's in the agreements.

23   Now what that implicates in terms of ultimate enforcement

24   rights with respect to the patents under the 2003 agreement is

25   a separate issue.  I don't think we even need to get there,

1    given the fact that the 2004 agreement passes rights to it,

2    certainly to the non-threaded technology.

3            For the record, there is no issue that the '973 is an

4    application that has in it cylindrical non-threaded technology.

5    That's just one example, and there are others.  And there's a

6    reference to it in the specification as well.  So this

7    application falls squarely within the scope of that -- of that

8    paragraph.

9            So you know, look, this is sort of -- if we take a

10   step back, your Honor, the big picture at the time was, again,

11   you had Spine-Tech threaded, and that's what the agreement

12   says.  I don't think there was any issue about it.  You have

13   the '93 agreement that applies to the field of use was

14   threaded.  You have the '94 non-threaded, you move forward in

15   time, we had this issue in 1999 to the extent it amended the

16   agreement in 1992 that they had with Spine-Tech was a thread

17   agreement, and then query whether or not that was even an

18   appropriate agreement given the earlier time grant.

19           And what's been at issue here and what has been

20   asserted by Warsaw, the hypothetical negotiation is basically

21   our question that Warsaw is an exclusive licensee to

22   non-threaded push-in implants that NuVasive wants to practice.

23   But that's kind of where we are.

24           And I do go back, your Honor, to the question of -- I

25   think it's our point that we don't think it's ambiguous, we

1    don't.  We think it's unambiguous, and it captures, again, 3.2

2    references the devices, device technology, and then you have

3    the technology that captures it.  Granted, it says application.

4    We have the 2004 agreement that references this application by

5    description.

6          You know, if NuVasive wants to take the position that

7    gee, this thing never really was licensed and make it an issue

8    at trial, okay, I obviously disagree with that proposition, and

9    we can have Dr. Michelson come in and testify about what he

10   intended to do.  And I guess what we have is, Dr. Michelson

11   take the stand and say exactly how much he would have licensed

12   that stuff over to NuVasive for.  That's kind of where we are

13   your Honor.  Look, it's in your hands.

14         THE COURT:  Oh, thanks.

15         MR. TRIPODI:  If I may respond to just a couple

16   things?

17         THE COURT:  Yes, please, and then we're going to wrap

18   up.

19         MR. TRIPODI:  So first of all, at the Court noted in

20   Exhibit 699-3, the pretrial order, I said at the beginning of

21   today's argument, depending on what we talked about today, I

22   will mention claim construction again.  I think it's kind of a

23   good setup for what is said here.  These are the contentions.

24   These are not -- and in the brief, and I want to read this,

25   because the brief says:

1          At the time the parties in that case filed their third

2   amended -- third joint amended pretrial order in April of 2004,

3   nine months after Medtronic's expert submitted his report, the

4   parties were in agreement.  This is on page 2 of the sur-reply.

5   The parties were in agreement that the '973 Patent was subject

6   to the 1993 license.

7          That is absolutely false.  And the document that was

8   cited, it is clear a contention.  It's by no means an

9   agreement.

10         We also heard Mr. Dauchot earlier in the day, I

11  believe, say the '973 covers both threaded and non-threaded

12  implants.  And we're hearing argument now for the first time

13  that there's exclusivity, because based on the Court's

14  assumption, right, or the assumption that you asked Medtronic

15  to make that they did have rights to the '973, why are they an

16  exclusive license, he said, oh, it's because these are threaded

17  versus non-threaded.  There is no doubt that Spine-Tech has

18  rights in the '973 Patent, okay?

19         And that comes from the 2005 purchase agreement.  This

20  is Exhibit 2, page 380.  It says Zimmer is currently a

21  licensee.  And just to clarify, Zimmer either bought or

22  succeeded to the rights of Spine-Tech.  It becomes a little

23  confusing.  But Zimmer is now in the shoes of Spine-Tech.

24  There's a reference to the '92 agreement and the '99 agreement,

25  okay?  And then later in the document, it says what the SDGI

 1   patent rights are, right?  And it identifies -- pardon me.

 2           Where is the exhibit that shows the '973 in the

 3   Zimmer?

 4           I think I pulled the wrong page.  I believe this is in

 5   the earlier report, your Honor.  I'm sorry for the confusion.

 6   The point that I wanted to make and I'm -- oh, yes, all right.

 7   Sorry.  It's the logic that I got wrong, not the exhibit.

 8   Zimmer has rights to the SDGI Patent rights, right, by virtue

 9   of the definition in paragraph 1.22.

10           Your Honor, I'm going to have to withdraw my argument

11   on this.  I'm not clear, and I apologize.  I think I'm confused

12   by the exhibits that I pulled.  The bottom line, in the 2004

13   purchase agreement immediately before it was executed,

14   Zimmer -- Michelson went to Zimmer -- I'm sorry.  Michelson and

15   Medtronic went to Zimmer and they signed a follow-up agreement

16   that acknowledged the rights that had been granted, so those

17   rights are rights in the '973 Patent.  And I believe we can

18   find a reference to it by number in the Zimmer agreement.

19           Is that correct?

20      (Defense attorney discussion off the record.)

21      MR. TRIPODI:  I would like to put Ms. Dashe up here to

22   explain, if the Court would indulge that.  The point is, it's

23   rights in the patent, so two companies are sharing rights in

24   the patent that Gary Michelson owns.  So even if they were

25   right and Medtronic had acquired rights to the '973, they're

1   still not an exclusive licensee.  The Western District of

2   Tennessee found that.  And the document, the purchase agreement

3   document, acknowledges those rights exist in Zimmer, who

4   succeeded those contract rights.  Hopefully that clarifies the

5   meandering path that I took the Court down.  My apologies for

6   that.

7            But I do take offense, your Honor, at the fact that

8   that document was represented -- and I'm talking about the

9   pretrial order was represented as an agreement.  It is not an

10  agreement that the parties had some stipulation about the '973

11  being covered.  It is absolutely not.

12           MR. DAUCHOT:  Your Honor, I mean, whenever somebody

13  says I made a false statement, I take some umbrage.  The brief

14  is actually accurate.  It says there was wan agreement.  Here

15  is what Dr. Michelson testified to back in Memphis.  So the

16  brief is accurate.  It says the parties agreed.

17           THE COURT:  I'm sorry.  What?

18           MR. DAUCHOT:  Sure.  That's his testimony.  If I could

19  just -- Mr. Tripodi basically said that --

20           THE COURT:  This is the face page of the -- okay.

21           MR. DAUCHOT:  So that's my only point.  And the

22  reason, actually I may have used today's stipulation, and if I

23  did, I misspoke.  But certainly there was in agreement.  When

24  you were in Memphis at that trial, nobody disagreed that the

25  '973, that Medtronic had rights to it.  Dr. Michelson, that's

 1    his testimony.  It was never an issue.  And in fact, if he had

 2    taken the position that it wasn't, he could hardly take the

 3    position that there was a breach because of failure to exercise

 4    due diligence or best effort.  So with that, I'll leave it be.

 5    One final point, your Honor --

 6         THE COURT:  I'm sorry.  If I read that, the follow-up

 7    question and answer, it would suggest that he was acknowledging

 8    that the '661 and the '973 are both patents that are licensed

 9    under paragraph 6.

10         MR. DAUCHOT:  Absolutely.  And that's exactly what I

11    said earlier, your Honor, that our position has always been

12    that the '661 and the '973 both by virtue of the fact you had

13    these applications split the way I described.  The '661 being

14    instruments and methods, the '973 being devices.  Everything on

15    the table as of the date these agreements were signed and on a

16    question of fact, Medtronic discussing them internally as of

17    January of 2004, Medtronic taking the position that this is all

18    stuff that we have rights to under these agreements.  I mean --

19         THE COURT:  Can I ask, what's the context of this

20    deposition?

21         MR. DAUCHOT:  It's not a deposition.  It's trial

22    testimony in Memphis.

23         THE COURT:  So this was Dr. Michelson's testimony

24    under oath in the Tennessee litigation where he acknowledged

25    under paragraph 6, the '973 was intended to be licensed?

 1          MR. DAUCHOT:  Yes, your Honor.

 2          THE COURT:  Well, that kind of cuts to the chase.  I

 3    mean, you know, there's lots of ways to get around these

 4    arguments, and a lot of this was done in the Tennessee court

 5    were things were sort of in flux.  The issues before that judge

 6    are not specifically the same as they are here.  But if the

 7    inventor, if it's his patent and it's his technology and he

 8    testified that it was licensed to Medtronic, then why would I

 9    find otherwise?  Do you have something where it's contrary to

10    that?

11          MR. TRIPODI:  Your Honor, I cannot explain the trial

12    testimony.  The only person who can do that is Dr. Michelson's

13    lawyer, Mr. Dauchot, okay?  He was the man who was on the

14    ground there.  The testimony may be convenient.  It is parol

15    evidence, and it is inconsistent with the Court's conclusions

16    about the coverage of the agreement, okay?  So it doesn't

17    matter whether it was under oath.  It is convenient for some

18    reason that we don't know, and it is inconsistent with what the

19    Court said the contracts cover.

20          I would like to mention two things.  I would like to

21    clarify, first of all, the argument they made before.  In the

22    end, it doesn't matter because if Medtronic is not the

23    exclusive licensee, then they're not at the table.  And I have

24    clarified.  So Zimmer --

25          THE COURT:  I'm sorry.  This is from document ...?

```
 1            MR. TRIPODI:  This is from the purchase agreement in

 2   2005.  That's Exhibit 2.  Zimmer now in 2005 is confirmed as a

 3   current licensee of the SDGI Patent rights.

 4            THE COURT:  I'm sorry.  This is not -- Exhibit 2 is --

 5            MR. TRIPODI:  So this is a statement that Zimmer has--

 6   sorry.

 7            THE COURT:  What I am I looking at?

 8            MR. TRIPODI:  Exhibit 2 to the original motion.

 9            THE COURT:  Okay.

10       MR. TRIPODI:  Now the SDGI Patent rights are the

11   rights that SDGI is acquiring in there agreement.

12            THE COURT:  Okay.

13       MR. TRIPODI:  And they are acquiring, as part of this

14   agreement, the '973 Patent.  But the problem is, Spine-Tech

15   already had rights to the '973.  So this agreement is

16   confirming those rights and confirming that they existed, and

17   it's giving them the name SDGI Patent rights because those are

18   what SDGI is getting when it's executing the purchase

19   agreement.

20            THE COURT:  And what page is this of that agreement?

21            MR. TRIPODI:  This is on the bottom center.  It's

22   referred to as Exhibit 2, page 380.

23            THE COURT:  Okay.

24            MR. TRIPODI:  And for Court's reference, before I go

25   to the schedule in paragraph 1.22, there is a definition that
```

1   it is consistent with the definition in the original Zimmer

2   agreement of SDGI Patent rights.  These are all things flowing

3   from the granddaddy patent.  The 2005 purchase agreement

4   confirms that Zimmer has rights, not to threaded, not to the

5   unthreaded, but rights in and to the '973 Patent.  And that's--

6        THE COURT:  Because at one time, the '973 Patent

7   claimed priority to the '247.

8        MR. TRIPODI:  Correct, correct.  So even if

9   Dr. Michelson said it was covered.  Even if we're wrong, which

10  we don't believe we are, we think that everything that we've

11  told the Court is internally consistent and logical.  Even if

12  these documents make clear that Spine-Tech, which is now

13  Zimmer, has rights to the patent that we're litigating here in

14  this case and at 2004 in the hypothetical negotiation, it

15  wouldn't have been Medtronic because Medtronic was not the

16  exclusive licensee.  It would have been Gary Michelson.  Thank

17  you.

18        THE COURT:  Okay.  Do you disagree with their position

19  that Zimmer had rights to practice the '973 Patent?

20        MR. DAUCHOT:  Certainly.

21        THE COURT:  Has to rights to practice?  I don't know

22  what the current --

23        MR. DAUCHOT:  Today, yes.  And on the threading.  But

24  today, yes.

25        THE COURT:  Okay.  Wait.  In 2004 --

```
 1              MR. DAUCHOT:  Right.

 2              THE COURT:  -- at the time the negotiation would have

 3    taken place --

 4              MR. DAUCHOT:  Right.

 5              THE COURT:  -- did they have rights to practice the

 6    '973 Patent?

 7              MR. DAUCHOT:  To practice any of the '973 Patents?

 8    Yeah.

 9              THE COURT:  Well, you either have right to practice.

10    There is nothing in here that carves out that you get certain

11    claims of certain --

12              MR. DAUCHOT:  No, I disagree with that.  That's just

13    threading.

14              MR. TRIPODI:  Once again --

15              THE COURT:  Rights means all claims to any future U.S.

16    foreign continuation for reexaminations that at any time during

17    pendency made claims of priority.

18              MR. DAUCHOT:  Yeah.  And it all ties back to the 1992

19    agreement.  But let me put it this way, certainly depending on

20    what we're looking at as of 1999, okay.  And I'm not going to

21    talk about 2005 because I just -- but as of 1999, at a minimum

22    and assuming that -- you know, my short answer is, did Zimmer

23    have rights in 1999?  I don't know given the exclusive rights

24    that are passed along in the '973 or in the 1993 agreement, but

25    we're talking about threaded implants in the 1992 agreement.
```

 1          MR. TRIPODI:  If I may, your Honor?

 2          MR. DAUCHOT:  If I could just --

 3          THE COURT:  I'm sorry.  There's too many agreements

 4   floating around.  So there's an agreement with Zimmer or their

 5   predecessor to license the '247 Patent?

 6          MR. DAUCHOT:  Yes.

 7          THE COURT:  And subsequently Zimmer argued they should

 8   get anything that hadn't claimed priority back to that?

 9          MR. DAUCHOT:  Subsequent to that, there was an issue

10   over whether or not the scope of the 1992 agreement should be

11   broadened, but the issue was not over the division between

12   threaded and non-threaded.  The issue was over whether or

13   not -- it was basically field of use, okay?  And the issue was

14   the number of patents captured within it.  But the question of

15   Zimmer being entitled to just the threaded technology was never

16   an issue.

17          And as an aside, I just don't know on the question

18   of -- there is nothing -- you know, you can be an exclusive

19   licensee to a certain field of use.  I mean, the Federal

20   Circuit --

21          THE COURT:  But you would need to say that somewhere.

22   This paragraph says nothing about you get just those aspects of

23   these patents that are threaded technology.  It says that you

24   have rights to issue pending patents listed on a particular

25   schedule attached to this thing and to all claims of any future

```
 1    U.S. or foreign continuations, et cetera.  So they're giving

 2    them rights to the patents, not to pieces of the patents.

 3         (Plaintiff attorney discussion off the record.)

 4              MR. TRIPODI:  Your Honor, I don't want to have the

 5    record be unclear.  I don't know the answer to your question,

 6    but from our perspective, it doesn't matter whether the license

 7    is limited to threaded or not.  The parties still share the

 8    entire patent, and because they shared the entire patent, they

 9    are not exclusive licensees.  The patent is owned by Gary

10    Michelson, okay?

11              THE COURT:  Okay.  Yes, I understand that.

12              MR. DAUCHOT:  Look, your Honor, the license grant

13    is -- okay, it's to Spinal-Tech hereby grants to Karlin.

14              That's actually the wrong one, Justin.

15              THE COURT:  I can't hear you.  Regardless if Dr.

16    Michelson could grant rights to Spine-Tech when you're claiming

17    he had given an exclusive license to Medtronic, how does that

18    comport?  Because he must have reserved rights to himself.

19    They can't be exclusive then, because even if he is only giving

20    them a field of use limited license, it's still a license to

21    practice the patent.

22              MR. DAUCHOT:  All right.  Let me -- what we have in

23    1992 with Zimmer, there is no issue the license is limited to

24    practice the patents with respect to threaded implants.  That's

25    just factual.  That's in the four corners of the license
```

 1    agreements.  I'm hoping one of my colleagues finds the license

 2    agreement that makes that clear.  And just from a licensing

 3    perspective, you can't license a patent insofar as to the

 4    extent of a limited field of use.  You can't.

 5              THE COURT:  Yes, I know you can't.  I understand that.

 6              MR. DAUCHOT:  And you can grant exclusive rights in

 7    that respect, if you wish, okay?  That's what happened in '92.

 8    Then we get into the 1993 agreement where there is an exclusive

 9    license that Dr. Michelson gives over to Sofamor Danek on the

10    threaded side.  That license makes references back.

11              THE COURT:  Yes, you're exclusive, but for this

12    carve-out.

13              MR. DAUCHOT:  Precisely right.  Then we have, the '94

14    purchase agreement covers non-threaded.  We don't have to deal

15    with it because Zimmer didn't have rights to the non-threaded.

16              Then we move forward to 1999.  And in 1999, there was

17    an additional amendment to the Zimmer agreement where there was

18    some broadening of the scope.  And at that point in time, the

19    1992 agreement was widened to broaden it along the lines that

20    Mr. Tripodi pointed out.  And I'm reading it, which is

21    basically, look, to the extent we previously limited it to just

22    stuff that was actually a priority to the '247, we're not going

23    to extend beyond it.  We all saw the language, okay?  So that's

24    as of 1999.

25              At best, at best what we have is a situation where you

1  have Zimmer at that point in time acquiring a right to practice

2  the threaded '973 technology, at best.  And why I say at best

3  is, I'm not sure.  And I'm not going -- you know, this isn't

4  part of this litigation, that if you read the agreements that

5  this is actually something that could have been granted, right?

6  I'm not going to throw Dr. Michelson under the bus.  I'm just

7  positing, I'm just questioning whether or not -- I mean, if you

8  have the '93 agreement saying we're subject to the '92, and

9  then later in time, the '99 is amended, I'm just not so sure

10  the '973 was part of that given the timing.

11      THE COURT:  Well, there certainly would be a question

12  as to the legitimacy of broadening the scope of an agreement

13  that existed and was a carve-out from an exclusive right that

14  was granted to somebody after that, and then to come back and

15  say, oh, that little carve-out, I'm going to make it broader

16  without getting your permission first to go there.

17      MR. DAUCHOT:  And what I just don't know enough of the

18  underlying facts in the communications to explain what

19  precisely happened at that point.  What I can say is that

20  regardless, when we're talking about Spine-Tech and we're

21  talking about Zimmer, we're talking about the threaded

22  technology.

23      Now we move up -- so as of the date of the

24  hypothetical negotiation, okay, we do have a situation where

25  Warsaw is the exclusive licensee.  If we -- you know, if we cut

1    everything else, is the exclusive licensee to practice

2    non-threaded technology under the '973 by virtue of the 1994

3    purchase agreement.  Whether or not, okay, it was the exclusive

4    licensee for purposes, it may be subject for some rights to

5    Zimmer.  I can go back to the case law.  I don't know that it

6    is necessarily consistent that you can be exclusive for

7    purposes of enforcing patents, subject to someone else's

8    rights.  I mean, that happens all the time, particularly when

9    you have settlement negotiations.  I'm aware of Federal Circuit

10   decisions on that, and I'm happy to provide them to the Court,

11   but that doesn't necessarily make you a nonexclusive, the fact

12   that you have the single carve-out.

13           But that aside, we're at the hypothetical negotiation.

14   What does NuVasive want to do?  NuVasive wants to practice the

15   non-threaded '973 technology.  That's what it built its company

16   on.  That's what it wanted to do.  And Warsaw had exclusive

17   rights to it.  I mean, and I haven't heard anything said by --

18   you know by -- the only argument that I've heard against that

19   proposition is the notion that Judge McCullough's order of

20   November 2003 and the reference to no CIP somehow automatically

21   means that the purchase agreement can't capture the '973

22   because the '973 was filed as a CIP.  And our short answer to

23   that is, that's neither here nor there because the technology

24   existed as of the time that the purchase agreement was signed.

25           MR. TRIPODI:  So if I may?

1              THE COURT:  We need to wrap this up.

2              MR. TRIPODI:  None of the arguments you're hearing

3    right now about threaded versus non-threaded were ever brought

4    up in the briefing of this motion.  This a brand new theory

5    that is coming out right here.  But the one thing that we

6    should know in all of this is that if there's anyone who has a

7    clear claim of title to rights in the '973 Patent, it is

8    Spine-Tech.  That was the '92 agreement, clarified by the '99

9    agreement, confirmed by the purchase agreement, which actually

10   lists the '973.  If there's a question about title and if

11   anyone has title, that's on the Medtronic side.

12             The claims of the '973 Patent do not distinguish in

13   many cases between threaded and non-threaded.  So hearing for

14   the first time an argument that was not presented in the

15   papers, the problem is that both these parties have rights.

16   They have rights in the same claims, and they have rights in

17   the spine space.  That is all the more reason that Gary

18   Michelson should be at the negotiating table.

19             And I said at the beginning of this hearing, that I

20   thought it was like claim construction, we want to get it

21   right.  I know one way that we can get it right, your Honor.  I

22   am willing to stipulate on behalf of NuVasive that Gary

23   Michelson and NuVasive are the parties at the table that is

24   going -- if we can get the stipulation from Medtronic that is

25   an irreversible stipulation, we will not be back here.  If we

 1    don't get it right, we have their agreement --

 2          THE COURT:  They're not agreeing to that.

 3          MR. TRIPODI:  Of course not.

 4          THE COURT:  That's why we're here.

 5          MR. TRIPODI:  Of course not.  But that's the point.

 6    If we don't get it right, then we're back, and I certainly

 7    don't want to be back here.  But if it looks to us that all

 8    papers and all the orders and all the agreements confirm our

 9    understanding --

10          MR. DAUCHOT:  Your Honor, just on this Spine-Tech.

11    This is -- just so it's clear, we begin at the front page of

12    the Zimmer license, the '92 license.  Implant means threaded.

13    Implant per threaded.  Then we move on, and the question is

14    just for purposes of what are Zimmer products and methods, and

15    that's what they have a license to practice.  And the Zimmer

16    products and the methods are --

17          THE COURT:  Well, okay.  Once you get to the last

18    agreement of 2005, there's a definition for the field.  They're

19    granting them a royalty bearing license to practice these

20    patents within the field, and the field is very specific that

21    it's threaded implants.

22          MR. DAUCHOT:  Right.

23          THE COURT:  So I understand your point was that the

24    initial carve-out to them was for threaded implants.  That was

25    the license that they had, that it may have been broadened in

1   terms of the patents that subsequently incorporated that, but

2   the field never got broader.  It was threaded implants.

3          MR. DAUCHOT:  Right.

4          THE COURT:  If you were suing them for infringement of

5   a threaded implant, you might be in a different position than

6   you were right now, because this case is about non-threaded

7   implants.

8          MR. DAUCHOT:  And one additional point on this whole

9   question of Judge McCullough related to the '973 wasn't subject

10  to the license agreement, why on earth -- if that's what Judge

11  McCullough had ruled in November of 2003, why on earth would

12  Judge McCullough allow Dr. Michelson to proceed forward with a

13  claim that Medtronic had not exercised best efforts in

14  commercializing the '973 under the license agreement?  And why

15  on earth, if that were, in fact, the ruling, is the testimony

16  that you saw, was that even allowed.  The fact of the matter

17  is, that's not what Judge McCullough --

18         MR. TRIPODI:  And, your Honor --

19         MR. DAUCHOT:  If I could just finish?

20         MR. TRIPODI:  The only answer to those questions is

21  Mr. Dauchot.  That's the problem here.  We have no way of

22  verifying what he is saying or representing.

23         MR. DAUCHOT:  Your Honor, if I could just finish?

24         THE COURT:  Go ahead.

25         MR. DAUCHOT:  Yeah.  It's not just Mr. Dauchot.  The

1    record is the record.  And what Mr. Dauchot is saying is, in

2    fact, consistent with the record.  And the fact of the matter

3    is, Dr. Michelson proceeded on that claim.  That's why I saw

4    the testimony that we had up there.  Judge McCullough allowed

5    the testimony, and Judge McCullough allowed the claim.

6    Ultimately Dr. Michelson lost on the claim to try to say they

7    didn't exercise best efforts to perform under the agreements,

8    and so be it.

9            Again, putting that issue aside, if we really focus on

10   the --I'm not -- on the non-threaded stuff, there's not even an

11   issue.  And the Federal Circuit is absolutely clear.  I'm happy

12   to provide your Honor with, you know, with some additional

13   citations to that effect, but you can't -- a licensee is

14   perfectly -- or a licensor, I should say is entitled to split

15   up rights to a single patent and divvy them up on an exclusive

16   basis.  You can have exclusive licenses that way.  And Warsaw

17   was the exclusive licensee to the unthreaded stuff.  It just

18   was, so --

19           THE COURT:  All right.

20           MR. TRIPODI:  Your Honor, can I make one comment if

21   we're ready to move --

22           THE COURT:  We're ready to wrap up because they need

23   to leave.

24           MR. TRIPODI:  Okay.  I do have one other issue to talk

25   to the Court about, and it may render moot this entire issue,

1    at least for some time.  As this Court may be aware, we have

2    made an offer of judgment.

3            THE COURT:  Yes, I do.  And I did want to talk about

4    that.  Go ahead.

5            MR. TRIPODI:  So the offer of judgment on the '933

6    Patent is for the full amount sought by Medtronic, $5.8 million

7    roughly.  They did not accept that offer.  We'll be making a

8    motion to dismiss the case on that basis.  That will be

9    forthcoming next week.  But in the meantime, it would seem to

10   us a stay of the '973 Patent would be in order.  We're happy to

11   pay Medtronic their money on the '933 Patent to dispose of the

12   patent that was the Court's concern at the last hearing.  I

13   think the Court's comment was, if we're going to try one

14   patent, we may as well try both, and there is no reason now to

15   try the '933.

16           THE COURT:  Well, with regard to the Rule 68 offer,

17   what's the problem there?  They made you an offer for what they

18   said was your demand.

19           MR. DAUCHOT:  A couple problems.  One was a footnote

20   where they seem to hedge.  I'm not sure -- the short answer is,

21   we're not quite sure what the offer is, and they're bound to

22   the extent there is an offer, that's it within its four

23   corners.  So problem No. 1, there's a footnote where there's

24   some sort of, you know, money may not even exchange hands.

25   Issue No. 1.

1          Issue No. 2, there's nothing in the offer about -- the

2     '933 Patent has a life until ...?

3          MS. LOTFOLLAHI:  Several.

4          MS. WICKRAMESEKERA:  How many more years?

5          MS. LOTFOLLAHI:  Several.

6          MR. DAUCHOT:  I want to say 2024, but don't hold me to

7     that.  It's alive.  There's nothing in there how we're going to

8     deal with that.  It's an incomplete offer, it's unclear, and we

9     are not going to accept it.

10          THE COURT:  Well, obviously, you haven't, so ...

11          MR. DAUCHOT:  And we haven't.

12          THE COURT:  All right.  The case is going to continue,

13     and I can go back and read this stuff and give myself a

14     headache and make you wait forever, but based on the arguments

15     that were made today and the evidence before the Court,

16     including but not limited to Dr. Michelson's own testimony that

17     he understood the '973 Patent to be subject to the license

18     agreement and that the exclusivity of the license to Warsaw

19     carves out certain provisions to another company but does not

20     seem to cover the claims that are at issue in this case, I find

21     Warsaw is the proper party to the hypothetical negotiation, and

22     you should proceed as you have up to this point with preparing

23     with the proper parties at the table, Warsaw and NuVasive, to

24     determine a reasonable royalty.

25          I do, and I haven't even looked at the Daubert stuff

1    yet.  I don't know if it's all briefed.  But with the

2    understanding, again, that I hope your experts in preparing

3    their opinions are recognizing that the standard at a

4    Hypothetical Negotiation is a willing licensor and a willing

5    licensee.  You better not be putting up numbers that would

6    suggest if they want to license this patent they're going to go

7    out of business by doing it, because that doesn't reflect

8    willing.

9           And so the numbers -- it has always occurred to me

10   both in my prior life as a litigator and also as a judge that

11   if we're talking about a reasonable royalty, the experts really

12   should not be exponentially apart.  They may not agree, but no

13   one should be at an eight-figure number and the other person at

14   a four-figure number, because somebody in that context is not

15   being reasonable.

16          So I would hope that these experts are looking at this

17   in the context of, can they still make a profit and use this

18   invention, and you want to let them use this invention and get

19   what you're due, and not run this to a number that would, in

20   essence, make it impossible for them to practice the patent,

21   because that's not the goal here.  And this is on remand, I

22   think because there was overreaching the first time on legal

23   theories that the Federal Circuit rejected, so let's get into

24   some real numbers and see if you can work this out.

25          I would encourage you still on the '933 to see if you

1    can reach terms that are acceptable, a lump sum royalty or an

2    ongoing royalty would be for the life of that patent so that it

3    would further uncomplicate the case.  But given the nature of

4    the reexamination of this matter, I won't stay the case because

5    of that.  I think you need to get to a number here and know

6    what is at risk.

7         That doesn't mean you can't ask to stay execution of

8    the judgment post-bond while the reexamination continues, but I

9    think it will be helpful in reaching a business resolution here

10   if they knew what they were at risk to have to pay, whether

11   it's worth pursuing the negotiation or trying to negotiate off

12   that final number, because there ultimately will be a number.

13   It's inevitable.  The patent has been found valid and

14   infringed.

15        MR. DAUCHOT:  The '933, the products at issue are no

16   longer being used.

17        THE COURT:  Well, then you need to perhaps include

18   something of that nature in settlement discussions, that you

19   agree you're not going to go back and use it.

20        MR. DAUCHOT:  Okay.

21        THE COURT:  After you resolve it, if there's no longer

22   continuing use and ongoing royalty, it would be moot.

23        So thank you.  This was very interesting, an unusual

24   issue.  And I look forward to seeing you for -- when I review

25   the Daubert, we may set a hearing.  We have a hearing January

1    8th.

2              MS. LOTFOLLAHI:  The hearing is the 4th, your Honor.

3              THE COURT:  That's not going to go.  You can forget

4    that.  That is the first day we get back.  I am going to have a

5    very busy criminal calendar to catch up for being down a week

6    and a half.  So we will review the documents and then contact

7    you for a convenient date for a hearing on your Daubert

8    motions.

9              MR. DAUCHOT:  Thank you, your Honor.

10             MS. LOTFOLLAHI:  Thank you, your Honor.

11             MR. TRIPODI:  Thank you, your Honor.

12        (Court in recess at 4:10 P.M.)

13        *** End of requested transcript ***

14                  CERTIFICATE OF OFFICIAL REPORTER

15

16             I, Mauralee Ramirez, Federal official Court Reporter,
     in and for the United States District Court for the Southern
     District of California, do hereby certify that pursuant to
17   Section 753, Title 28, United States Code that the foregoing is
     a true and correct transcript of the stenographically reported
18   proceedings held in the above-entitled matter and that the
     transcript page format is in conformance with the regulations
19   of the Judicial Conference of the United States.

20             Dated this 8th day of December  2015.

21
               /S/ Mauralee Ramirez
22             _____
               Mauralee Ramirez, CSR No. 11674, RPR
               FEDERAL OFFICIAL COURT REPORTER
23

24

25